**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| NETCHOICE,<br><br>     *Plaintiff*,<br><br>     v.<br><br>MICHAEL HILGERS, in his official capacity as Attorney General of the State of Nebraska,<br><br>     *Defendant*. | Case No.   4:26-cv-3149 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      Nebraska's Parental Rights in Social Media Act ("Social Media Act" or "the Act"), which takes effect July 1, 2026, is the latest attempt in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors.  Books, movies, television, rock music, video games, and the Internet have all been accused in the past of posing risks to minors.  Today, similar debates rage about "social media" websites.  These debates are important, and the government may certainly take part in them.  But the First Amendment does not take kindly to government efforts to resolve them.

2.      Nevertheless, some states have recently taken it upon themselves to try to restrict minors' access to constitutionally protected speech on some of the most popular online services.  Courts across the country have rejected those efforts as inconsistent with the First Amendment.  *See, e.g.*, *NetChoice v. Jones*, 2026 WL 561099, at *10-12 (E.D. Va. Feb. 27, 2026) *appeal filed*, No. 26-1252 (4th Cir.); *NetChoice v. Murill*, 812 F.Supp.3d 594, 643 (W.D. La. 2025) *appeal filed*, No. 23-30016 (5th Cir.); *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1220-23, 1234 (N.D. Ga. 2025) *appeal filed*, No. 25-12436 (11th Cir.); *NetChoice, LLC v. Reyes*, 748 F.Supp.3d 1105, 1120-23, 1134 (D. Utah 2024) *appeal filed*, No. 24-4100 (10th Cir.); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F.Supp.3d 1011, 1032-34, 1044 (W.D. Tex. 2024) *appeal filed*, No. 24-50721 (5th Cir.); *NetChoice, LLC v. Yost*, 778 F.Supp.3d 923, 947-57 (S.D. Ohio 2025) *appeal filed*, No. 25-3371 (6th Cir.); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *7-10, 17 (W.D. Ark. Mar. 31, 2025) *appeal filed*, No. 25-1889 (8th Cir.).  And rightly so.  While states certainly have a legitimate interest in protecting minors who use such services, restricting the ability of minors (and adults) to access them via age verification and parental consent requirements is not a narrowly tailored means of advancing any such interest.  While the state perhaps "has the power to *enforce* parental

1

prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend," it "does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown v. Entmt. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to proselytize young people." *Id.* They "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

3.      Like the laws that have preceded it, the Social Media Act violates the First Amendment. *See* LB 383, §§26-30 (2025).[1] The Act requires "social media platform[s]" to verify the age of every individual seeking to create an account and obtain express parental consent before allowing a minor to become an accountholder. §28(1)-(3). The Act, moreover, does not limit its reach to "social media" as that term is commonly understood. It defines "social media" broadly to reach video-sharing platforms like YouTube, blogging platforms like Dreamwidth, messaging boards like College Confidential, and services for sharing research papers like Social Science Research Network (SSRN). By restricting the ability of minors (and adults, who must now prove their age) to access these websites, Nebraska has "with one broad stroke" restricted access to valuable sources for speaking and listening, learning about current events, "and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

4.      On top of that, the Act requires targeted companies to provide parents with tools to monitor every single post the minor makes, as well as all responses and messages sent to or by the

---

[1] Unless otherwise indicated, all statutory citations are to LB 383.

minor on social media. §28(4)(a)-(b). That remarkable requirement burdens First Amendment activity as well. Minors are far more likely to self-censor if they know that their parents are monitoring every post and private message they send and receive. Worse still, if the minor is speaking with another minor in Nebraska, the Act requires covered websites to give *other parents* insight into the minor's private messages too—even if the minor is discussing solutions for dealing with an abusive parent, or engaging in sensitive conversations with a significant other or friends.

5.      The state cannot begin to show that its age verification, parental consent, and parental surveillance provisions are necessary to advance any legitimate interest it may assert. Parents already have a wealth of tools at their disposal to limit what online services their minor children use, what they can do on those services, and how often they can use them. Indeed, other provisions of the Social Media Act already require covered websites to provide parents with tools to protect their minors (including tools to limit the amount of time their minors spend on the websites)—requirements that NetChoice has not challenged. §28(4)(c)-(d). Nebraska has not explained why those existing tools do not suffice to serve its interests. A "prophylaxis-upon-prophylaxis approach" is "a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *FEC v. Cruz*, 596 U.S. 289, 306 (2022). And Nebraska's felt need to impose access restrictions confirms that the point of its law is not to "support … what some parents of the restricted children actually want." *Brown*, 564 U.S. at 804. It is instead an impermissible attempt to impose "what the State thinks parents *ought* to want." *Id.*

6.      For these reasons and others, the Court should declare §§28(1), (2), (3), and (4)(a) and (b) of the Social Media Act unconstitutional and enjoin the Attorney General of Nebraska from enforcing them.

## THE PARTIES

7.    Plaintiff NetChoice is a nonprofit trade association for Internet companies. NetChoice's members include (among others) YouTube, TikTok, Meta Platforms, Inc., which owns Facebook and Instagram, Reddit Inc., Snap Inc., which operates Snapchat, Dreamwidth Studios, LLC, and Nextdoor.    A    full    list    of    NetChoice's    members    is    located    here: https://tinyurl.com/4xpmtmzu.  NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful.  NetChoice serves the interests of its members, which share a commitment to the vital First Amendment protections that the Social Media Act undermines.  NetChoice brings this action on behalf of its members to vindicate their First Amendment rights and the First Amendment rights of their users, and to prevent the economic and other injuries that the Social Media Act will cause members absent judicial relief.

8.    Defendant Michael Hilgers is the Attorney General of Nebraska.  The Social Media Act charges the Nebraska Attorney General with enforcement of its provisions.  §30.  Attorney General Hilgers is a resident of Nebraska.  NetChoice sues Attorney General Hilgers for declaratory and injunctive relief in his official capacity as the Attorney General of Nebraska.

## JURISDICTION AND VENUE

9.    NetChoice's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has subject matter jurisdiction under 28 U.S.C. §1331.  This Court has authority to grant legal and equitable relief under 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. §1651, and declaratory relief under 28 U.S.C. §2201(a) and 2202.

10.    NetChoice has standing to challenge the Social Media Act because: (1) it has

members who have Article III standing to sue in their own right; (2) challenging the Act is germane to NetChoice's associational purposes; and (3) individual participation by its members as parties is unnecessary to resolve this case. *See Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977); *NetChoice, LLC v. Fitch*, 134 F.4th 799, 803-07 (5th Cir. 2025); *Carr*, 789 F.Supp.3d at 1213; *Reyes*, 748 F.Supp.3d at 1118-19; *Paxton*, 747 F.Supp.3d at 1029-31; *NetChoice v. Yost*, 716 F.Supp.3d 539, 548-50 (S.D. Ohio 2024); *Griffin*, 2025 WL 978607, at *6.

11.     NetChoice has standing to bring this pre-enforcement challenge. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014). The Act takes effect on July 1, 2026, vests enforcement authority in the Attorney General, and exposes NetChoice members to civil penalties of $2,500 per violation. NetChoice's members have an "intention to engage in a course of conduct … proscribed by [the] statute," and its members face "a credible threat of prosecution thereunder." *SBA List*, 573 U.S. at 159.

12.     Venue is proper in the District of Nebraska under 28 U.S.C. §1391 because the defendant performs his official duties there and is therefore considered to reside in this District as a matter of law.

### BACKGROUND

13.     NetChoice is an Internet trade association whose members operate many online services, including Facebook, Instagram, X, YouTube, TikTok, Snapchat, Pinterest, Reddit, Dreamwidth, and Nextdoor. These services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104. On Instagram, users can share photos of everyday moments and express themselves with short, fun videos. On X, "users can petition

5

their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions. On TikTok, users can find advice, support, and empathy. On Snapchat, users can communicate with friends and family in fun and casual ways. On Pinterest, users can discover ideas for recipes, style, home décor, and more. On Reddit, users can join communities dedicated to shared interests and make their knowledge accessible to each other. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. And on Dreamwidth, users can share blog or journal entries or creative work with friends and family.

14. Like adults, minors use these websites to engage in an array of First Amendment activity on a wide range of topics. Minors use online services to read the news, connect with friends, explore new interests, follow their favorite sports teams, and research their dream colleges. Some use online services to hone a new skill or showcase their creative talents, including photography, writing, or other forms of expression. Others use them to raise awareness about social causes and participate in public discussions on salient topics of the day. Still others use them to build communities and connect with others who share similar interests or experiences, or are seeking support from others who understand their experiences.

15. These websites also engage in their own First Amendment activity. They curate and disseminate third-party speech to their users and, as a result, produce a "distinctive expressive offering." *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024). To take just a few examples, both Facebook and Instagram curate and disseminate third-party content to their users based on their judgment about what content users are likely to enjoy seeing and what content is appropriate for them. Snapchat curates feeds by using algorithms that show users content that may be particularly relevant to them based on their previous interactions. YouTube likewise disseminates videos to

users based on YouTube's judgment about what users may find especially interesting and what is appropriate for them. Reddit curates user feeds based in part on the communities they have joined or visited and the content they view, upvote, and downvote. And Dreamwidth removes content across its service that it deems objectionable under the standards in its terms of service and also provides a single limited forum on a separate page where users can go to view suggestions for accounts that they may be interested in based on what accounts their friends follow. These websites also engage in speech when they post their own speech on the service. For example, Dreamwidth's owners post updates on important topics to their users directly through the service so that users and visitors can stay abreast of issues impacting the service. *See, e.g.*, Denise Paolucci, *Mississippi Site Block, Plus A Small Restriction on Tennessee New Accounts*, Dreamwidth (Aug. 31, 2025), https://tinyurl.com/57fkt9dj.

16. Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree online services like Facebook, Instagram, X, YouTube, TikTok, Snapchat, Pinterest, Reddit, Dreamwidth, and Nextdoor are appropriate for minors. But concerns that new means of communication may be harmful to minors are hardly new. The same basic concerns animating discussion about minors' access to the Internet have been raised repeatedly in the past about other types of speech and other mediums of expression.

17. In the 1800s, for example, "penny dreadful" publications were condemned for glorifying criminals and were blamed for youthful delinquency by the media and parents alike. *See* James B. Twitchell, *Preposterous Violence: Fables of Aggression in Modern Culture* 169 (1989). Decades later, comic books were derided as "particularly injurious to the ethical development of children." *Juvenile Delinquency (Comic Books), Hearings Before the*

*Subcommittee to Investigate Juvenile Delinquency*, 83rd Cong., 2d Sess. 86 (1954) (testimony of Dr. Frederic Wertham). Movies were accused of "possess[ing] a great[] capacity for evil, particularly among the youth of a community." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952). Television too. *See, e.g.*, Surgeon General's Scientific Advisory Committee on Television and Social Behavior, *Television and Growing Up: The Impact of Televised Violence, Report to the Surgeon General*, U.S. Pub. Health Serv. (1971), https://tinyurl.com/39xcysnk; *Juvenile Delinquency (Television Programs): Hearings Before the Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary*, 83d Cong., 2d Sess. (1954). In the 1980s, "partly clad, long-haired rockers who sing about sex, sado-masochism, suicide, murder and other things" were the problem. *See* I. Molotsky, *Hearing on Rock Lyrics*, N.Y. Times (Sept. 20, 1985), https://tinyurl.com/yrknwwf8. A decade later, families and lawmakers alike raised concerns about the harmful effects of the Internet. *See* H.R. Rep. No. 105-775, p.7 (1998). Concerns about violent video games followed soon after. *See Brown*, 564 U.S. at 789-90.

18.    As these historical examples reflect, people inevitably have different opinions about what content and mediums are appropriate for minors. Some believe that Mark Twain's *Adventures of Huckleberry Finn* is inappropriate because it contains racial epithets; others think it is a uniquely valuable piece of literature. *See* Alvin Powell, *Fight Over Huck Finn Continues: Ed School Professor Wages Battle for Twain Classic*, Harvard Gazette (Sept. 28, 2000), https://tinyurl.com/ye2xwphb. Some think *Saving Private Ryan* is too violent for minors; others think it imparts valuable lessons. *See Graphic 'Private Ryan' Not For Kids*, Chicago Tribune (Aug. 6, 1998), https://tinyurl.com/44tf6jfr. Some think that video games are unduly violent. *See* William Siu, *I Make Video Games. I Won't Let My Daughters Play Them*, N.Y. Times (Oct. 2, 2022), https://tinyurl.com/muakc2hh. Opinions likewise differ greatly when it comes to whether

8

and to what extent it is appropriate for minors to use online services like Facebook, Instagram, X, YouTube, TikTok, Snapchat, Pinterest, Reddit, Dreamwidth, and Nextdoor.

19.     There are certainly legitimate concerns underlying both sides of these debates, and the government can provide parents with resources to help them make their own judgments about what speech is appropriate for their minor children, and whether and how they may use social media.  But when the government crosses the line into deciding for itself which constitutionally protected speech minors may access, courts have invalidated such efforts as inconsistent with the First Amendment.  *See, e.g.*, *Brown*, 564 U.S. at 794-95 (invalidating law prohibiting distribution of violent video games to minors without parental consent); *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-14 (1975) (invalidating law prohibiting display of movies containing nudity at drive-in theaters).  "Minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may the government bar public dissemination of protected materials to them." *Erznoznik*, 422 U.S. at 212-13 (citation omitted).  The government may, for example, "adjust the boundaries of an existing category of unprotected speech" like obscenity "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794.  After all, something that is not obscene for adults may still be obscene for children.  *See, e.g.*, *Free Speech Coal., Inc. v. Paxton (FSC)*, 606 U.S. 461, 477-78 (2025).  But that does not give the government carte blanche to restrict wide swaths of "fully protected speech," *id.* at 484-85, or "create a wholly new category of content-based regulation that is permissible only for speech directed at children," *Brown*, 564 U.S. at 794.

20.     In a Nation that values the First Amendment, the preferred response from the government is to let parents decide what speech is appropriate for their minor children, including by using tools that make it easier for them to restrict access should they choose to do so.  Market

9

forces typically drive industries to be responsive to parents' concerns. The movie, music, and video game industries, for example, have all developed sophisticated ratings systems to assist parents.

21. The same is true of the Internet. Plaintiff's members and others have developed sophisticated tools and technologies that allow parents to supervise and restrict what their minor children see and how they see it. Parents who wish to limit minors' access to online services like Instagram and YouTube, or to filter or monitor the content to which they are exposed, have many options at their disposal.

22. ***Device-level restrictions.*** Parents can decide whether and when to let their minor children use computers, tablets, and smartphones in the first place. And those who choose to let them use such devices have many ways to control what they see and do. Apple, for example, provides parents with tools to limit how long minors can spend on their iPhones, iPads, and MacBooks. *See, e.g.*, Apple, *Use parental controls to manage your child's iPhone or iPad*, https://tinyurl.com/uxfnna4y (last visited May 12, 2026). It also provides them with tools to control what applications (*e.g.*, Facebook, YouTube, and Reddit) minors can use, set age-related restrictions for those applications, filter online content in Safari and on other applications, and control privacy settings. *Id.* Google, Microsoft, and Samsung similarly offer parental controls for their devices. *See* Google, Family Link, *Help Keep Your Family Safer Online*, https://tinyurl.com/mr4bnwpy (last visited May 12, 2026); Microsoft, *Getting Started with Microsoft Family Safety*, https://tinyurl.com/yc6kyruh (last visited May 12, 2026); Samsung, *Manage Family Groups and Parental Controls with Your Samsung Account*, https://rb.gy/u4y1sz (May 12, 2026). And many third-party applications allow parents to control and monitor minors' use of Internet-connected devices and online services. *See, e.g.*, Alyson Behr, *The Best Parental*

*Control Apps in 2025, Tested by Our Editors*, CNN (Jan. 2, 2025), https://tinyurl.com/s6bje2jd.

23.    ***Network-level restrictions***.    Cell carriers and broadband providers also provide parents with tools to block apps and websites from their minors' devices, ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours.    *See, e.g.*, Verizon, *Verizon Family*, https://tinyurl.com/ycyxy6x6 (last visited May 12, 2026); AT&T, *AT&T Secure Family App*, https://tinyurl.com/d995ya2u (last visited May 12, 2026); T-Mobile, *Family Controls and Privacy*, https://tinyurl.com/57run7ac (last visited May 12, 2026); Comcast Xfinity, *Set Up Parental Controls for Your Home Network*, https://tinyurl.com/mpny6txv (last visited May 12, 2026).    Most wireless routers (the devices that provide wireless Internet throughout a home) contain parental control settings as well. *See* Molly Price & Ry Crist, *Parental Controls Are Easy to Set Up on Your Wi-Fi Router: Here's How to Do It*, CNET (June 26, 2025), https://tinyurl.com/mtvdwypu.    Parents can use those settings to block specific websites and applications (Facebook, YouTube, etc.) if they do not want their minor children to access them. *See, e.g.*, Netgear, *NETGEAR Smart Parental Controls*, https://tinyurl.com/34e4hxv4 (last visited May 12, 2026).    They can limit the time spent on the Internet by turning off their home Internet at specific times during the day, pausing Internet access for a particular device or user, or limiting how long their minor children can spend on a particular website or service. *Id.*    And they can set individualized content filters for their minor children and monitor the websites they visit and services they use. *Id.*

24.    ***Browser-level restrictions.***    Parental controls on Internet browsers offer another layer of protection.  Google Chrome, Microsoft Edge, and Mozilla Firefox all offer parents tools to control which websites minors can access.  *See, e.g.*, Mozilla, *Block and Unblock Websites with Parental Controls on Firefox*, https://tinyurl.com/6u6trm5y (last updated Aug. 11, 2022).

Microsoft offers "Family Safety," which allows parents to filter digital content and place screen time limits. *See* Microsoft, *Microsoft Family Safety*, https://tinyurl.com/zuseucpr (last visited May 12, 2026). Google has a similar feature. It also provides parents with "activity reports," allowing them to see what apps and websites their minor children are accessing the most. Google, *Google's Parental Controls – Google Safety Center*, https://tinyurl.com/kwkeej9z (last visited May 12, 2026).

25. ***Application-level restrictions.*** On top of all that, NetChoice members provide parents with many tools to decide what their minor children can see and do on their services. And they have devoted extensive resources to developing policies and practices to protect minors who use them.

26. For starters, services operated by NetChoice members, including Facebook, Instagram, TikTok, and Snapchat, prohibit minors under 13 from accessing their main services. Some members offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13. *See* YouTube for Families Help, *Important Info for Parents About YouTube Kids*, https://tinyurl.com/2z6cw92p (last visited May 12, 2026); YouTube Help, *What Is a Pre-Teen Supervised Experience on YouTube*, https://tinyurl.com/2uat3j5r (last visited May 12, 2026). These services allow parents to select content settings, set screen-time limits, and otherwise oversee minors' use of the services.

27. NetChoice members also expend significant resources curating the content users post on their services to ensure that it is appropriate for adults and teens alike. Members restrict the publication of (among other things) violent and sexual content, bullying, and harassment. Some prohibit content that encourages body shaming and promote content that encourages a

positive self-image. Several use "age gating" to keep minors from seeing certain content visible to adults, or younger teens from seeing content visible to older teens. For example, Reddit enforces an age gate to ensure that users under 18 cannot access mature content or not safe for work communities. *See* Reddit Help, *Why is Reddit Asking for My Age?*, https://tinyurl.com/yufr9tcn (last visited May 12, 2026). Snapchat, meanwhile, has special ads restrictions for teens. Snapchat, *The Teen Experience on Snapchat*, https://tinyurl.com/3k4kt66k (last visited May 12, 2026). NetChoice members implement their policies through algorithms, automated editing tools, and human review. If a member determines that a piece of content violates its policies, it can remove the content, restrict it, or add a warning label or a disclaimer to accompany it. And members can (and do) suspend or ban accounts that violate their policies.

28.     NetChoice members also provide users with tools to curate the content they wish to see. Users can generally choose whom to follow. Users can also generally block or mute other users and control who may see and interact with their own content. Some members provide users with tools to exclude specific categories of content they wish to avoid. Facebook users, for example, can alter the content Facebook displays by hiding certain types of content or opting to see fewer posts from a specific user or group (or blocking them altogether). Instagram users can select a "not interested" button to filter out content they do not wish to see. They can also use keyword filters (for example, "fitness" or "recipes" or "fashion") to do the same.

29.     NetChoice members also empower parents to monitor their children's online activities on their services.

30.     Facebook offers supervision tools that parents and guardians can use. Parents can see how much time their teens have spent on the Facebook app. They can set scheduled breaks for them and see their Facebook friends. Parents can also review some of their teens' privacy

13

settings and content preferences and see the people and pages they have blocked. *See, e.g.*, Meta, *Supervision on Facebook*, https://tinyurl.com/595h985k (last visited May 12, 2026).

31.     Instagram enables parents and guardians to set time limits for their teens, set reminders to close the app, monitor the time spent on Instagram, and monitor accounts followed by their teens and the accounts that follow them. Parents can also review the accounts blocked by their teens, as well as their teens' privacy, messaging, and sensitive content settings. *See, e.g.*, Instagram, Help Center, *About Supervision on Instagram*, https://tinyurl.com/zxxmmbhb (last visited May 12, 2026). Instagram recently announced that users under 18 will automatically be placed into "Instagram Teen Accounts," which default to the strictest privacy settings and have limitations on who can contact teens, which content they can see, and what time of day they receive notifications. Minors under 16 will need a parent's permission to relax any of these Instagram Teen Account settings. Instagram also provides additional supervision features, including features that allow parents to monitor with whom their teens are chatting and what they are seeing. *See, e.g.*, Instagram, *Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents* (Sept. 17, 2024), https://tinyurl.com/22fwuzz9.

32.     YouTube offers a "supervised experience" for teens (separate from the supervised experience for minors younger than 13), allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teens' channel activity (such as uploads, comments, and subscriptions); and (3) to choose whether to link accounts between a parent and teen. YouTube, *Choices for Every Family*, https://tinyurl.com/2dpetf76 (last visited May 12, 2026). YouTube has also developed features and policies directed at promoting digital wellbeing among teens and children, such as turning auto-play off by default, refining its recommendation systems so teens are not repeatedly exposed to potentially harmful content, and

14

reminding teens to take a break or go to bed. *Id.*

33.    Pinterest allows parents to create a "parental passcode," which permits them to manage their teen's accounts and provide guidance by managing social permissions. Pinterest, *Resources for Parents and Caregivers of Teens*, https://tinyurl.com/2mf7h5cc (last visited May 12, 2026).

34.    Snapchat provides parents with its Family Center, through which they can link their account to their teens' to view their lists of friends, review who they have recently communicated with, and restrict inappropriate content. Snapchat, *Family Center*, https://tinyurl.com/bdhysfwc (last visited May 12, 2026). Snapchat also allows parents to submit privacy requests on behalf of their teenagers. These requests may include options to access, download, and delete their teen's information, including the deletion of their teen's Snapchat account. Snapchat, *How Do I Make a Privacy Request for My Teen?*, https://tinyurl.com/3eu27psp (last visited May 12, 2026).

35.    TikTok offers Family Pairing, which allows parents to set a screen time limit, schedule time away, and customize or completely turn off comments. Parents can also decide who can send messages or message requests to their teen, and view who their teen is following and who follows them. Additionally, parents can see which accounts their teens have blocked and view all of their privacy settings, including account visibility and comment control settings. Parents can also enable Restricted Mode to limit their teens' exposure to certain content. TikTok, *Youth Safety and Well-being*, https://tinyurl.com/mrxjff82 (last visited May 12, 2026). TikTok also provides safeguards for all teen accounts, including extra safeguards for younger teens. For example, all teen accounts have a defaulted daily screen time limit of 60 minutes and cannot receive push notifications at night. Additionally, TikTok does not ever allow users under 16 to direct message others. TikTok also offers a Teen Safety Center that is accessible both through the app and via

15

browser which helps users with managing interactions (including setting an account to private, blocking/muting other users, and reporting accounts or content that violates TikTok's Community Guidelines), and provides support resources for suicide and self-harm, substance abuse, sexual abuse, and bullying prevention. TikTok, *Teen Safety Center*, https://tinyurl.com/mth2h5fd (last visited May 12, 2026).

36.    NetChoice members also restrict communications between adults and teens on their services, if they allow such communications at all.

37.    Facebook and Instagram, for example, all take steps to limit adults from messaging teens to whom they are not connected.  *See, e.g.*, Meta, *Introducing Stricter Message Settings for Teens on Instagram and Facebook* (Jan. 25, 2024), https://tinyurl.com/2ucma8sv.  X similarly limits teenage accounts by permitting them to receive direct messages only from accounts they follow.  X, *Information for Parents and Minor Users*, https://tinyurl.com/4us4377u (last visited May 12, 2026).

38.    Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected.  And Instagram Teen Accounts take this a step further by restricting direct messaging from people teens do not follow or are not connected to, regardless of the user's age.

39.    Snapchat makes teenage accounts private by default, which means teen users can communicate only with mutually accepted friends or with those whose phone number is already saved to their contacts.

40.    TikTok defaults accounts for users under 18 to private, which limits who can follow the account, view or interact with their posts, and read their bios.  TikTok does not allow direct messaging for accountholders who are under 16.

41.     Some NetChoice members also inform users when an adult who has been exhibiting potentially suspicious behavior attempts to interact with them.  If, for example, an adult is sending a large amount of friend or message requests to people under age 18, or has recently been blocked by people under age 18, Instagram alerts the recipients and gives them the option to end the conversation and block, report, or restrict the adult.

42.     YouTube and other members do not offer private messaging between users at all.

**Nebraska Parental Rights in Social Media Act**

43.     Notwithstanding the long line of cases striking down government efforts to decree what constitutionally protected speech minors may access, and the wealth of tools available to help parents tailor and restrict their minor children's Internet access should they choose to do so, Nebraska has taken it upon itself to decide what is appropriate for minors on the Internet.  In May 2025, Nebraska enacted the Social Media Act, which dramatically restricts minors' access to "social media platform[s]," significantly curtailing (and in some cases, eliminating) their ability to engage in core First Amendment activities on many of the most popular online services, as well as burdening adult social media users by requiring that they provide identification to verify their age. A true and correct copy of LB383, which sets forth the Social Media Act beginning at section 26, is attached hereto as Exhibit A. *See also* 2025 Neb. Laws 1036–38 (publishing slip law of LB383, 109th Leg., 1st Sess. (Neb. 2025)).

44.     The Act defines "[s]ocial media company" as a website or Internet application "that is an interactive computer service and that provides a social media platform."  §27(10).  It defines a "[s]ocial media platform," in turn, as a "website or Internet application" that allows users to create an account and "[e]nables" them to "communicate with other account holders and users through posts."  §27(11)(a).  That definition is extremely broad.  It appears to sweep in everything

17

from traditional "social media platform[s]" like Facebook and Instagram, to blogging websites like Dreamwidth, to messaging boards on websites like College Confidential, to research paper websites like Social Science Research Network (SSRN).

45.    At the same time, the Social Media Act exempts websites based on the content on those sites. For example, the Act excludes any website that "consist primarily of content that is not generated by account holders, but rather is preselected by the service, application, or website," and "[f]or which interactive functionality is incidental to, directly related to, or dependent upon, such preselected content," as well as "[o]nline shopping" sites, websites that "primarily provide[] career development opportunities," and websites where user interaction is "limited to reviewing products offered for sale" or "technical support." §27(11)(b)(iii)-(vii).

46.    The Act imposes several restrictions on access to "social media platform[s]" that are relevant here.

47.    The Act specifies that "a social media company shall not permit a minor to become an account holder" unless "the parent of such minor provides express parental consent." §28(1)(a), (2). To determine whether someone is a "minor"—defined as someone under the age of 18, §27(5)—the Act requires social media companies to "use a reasonable age verification method to verify the age of an individual seeking to become an account holder." §28(1)(a). Social media companies must then verify the parents' age, §28(2)(a), and obtain an "oath, affirmation, or form signed by the parent and returned to the social media company or third-party vendor by common carrier, facsimile, or electronic scan," §28(2)(b). The Act also requires a "social media company" to "develop a method for a parent to revoke consent." §28(3)(b).

48.    In addition to the age-verification and parental consent requirements, the Social Media Act requires "social media platforms" to "provide a parent of a minor account holder" with

18

the ability to "[v]iew all posts the minor account holder makes under the social media platform account" and "[v]iew all responses and messages sent to or by the minor account holder in the social media platform account." §28(4)(a)-(b). In other words, "social media platform[s]" not only must give a minor's parent the ability to monitor the minor's private messages; if the minor is speaking to another minor, the "social media platform" must give the other minor's parents the ability to monitor that conversation as well.[2]

49.     The Social Media Act gives the Attorney General enforcement authority. The Attorney General may "impose a penalty of up to two thousand five hundred dollars per violation" of the act's substantive provisions. §30. The Attorney General is not the sole enforcer, however, as the Act also allows any "person aggrieved" to seek injunctive relief, damages, and attorney's fees. §29.

50.     The Act is scheduled to take effect on July 1, 2026.

### Impact on NetChoice Members

51.     If the Social Media Act takes effect, it will impose severe burdens on NetChoice members.

52.     Given the Act's broad reach, multiple websites operated by NetChoice members appear to be regulated by the law, including, but not limited to: Facebook, Instagram, X, YouTube, TikTok, Snapchat, Pinterest, Reddit, Dreamwidth, and Nextdoor. All of those websites allow users to "create an account" and "communicate with other account holders and users through posts." §27(11)(a). None appears to meet any of the statute's exemptions.

---

[2] The Act also requires "social media platform[s]" to provide parents with the ability to "[c]ontrol the minor's privacy and account settings" and "[m]onitor and limit the amount of time the minor account holder spends using the social media platform." §28(4)(c)-(d). NetChoice does not challenge those requirements.

53.    None of these websites currently verifies the ages of all users in Nebraska before allowing them to create accounts.  Nor do any of these websites currently require parental consent before permitting a minor under 18 in Nebraska to create an account.  And none of these websites currently provide parents with the ability to "[v]iew all posts the minor account holder makes under the social media platform account," or "[v]iew all responses and messages sent to or by" their minors.  §28(4)(a)-(b).

54.    Because Facebook, Instagram, X, YouTube, TikTok, Snapchat, Pinterest, Reddit, Dreamwidth, and Nextdoor (among others) are "object[s] of" the Social Media Act, *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025), they would be forced "to take significant and costly compliance measures or risk" potential enforcement if the Attorney General is not enjoined from enforcing the challenged provisions of the Act, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988).  To avoid the substantial risk of an enforcement action, Facebook, Instagram, X, YouTube, TikTok, Snapchat, Pinterest, Reddit, Dreamwidth, and Nextdoor (among others) would need to implement systems to limit minors under 18 from accessing their services without parental consent and allow parents to monitor their minor's posts and private messages. They would also need to implement systems to conduct parental verification.  Making such changes would be costly and would require a significant amount of budget, resources, and staff investment over many months and possibly longer.

55.    Compliance would require, among other things, systems for collecting or verifying user age; identifying Nebraska users; obtaining, authenticating, recording, and revoking parental consent; verifying parental identity and age; creating parental-access dashboards; exposing posts, responses, and messages to parents; maintaining records sufficient to defend against enforcement; and redesigning privacy, security, trust-and-safety, and user-support workflows.  These

20

requirements would also force covered services to collect or process additional sensitive information from users and parents, creating privacy and security concerns. For some members, the only feasible way to comply with the Social Media Safety Act is to restrict Nebraskans from accessing their websites altogether.

56.    The Social Media Act will also hinder these websites' ability to communicate with their users, burdening their own exercise of First Amendment rights. All of these websites curate and disseminate third-party content to users that they think will be particularly relevant or interesting to them. *Moody*, 603 U.S. at 738. By conditioning access to these websites on age verification and parental consent, the Social Media Act burdens both the users' and the websites' exercise of First Amendment rights.

## CLAIMS FOR RELIEF

### COUNT ONE
### First Amendment
### Age-Verification and Parental-Consent Requirements - LB 383 §28(1), (2), (3)
### (42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §2201(a) and 2202)

57.    NetChoice re-alleges and incorporates by reference the preceding paragraphs and allegations as though fully set out herein.

58.    "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. Today, those places include the "vast democratic forums of the Internet." *Id.* The Supreme Court has therefore held that the First Amendment limits the government's ability to restrict access to "social media" websites like Facebook and YouTube, even when its ostensible aim is to protect minors.

59.    In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment.

21

The state tried to justify the law on the ground that it served its interest in keeping convicted sex offenders away from minors. *See id.* at 106. While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment even assuming intermediate scrutiny applied. *Id.* at 107-08. By barring sex offenders from accessing "social networking" websites altogether, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Id.* at 106-07. Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107. For the government to "foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

60.    That rule applies with full force to efforts to restrict minors' access to such services. The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik*, 422 U.S. at 212-13, and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Courts have therefore routinely invalidated government efforts to protect minors from the purportedly harmful effects of new forms of media by restricting their access to constitutionally protected speech.

61.    In *Brown*, for example, the Supreme Court held that a California law that prohibited the sale of violent video games to minors violated the First Amendment. 564 U.S. at 804-05. While California (and the dissent) resisted the notion that "persons under 18 have any constitutional right to speak or be spoken to without their parents' consent," the Court disagreed. *Id.* at 795 n.3. Of course, "parents have traditionally had the power to control what their children hear and say." *Id.* And the state perhaps "has the power to *enforce* parental prohibitions—to

require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id.* "But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent.*" *Id.* Otherwise, states could make it "criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors." *Id.* Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to" engage with them. *Id.* They "do not enforce *parental* authority over children's speech; they impose *governmental* authority, subject only to a parental veto." *Id.*

62. Given these long-settled principles, it is unsurprising that courts across the country have concluded that state laws restricting minors' access to "fully protected speech," *FSC*, 606 U.S. at 484, on "social media" websites—including laws requiring parental consent to access them—are unconstitutional. *See, e.g.*, *Jones*, 2026 WL 561099, at *10-12; *Carr*, 789 F.Supp.3d at 1223-27; *Reyes*, 748 F.Supp.3d at 1120-23; *Paxton*, 747 F.Supp.3d at 1032-34; *Yost*, 716 F.Supp.3d at 552-58; *Griffin*, 2025 WL 978607, at *17.

63. The Social Media Act's age-verification and parental-consent requirements should meet the same fate. They violate the First Amendment both on their face and as applied to NetChoice members who operate "social media platform[s]" under the Act.

64. Requiring minors to obtain parental consent before accessing social media restricts core First Amendment activity. Those provisions directly restrict minors from accessing websites where users engage in *speech* because people, including minors, use those websites to gain access to places "where they can speak and listen." *Packingham*, 582 U.S. at 104. As numerous courts have concluded, requiring minors to obtain parental consent to access "social media" abridges the

23

First Amendment rights of minors. *See, e.g.*, *Carr*, 789 F.Supp.3d at 1223-27; *Reyes*, 748 F.Supp.3d at 1120-23; *Yost*, 716 F.Supp.3d at 551; *Griffin*, 2025 WL 978607, at *17.

65.    The Act also burdens the First Amendment rights of *adults* to access covered services, as it requires adults to prove their age to do so.  §28(1)(a).  As courts have repeatedly reaffirmed, requiring adults to verify their age before accessing speech burdens First Amendment rights.  *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2024); *Reno v. ACLU*, 521 U.S. 844, 849, 856 (1997); *Carr*, 789 F.Supp.3d at 1224-30 (similar); *Griffin*, 2025 WL 978607, at *7, 17; *Yost*, 716 F.Supp.3d at 552.  The Supreme Court reaffirmed this principle just last Term, explaining that "submitting to age verification is a burden on the exercise of [First Amendment] right[s]." *FSC*, 606 U.S. at 483.  By forcing adults to either surrender sensitive personal information to access protected speech or drastically curtail their consumption of protected speech, the Act "discourage[s] users from accessing" online services and may even "completely bar" some adults from doing so.  *Reno*, 521 U.S. at 856.

66.    On top of that, the Act's age-verification and parental-consent requirements interfere with the First Amendment rights of NetChoice members to disseminate both their own and third-party speech to their users—restricting members' First Amendment rights as well.  *See Moody*, 603 U.S. at 731-32, 741; *Carr*, 789 F.Supp.3d at 1223-27; *Reyes*, 748 F.Supp.3d at 1120-23; *Yost*, 716 F.Supp.3d at 551-52.

67.    Because the age-verification and parental-consent requirements restrict access to large swaths of constitutionally protected speech, it is subject to heightened scrutiny.  *See Packingham*, 582 U.S. at 103.  Indeed, the provisions trigger strict scrutiny because the Act discriminates based on content and speaker.

68.    The Act is content based on its face because it singles out "social media

24

platform[s]" based on the content of the speech that minors may encounter on these services. That is plain on its face. The law covers any website that "[e]nables an account holder to communicate with other account holders and users through posts," but exempts "online shopping" websites, "career development" websites, and websites where user interaction is limited to reviewing products and technical support. That "overt subject-matter discrimination" renders the Act "facially content based." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 74 (2022).

69.     The Act also discriminates among speakers, because it defines "social media platform[s]" based on whether they permit users to "communicate with other account holders and users through posts," while exempting websites that consist "primarily of content … preselected by the service." §27(11)(a). The Supreme Court has repeatedly warned that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Laws that "discriminate among media," moreover, "often present serious First Amendment concerns," particularly where the discrimination risks "distort[ing] the market for ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659-60 (1994). Those concerns are on full display here, as the Act's speaker-based distinctions are unquestionably a means to control content. There is no coherent explanation for why Nebraska would favor provider-generated speech over user-generated speech save concerns about the content of each group's speech. That is why many courts have held that "[t]he elevation of … provider-generated content over user-generated content is a content-based regulation." *SEAT v. Paxton*, 765 F.Supp.3d 575, 592 (W.D. Tex. 2025) *appeal filed*, No. 25-50096 (5th Cir.); *Reyes*, 748 F.Supp.3d at 1122-23; *Yost*, 778 F.Supp.3d at 953.

70.     The Social Media Act cannot satisfy any level of heightened scrutiny, let alone strict scrutiny. Strict scrutiny requires Nebraska to demonstrate that the Act is "the least restrictive

25

means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Intermediate scrutiny requires it to show that the Act is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06. The state's interest must be "unrelated to the suppression of free speech." *FSC*, 606 U.S. at 495-96. And its chosen solution may not "burden substantially more speech than necessary to further those interests." *Id*. at 496. The Social Media Act flunks both levels of scrutiny.

71. The Social Media Act does not include any legislative findings or statement of purpose explaining the point of its restrictions. To the extent Nebraska seeks to justify the Social Media Act's restrictions on the theory that it "assist[s] parents to be the guardians of their children's well-being," that is squarely foreclosed by Eighth Circuit precedent. *See Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 959 (8th Cir. 2003). As the Eighth Circuit concluded, "the government cannot silence protected speech by wrapping itself in the cloak of parental authority." *Id.* at 960. Accepting such a "broadly-drawn interest as a compelling one would be to invite legislatures to undermine the first amendment rights of minors willy-nilly under the guise of promoting parental authority." *Id.*; *see also Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 689-90 (8th Cir. 1992).

72. Nor can Nebraska justify the Social Media Act on the theory that it has an important interest in protecting minors from the "inherent risk" that social media allegedly poses. Cindy Gonzalez, *Gov. Pillen, Lawmakers Take Aim at Youth Social Media and Cellphone Use*, Nebraska Examiner (Jan. 13, 2025), https://tinyurl.com/46ynse58. To the extent the state is concerned about particular content on "social media," *id.* (referencing "bullying" and "unhealthy obsessions with body flaws"), its interest is plainly related "to the suppression of free speech," *FSC*, 606 U.S. at 471, as there is no way to understand the Act as anything other than an effort "to protect the young

26

from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 795.

73.     To the extent the state is concerned about "addiction" to "social media," that concern is also "very much related to the suppression of free expression." *Moody*, 603 U.S. at 740. After all, the Act is not seeking to protect minors from "addiction" to nonspeech products like drugs and gambling. It seeks to protect minors from alleged risks from websites that allow them to access, engage in, and interact with speech. The state has no legitimate interest in restricting access to speech just because minors find it especially appealing. *See Sorrell*, 564 U.S. at 576. Nebraska could not, for example, validly restrict minors from accessing Disney+ because it offers too many shows that "contain … catchy jingles" or end in cliffhangers. *Id.* at 578. Nor could it validly restrict access to books that are page-turners or use shorter chapters to keep readers more engaged. As the Supreme Court has repeatedly made clear, "the fear that speech might persuade provides no lawful basis for quieting it." *Id.* at 576. Burdening access to protected speech citizens find especially interesting is especially inconsistent with the First Amendment

74.     In all events, the Social Media Act is not a narrowly tailored means of addressing a legitimate state interest. Even under intermediate scrutiny, the Act must not "burden substantially more speech than necessary to further [its] interests." *FSC*, 606 U.S. at 495-96. Unlike laws that restrict access to websites that contain content that is unprotected as to minors, *see id*. at 467-68, the Act restricts "with one broad stroke" access to services that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Indeed, the Social Media Act is not limited to traditional "social media" websites like Instagram and TikTok. It appears to sweep in everything from Dreamwidth to Pinterest to messaging boards on College Confidential (a community of current and aspiring college students), and research paper websites like Social

27

Science Research Network (SSRN), even though there is no basis to think that those websites pose any of Nebraska's concerns. And it has the practical effect of hindering adults' access to those services, even though Nebraska has no legitimate reason to do so. *See Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-57.

75.     On top of that, Nebraska has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490; *see Packingham*, 582 U.S. at 107. Even under intermediate scrutiny, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. Parents already have many tools to protect their minors on the Internet generally and "social media" specifically should they choose to do so. *See, e.g., NetChoice v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Reyes*, 748 F.Supp.3d 1126-30; *Yost*, 716 F.Supp.3d at 560; *Carr*, 789 F.Supp.3d at 1230. In fact, Nebraska itself uses such tools itself when it comes to limiting minors' access to "social media" in schools, including by restricting the use of cell phones during instruction time. *See* LB 140, §2(a)(i) (Neb. 2025). And the Social Media Act requires covered websites to provide many of those tools—in provisions that NetChoice has not challenged. Nebraska cannot explain why existing tools and the Act's separate provisions requiring covered websites to provide parents supervision tools (including tools to limit the amount of time their minors spend on the websites) are insufficient to achieve its goals. *See* §28(4)(c), (d). Even under intermediate scrutiny, "a prophylaxis-upon-prophylaxis approach" is "a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *Cruz*, 596 U.S. at 306; *see McCullen*, 573 U.S. at 490-91.

76.     Unlike the tools discussed above which allow parents and users to tailor restrictions to particular children, services, contacts, settings, and risks, the Act imposes access barriers on

28

covered websites regardless of a minor's age, maturity, parental preferences, or actual risk. That Nebraska insists on layering additional restrictions on top of those existing ones underscores that its real concern is that some parents choose not to utilize those tools to prevent their minor children from creating accounts on "social media" websites. But the First Amendment does not tolerate speech restrictions "in support of what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 804.

### COUNT TWO
### First Amendment
### Parental Surveillance Requirements - LB 383 §28(4)(a) and (b)
### (42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §2201(a) and 2202)

77.    NetChoice re-alleges and incorporates by reference the preceding paragraphs and allegations as though fully set out herein.

78.    The Social Media Act also requires covered entities to give parents tools to surveil "all posts the minor account holder makes" and "all responses and messages sent to or by the minor." §28(4)(a) and (b).[3]

79.    That remarkable requirement is likewise inconsistent with the First Amendment, and it is unconstitutional both on its face and as applied to NetChoice members who operate "social media platforms" covered by the Act.

80.    The First Amendment's guarantee of free speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). In "the context of fully protected expression," the "constitutional equivalence of compelled speech and compelled silence" is well "established." *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796-97 (1988).

---

[3] NetChoice does not challenge the requirements in §28(4)(c) and (d).

29

81.     The freedom to refrain from speaking includes the freedom to choose with whom to speak. And because one who chooses to speak may "desire to preserve as much of one's privacy as possible," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995), courts have recognized in a variety of different contexts that compelled disclosure of First Amendment activity can chill that activity just as much as direct restrictions.

82.     In *McIntyre*, for example, the Court struck down an Ohio statute that banned anonymous political speech. "Despite readers' curiosity" in "identifying" a speaker of a particular message, the speaker "generally is free to decide whether or not to disclose his or her true identity" while speaking. 514 U.S. at 341. "The decision in favor of anonymity may be motivated … merely by a desire to preserve as much of one's privacy as possible," but "[w]hatever the motivation may be," a speaker's "decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.* at 342.

83.     Likewise, in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), the Supreme Court struck down on its face a California regulation that required charities to disclose the names and addresses of their major donors. "It is hardly a novel perception," the Court explained, "that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effect a restraint on freedom of association as other forms of governmental action." *Id.* at 606. Such disclosure requirements have an "inevitable" "deterrent effect on the exercise of First Amendment rights." *Id.* at 607; *see also Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022) (similar). The Court has not limited that logic to laws compelling disclosure of the speaker, but has extended it to laws that compel disclosure of recipients of speech as well. *See Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87, 95 (1982).

30

84.   The Social Media Act's parental-surveillance requirements burden First Amendment rights for similar reasons.  By requiring covered websites to provide parents with the ability to monitor all their minors' posts and private messages, the requirements unquestionably "discourage [minors] from exercising rights protected by the Constitution."  *Bonta*, 594 U.S. at 610.  Minors will be far more likely to self-censor if they know that their parents are monitoring every post and private message they send and receive.  Worse still, if the minor is speaking with another minor in Nebraska, the parental-surveillance requirements demand that NetChoice members give other parents insight into the minor's private messages as well, even if the minors are discussing solutions for dealing with an abusive parent or engaging in an intimate conversation with close friends or significant others.

85.   Because the parental-surveillance requirements will "inevitably deter[] the exercise of First Amendment rights," *First Choice Women's Resource Ctrs., Inc. v. Davenport*, 2026 WL 1153029, at *8 (U.S., Apr. 29, 2026), they trigger (at a minimum) intermediate scrutiny.  *See Bonta*, 594 U.S. at 611-12; *Dakotans for Health*, 52 F.4th at 388-89.  In fact, the parental-surveillance requirements trigger strict scrutiny because whether they apply to a particular website turns on the content on the website.  As explained, the Social Media Act's definition of "social media platform" is content based in multiple respects.  Because the parental-surveillance requirements turn on that definition, they trigger strict scrutiny too.  *See Griffin*, 2025 WL 978607, at *9-10; *Carr*, 789 F.Supp.3d at 1219-23; *Yost*, 778 F.Supp.3d at 953-54.

86.   In all events, whatever level of scrutiny applies, the parental-surveillance requirements do not survive because they are nowhere close to a narrowly tailored means of achieving any important interest Nebraska could assert.  Again, the Act does not include any factual findings or statement of purpose.  But to the extent the state's interest is protecting minors from

31

particular content or individuals on social media, such as "online abuse" and "sexual predators," Gonzalez, *supra*, the parental-surveillance requirements are not even close to tailored. They apply to everything from blogging platforms like Dreamwidth to messaging boards on College Confidential—websites that could hardly be said to raise the state's concerns. *See Packingham*, 582 U.S. at 107; *Griffin*, 2025 WL 978706, at *8, 13.

87.   Moreover, here, too, Nebraska has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490. As discussed, Plaintiff's members already take active steps to give parents and minor users tools to protect them from cyberbullying, sexual predators, and the other dangers Nebraska might be concerned with. For instance, Snapchat not only offers parents the ability to supervise whom their teenagers have befriended and communicated with, but also works with law enforcement to detect sexual abuse and elevate concerns to the relevant authorities. TikTok allows parents to limit their teen's exposure to certain types of content and limit who may contact them. And NetChoice members generally remove content that violates their content-moderation policies, including harassment and other offensive content. Nebraska has failed to explain how existing tools do not suffice. Nor, again, has Nebraska explained how the other provisions of the law that NetChoice are not challenging are insufficient to accomplish its goals. Again, "a prophylaxis-upon-prophylaxis approach" is "a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *Cruz*, 596 U.S. at 306.

**COUNT THREE**
**EQUITABLE RELIEF**

88.   NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set herein.

89.   The Social Media Act violates federal law and deprives Plaintiff's members and

32

their users of enforceable federal rights.  Federal courts have the power to enjoin unlawful actions by state officials.  *See Ex parte Young*, 209 U.S. 123 (1908); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

90.     This Court can and should exercise its equitable power to enter a preliminary and permanent injunction enjoining Attorney General Hilgers, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing §§28(1)-(3), (4)(a)-(b) against NetChoice members who operate "social media platform[s]" as defined by the Act.

## COUNT FOUR
## DECLARATORY RELIEF

91.     NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set herein.

92.     The Social Media Act violates federal law and deprives Plaintiff's members and their users of enforceable federal rights.

93.     With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. §2201(a).  And they have the power to grant "[f]urther and necessary or proper relief based on a declaratory judgment or decree … after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."  *Id.* §2202.

94.     This Court can and should exercise its power under §§2201(a) and 2202 to enter a declaration that §2§8(1)-(3), (4)(a)-(b) on their face violate the United States Constitution and are therefore void and unenforceable, or, in the alternative, that they are unconstitutional as applied to NetChoice members who operate "social media platforms" as defined by the Act.

33

**PRAYER FOR RELIEF**

NetChoice prays for the following relief from the Court:

a.  A declaration, pursuant to 28 U.S.C. §2201(a) and 2202, that LB 383 §§28(1)-(3), and (4)(a)-(b) on their face violates the United States Constitution and are therefore void and unenforceable, or, in the alternative, that they are unconstitutional as applied to NetChoice members who operate "social media platforms" as defined by the Act.

b.  A preliminary injunction enjoining Attorney General Hilgers, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing LB383 §§28(1)-(3), and (4)(a)-(b) against NetChoice members who operate "social media platforms" as defined by the Act.

c.  A permanent injunction enjoining Attorney General Hilgers, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing LB383 §28(1)-(3), and (4)(a)-(b) against NetChoice members who operate "social media platforms" as defined by the Act.

d.  Such costs and reasonable attorneys' fees to which NetChoice may be entitled by law, including under 42 U.S.C. §1988.

e.  Any further relief that the Court deems just and proper.

[*Signature on next page.*]

NETCHOICE, Plaintiff

Erin E. Murphy* (D.C. Bar #995953)
James Y. Xi* (D.C. Bar #1617537)
Camilo Garcia* (D.C. Bar #90004901)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
camilo.garcia@clementmurphy.com


*pro hac vice forthcoming

*/s/Nathan D. Clark*
Nathan D. Clark (Nebraska Bar #25857)
CLINE WILLIAMS WRIGHT JOHNSON &
OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, NE 38508
(404) 474-6900
nclark@clinewilliams.com

May 14, 2026

35

LB383
2025

LB383
2025

┌─────────────┐
│ **EXHIBIT**  │
│             │
│   **A**      │
└─────────────┘

# LEGISLATIVE BILL 383

Approved by the Governor May 20, 2025

Introduced by Storer, 43; at the request of the Governor; Ballard, 21; Bosn, 25; Clouse, 37; Dover, 19; Hardin, 48; Holdcroft, 36; Ibach, 44; Kauth, 31; Lippincott, 34; Meyer, 17; Prokop, 27; Murman, 38.

A BILL FOR AN ACT relating to minors; to amend sections 25-21,291, 25-21,302, 27-1301, 28-116, 28-320.02, 28-813.02, 28-833, 28-1463.01, 28-1463.02, 28-1463.06, 28-1601, 28-1602, 83-174.02, 84-205, and 87-302, Reissue Revised Statutes of Nebraska, and sections 28-813.01, 28-1354, 28-1463.03, 28-1463.05, 28-1701, 29-110, 29-119, 29-4003, 29-4309, and 29-4316, Revised Statutes Cumulative Supplement, 2024; to adopt the Parental Rights in Social Media Act; change the name of the Child Pornography Prevention Act to the Child Sexual Abuse Material Prevention Act; to prohibit conduct involving computer-generated child pornography; to prohibit receipt of child pornography; to transfer provisions of the Nebraska Criminal Code and the Child Pornography Prevention Act; to provide enhanced penalties; to define and redefine terms; to eliminate obsolete provisions; to harmonize provisions; to provide operative dates; to provide severability; to repeal the original sections; and to outright repeal section 28-1463.04, Reissue Revised Statutes of Nebraska.
Be it enacted by the people of the State of Nebraska,

**Section 1.** Section 28-1463.01, Reissue Revised Statutes of Nebraska, is amended to read:
28-1463.01 Sections 1 to 6 of this act 28-1463.01 to 28-1463.06 shall be known and may be cited as the Child Sexual Abuse Material Child Pornography Prevention Act.
**Sec. 2.** Section 28-1463.02, Reissue Revised Statutes of Nebraska, is amended to read:
28-1463.02 As used in the Child Sexual Abuse Material Pornography Prevention Act, unless the context otherwise requires:
(1) Child , in the case of a participant, means an individual any person under the age of eighteen years other than the defendant and, in the case of a portrayed observer, means any person under the age of sixteen years;
(2) Child sexual abuse material means any visual depiction of sexually explicit conduct that:
(a) Depicts a child as a participant or portrayed observer, regardless of whether the visual depiction is obscene;
(b) Depicts a person with identifiable physical features of a child as a participant or portrayed observer, regardless of whether the visual depiction is obscene; or
(c) Is obscene and depicts a person or a computer-generated person as a participant or portrayed observer, and such person:
(i) Is a child;
(ii) Would appear to a reasonable person to be a child; or
(iii) Is depicted with physical features of a child;
(3) Computer-generated means that a visual depiction has been created, adapted, or modified by using a computer, digital program or process, artificial intelligence, or any similar device or means;
(4) Computer-generated person means a computer-generated image that appears to depict a human being, or a human being whose image has been morphed, altered, or modified, whether or not that human being exists or existed in the natural world;
(5)(a) Conviction or convicted includes a plea or verdict of guilty or a conviction following a plea of nolo contendere.
(b) Conviction or convicted includes a conviction that has been set aside under section 29-2264.
(c) Conviction or convicted does not include a conviction for which a pardon has been obtained;
(6) Covered offense means a violation of section 28-308, 28-309, 28-310, 28-311, 28-313, 28-314, 28-315, 28-319, 28-319.01, 28-320.01, 28-833, or section 3, 4, or 5 of this act, or subsection (1) or (2) of section 28-320;
(7) Electronic communication device has the same meaning as in section 28-833;
(8) (2) Erotic fondling means touching a person's clothed or unclothed genitals or pubic area, breasts if the person is a female, or developing breast area if the person is a female child, for the purpose of real or simulated overt sexual gratification or sexual stimulation of one or more persons involved. Erotic fondling shall not be construed to include physical contact, even if affectionate, which is not for the purpose of real or simulated overt sexual gratification or sexual stimulation of one or more of the persons involved;
(9) (3) Erotic nudity means the display of the human male or female genitals or pubic area, the human female breasts, or the developing breast area of the human female child, for the purpose of real or simulated overt sexual gratification or sexual stimulation of one or more of the persons involved in

the visual depiction or for the sexual gratification or stimulation of the viewer;

(10) Obscene has the same meaning as in section 28-807;

(11) Person, with respect to the subject of a visual depiction, includes an actual person or any visual depiction that appears to be such person or an actual person whose image has been morphed, altered, or modified;

(12) (4) Sadomasochistic abuse means flagellation or torture by or upon a nude person or a person clad in undergarments, a mask, or bizarre costume, or the condition of being fettered, bound, or otherwise physically restrained when performed to predominantly appeal to the morbid interest;

(13) (5) Sexually explicit conduct means: (a) Real or simulated intercourse, whether genital-genital, oral-genital, anal-genital, or oral-anal between persons of the same or opposite sex or between a human and an animal or with an artificial genital; (b) real or simulated masturbation; (c) real or simulated sadomasochistic abuse; (d) erotic fondling; (e) erotic nudity; or (f) real or simulated defecation or urination for the purpose of sexual gratification or sexual stimulation of one or more of the persons involved; and

(14) (6) Visual depiction means live performance or photographic representation, whether of actual persons or events, computer-generated persons or events, or any combination thereof, and includes any undeveloped film or videotape or data stored on a computer disk or by other electronic means which is capable of conversion into a visual image and also includes any photograph, film, video, picture, digital image, or computer-displayed image, video, or picture, whether made, or produced, morphed, altered, or modified by electronic, mechanical, computer-generated, computer, digital, or other means.

**Sec. 3.** Section 28-813.01, Revised Statutes Cumulative Supplement, 2024, is amended to read:

28-813.01 (1) It shall be unlawful for a person nineteen years of age or older to knowingly possess or receive any child sexual abuse material visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers. Violation of this subsection is a Class IIA felony.

(2)(a) (2) It shall be unlawful for a person under nineteen years of age to knowingly and intentionally possess or receive any child sexual abuse material visual depiction of sexually explicit conduct which has a child other than the defendant as one of its participants or portrayed observers.

(b) Violation of this subsection is a Class I misdemeanor. A second or subsequent conviction under this subsection is a Class IV felony.

(3) For a defendant who was eighteen years of age or older but under nineteen years of age at the time of the offense, it It shall be an affirmative defense to a charge made pursuant to subsection (2) of this section that:

(a)(i) The defendant was less than nineteen years of age;

(a) The visual depiction:

(i) Portrays (ii) the visual depiction of sexually explicit conduct portrays a child who is fifteen years of age or older;

(ii) Was (iii) the visual depiction was knowingly and voluntarily generated by the child depicted therein;

(iii) Was (iv) the visual depiction was knowingly and voluntarily provided by such the child depicted in the visual depiction; and

(iv) Portrays (v) the visual depiction contains only one child other than the defendant;

(b) The (vi) the defendant has not provided or made available the visual depiction to another person except such the child depicted who originally sent the visual depiction to the defendant; and

(c) The (vii) the defendant did not coerce such the child in the visual depiction to either create or send the visual depiction. ; or

(4) For a defendant who was under eighteen years of age at the time of the offense, it shall be an affirmative defense to a charge made pursuant to subsection (2) of this section that:

(b)(i) The defendant was less than eighteen years of age;

(a) The (ii) the difference in age between the defendant and the child portrayed is less than four years;

(b) The visual depiction:

(i) Was (iii) the visual depiction was knowingly and voluntarily generated by the child depicted therein;

(ii) Was (iv) the visual depiction was knowingly and voluntarily provided by such the child depicted in the visual depiction; and

(iii) Portrays (v) the visual depiction contains only one child other than the defendant;

(c) The (vi) the defendant has not provided or made available the visual depiction to another person except such the child depicted who originally sent the visual depiction to the defendant; and

(d) The (vii) the defendant did not coerce such the child in the visual depiction to either create or send the visual depiction.

(5) Except as provided in subdivision (2)(b) of this section, any (4) Any person who violates subsection (1) or (2) of this section and who has previously been convicted of a covered offense violation of this section or section 28-308, 28-309, 28-310, 28-311, 28-313, 28-314, 28-315, 28-319, 28-319.01, 28-320.01, 28-833, 28-1463.03, or 28-1463.05 or subsection (1) or (2) of section 28-320 shall be guilty of a Class IC felony for each offense.

(5) In addition to the penalties provided in this section, a sentencing court may order that any money, securities, negotiable instruments, firearms, conveyances, or electronic communication devices as defined in section 28-833

or any equipment, components, peripherals, software, hardware, or accessories related to electronic communication devices be forfeited as a part of the sentence imposed if it finds by clear and convincing evidence adduced at a separate hearing in the same prosecution, conducted pursuant to section 28-1601, that any or all such property was derived from, used, or intended to be used to facilitate a violation of this section.

(6) The definitions in section 28-1463.02 shall apply to this section.

**Sec. 4.** Section 28-1463.05, Revised Statutes Cumulative Supplement, 2024, is amended to read:

28-1463.05 (1) It shall be unlawful for a person to knowingly possess with intent to rent, sell, deliver, distribute, trade, or provide to any person any child sexual abuse material visual depiction of sexually explicit conduct which has a child other than the defendant as one of its participants or portrayed observers.

(2)(a) Any person who is under nineteen years of age at the time he or she violates this section shall be guilty of a Class IIIA felony for each offense.

(b) Any person who is nineteen years of age or older at the time he or she violates this section shall be guilty of a Class II IIA felony for each offense.

(c) Any person who violates this section and who has previously been convicted of a covered offense violation of this section or section 28-308, 28-309, 28-310, 28-311, 28-313, 28-314, 28-315, 28-319, 28-319.01, 28-320.01, 28-813, 28-833, or 28-1463.03 or subsection (1) or (2) of section 28-320 shall be guilty of a Class IC felony for each offense.

**Sec. 5.** Section 28-1463.03, Revised Statutes Cumulative Supplement, 2024, is amended to read:

28-1463.03 (1) It shall be unlawful for a person to knowingly make, publish, direct, create, provide, or in any manner generate any child sexual abuse material visual depiction of sexually explicit conduct which has a child other than the defendant as one of its participants or portrayed observers.

(2) It shall be unlawful for a person knowingly to purchase, rent, sell, deliver, distribute, display for sale, advertise, trade, publish, circulate, or provide to any person any child sexual abuse material visual depiction of sexually explicit conduct which has a child other than the defendant as one of its participants or portrayed observers.

(3) It shall be unlawful for a person to knowingly employ, force, authorize, induce, or otherwise cause a child to appear or be depicted in any child sexual abuse material engage in any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers.

(4) It shall be unlawful for a parent, stepparent, legal guardian, or any person with custody and control of a child, knowing the content thereof, to consent to such child appearing or being depicted in any child sexual abuse material engaging in any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers.

(5) For a defendant who was eighteen years of age or older but under nineteen years of age at the time of the offense, it shall be an affirmative defense to a charge made pursuant to subsection (1) of this section that:

(a) The visual depiction:

(i) Portrays a child who is fifteen years of age or older;

(ii) Was knowingly and voluntarily generated by the child depicted therein;

(iii) Was knowingly and voluntarily provided by such child; and

(iv) Portrays only one child other than the defendant;

(b) The defendant has not provided or made available the visual depiction to another person except such child; and

(c) The defendant did not coerce such child to either create or send the visual depiction.

(6) For a defendant who was under eighteen years of age at the time of the offense, it shall be an affirmative defense to a charge made pursuant to subsection (1) of this section that:

(a) The difference in age between the defendant and the child portrayed is less than four years;

(b) The visual depiction:

(i) Was knowingly and voluntarily generated by the child depicted therein;

(ii) Was knowingly and voluntarily provided by such child; and

(iii) Portrays only one child other than the defendant;

(c) The defendant has not provided or made available the visual depiction to another person except such child; and

(d) The defendant did not coerce such child to either create or send the visual depiction.

(7) Any person who is under nineteen years of age at the time he or she violates this section shall be guilty of a Class III felony for each offense.

(8) Any person who is nineteen years of age or older at the time he or she violates this section shall be guilty of a Class ID felony for each offense.

(9) Any person who violates this section and who has previously been convicted of a covered offense shall be guilty of a Class IC felony for each offense.

**Sec. 6.** Section 28-1463.06, Reissue Revised Statutes of Nebraska, is amended to read:

28-1463.06 In addition to the penalties provided in the Child Sexual Abuse Material Child Pornography Prevention Act, a sentencing court may order forfeiture as provided in sections 28-1601 to 28-1603. that any money, securities, negotiable instruments, firearms, conveyances, or electronic

communication devices as defined in section 28-833 or any equipment, components, peripherals, software, hardware, or accessories related to electronic communication devices be forfeited as a part of the sentence imposed if it finds by clear and convincing evidence adduced at a separate hearing in the same prosecution, conducted pursuant to section 28-1601, that any or all such property was derived from, used, or intended to be used to facilitate a violation of the Child Pornography Prevention Act.

**Sec. 7.** Section 25-21,291, Reissue Revised Statutes of Nebraska, is amended to read:

25-21,291 For purposes of the Exploited Children's Civil Remedy Act:

(1) Access software provider means a provider of software, including client or server software, or enabling tools that do any one or more of the following: (a) Filter, screen, allow, or disallow content; (b) pick, choose, analyze, or digest content; or (c) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content;

(2) Aid or assist another with the creation, distribution, or active acquisition of child sexual abuse material child pornography means help a principal in some appreciable manner with the creation, distribution, or active acquisition of a visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers. The term also includes knowingly employing, forcing, authorizing, inducing, or otherwise causing a child to engage in any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers. No parent, stepparent, legal guardian, or person with custody and control of a child, knowing the content thereof, may consent to such child engaging in any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers;

(3) Cable operator means any person or group of persons (a) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system or (b) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system;

(4) Child has the same meaning as in section 2 of this act 28-1463.02;

(5) Create means to knowingly create, make, manufacture, direct, publish, finance, or in any manner generate;

(6) Distribute means the actual, constructive, or attempted transfer from one person, source, or location to another person, source, or location. The term includes, but is not limited to, renting, selling, delivering, displaying, advertising, trading, mailing, procuring, circulating, lending, exhibiting, transmitting, transmuting, transferring, disseminating, presenting, or providing any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers;

(7) Interactive computer service means any information service system or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions;

(8) Participant means a child who appears in any visual depiction of sexually explicit conduct and is portrayed or actively engaged in acts of sexually explicit conduct appearing therein;

(9) Portrayed observer means a child who appears in any visual depiction where sexually explicit conduct is likewise portrayed or occurring within the child's presence or in the child's proximity;

(10) Sexually explicit conduct has the same meaning as in section 2 of this act 28-1463.02;

(11) Telecommunications service means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used; and

(12) Visual depiction has the same meaning as in section 2 of this act 28-1463.02.

**Sec. 8.** Section 25-21,302, Reissue Revised Statutes of Nebraska, is amended to read:

25-21,302 (1)(a) In addition to any other civil or criminal penalties provided by law, any property used in the commission of a violation of the Child Sexual Abuse Material Child Pornography Prevention Act or section 28-813, 28-831, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107 may be forfeited through a proceeding as provided in this section.

(b) The following property shall be subject to forfeiture if used or intended for use as an instrumentality in or used in furtherance of a violation of the Child Sexual Abuse Material Child Pornography Prevention Act or section 28-813, 28-831, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107:

(i) Conveyances, including aircraft, vehicles, or vessels;

(ii) Books, records, telecommunication equipment, or computers;

(iii) Money or weapons;

(iv) Everything of value furnished, or intended to be furnished, in exchange for an act in violation and all proceeds traceable to the exchange;

(v) Negotiable instruments and securities;

(vi) Any property, real or personal, directly or indirectly acquired or received in a violation or as an inducement to violate;

(vii) Any property traceable to proceeds from a violation; and

(viii) Any real property, including any right, title, and interest in the whole of or any part of any lot or tract of land, used in furtherance of a

violation of the Child Sexual Abuse Material ~~Child Pornography~~ Prevention Act or section 28-813, 28-831, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107.

(c)(i) No property used by any person as a common carrier in the transaction of business as a common carrier is subject to forfeiture under this section unless it appears that the owner or other person in charge of the property is a consenting party or privy to a violation of the Child Sexual Abuse Material ~~Child Pornography~~ Prevention Act or section 28-813, 28-831, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107.

(ii) No property is subject to forfeiture under this section by reason of any act or omission proved by the owner thereof to have been committed or omitted without his or her actual knowledge or consent. If the confiscating authority has reason to believe that the property is leased or rented property, then the confiscating authority shall notify the owner of the property within five days after the confiscation or within five days after forming reason to believe that the property is leased or rented property.

(iii) Forfeiture of property encumbered by a bona fide security interest is subject to the interest of the secured party if such party neither had actual knowledge of nor consented to the act or omission.

(2) No property shall be forfeited under this section, to the extent of the interest of an owner, by reason of any act or omission established by the owner to have been committed or omitted without his or her actual knowledge or consent.

(3) Seizure without process may be made if the seizure is incident to an arrest or a search under a search warrant.

(4)(a) When any property is seized under this section, proceedings shall be instituted within a reasonable period of time from the date of seizure or the subject property shall be immediately returned to the party from whom seized.

(b) A petition for forfeiture shall be filed by the Attorney General or a county attorney in the name of the State of Nebraska and may be filed in the county in which the seizure is made, the county in which the criminal prosecution is brought, or the county in which the owner of the seized property is found. Forfeiture proceedings may be brought in the district court or the county court. A copy of the petition shall be served upon the following persons by service of process in the same manner as in civil cases:

(i) The owner of the property if the owner's address is known;

(ii) Any secured party who has registered a lien or filed a financing statement as provided by law if the identity of the secured party can be ascertained by the entity filing the petition by making a good faith effort to ascertain the identity of the secured party;

(iii) Any other bona fide lienholder or secured party or other person holding an interest in the property in the nature of a security interest of whom the seizing law enforcement agency has actual knowledge; and

(iv) Any person in possession of property subject to forfeiture at the time that it was seized.

(5) If the property is a motor vehicle subject to titling under the Motor Vehicle Certificate of Title Act or a vessel subject to titling under the State Boat Act, and if there is any reasonable cause to believe that the motor vehicle or vessel has been titled, inquiry of the Department of Motor Vehicles shall be made as to what the records of the department show as to who is the record owner of the motor vehicle or vessel and who, if anyone, holds any lien or security interest that affects the motor vehicle or vessel.

(6) If the property is a motor vehicle or vessel and is not titled in the State of Nebraska, then an attempt shall be made to ascertain the name and address of the person in whose name the motor vehicle or vessel is licensed, and if the motor vehicle or vessel is licensed in a state which has in effect a certificate of title law, inquiry of the appropriate agency of that state shall be made as to what the records of the agency show as to who is the record owner of the motor vehicle or vessel and who, if anyone, holds any lien, security interest, or other instrument in the nature of a security device that affects the motor vehicle or vessel.

(7) If the property is of a nature that a financing statement is required by the laws of this state to be filed to perfect a security interest affecting the property and if there is any reasonable cause to believe that a financing statement covering the security interest has been filed under the laws of this state, inquiry shall be made as to what the records show as to who is the record owner of the property and who, if anyone, has filed a financing statement affecting the property.

(8) If the property is an aircraft or part thereof and if there is any reasonable cause to believe that an instrument in the nature of a security device affects the property, inquiry shall be made as to what the records of the Federal Aviation Administration show as to who is the record owner of the property and who, if anyone, holds an instrument in the nature of a security device which affects the property.

(9) If the answer to an inquiry states that the record owner of the property is any person other than the person who was in possession of it when it was seized or states that any person holds any lien, encumbrance, security interest, other interest in the nature of a security interest, mortgage, or deed of trust that affects the property, the record owner and also any lienholder, secured party, other person who holds an interest in the property in the nature of a security interest, or holder of an encumbrance, mortgage, or deed of trust that affects the property is to be named in the petition of

forfeiture and is to be served with process in the same manner as in civil cases.

(10) If the owner of the property cannot be found and served with a copy of the petition of forfeiture or if no person was in possession of the property subject to forfeiture at the time that it was seized and the owner of the property is unknown, there shall be filed with the clerk of the court in which the proceeding is pending an affidavit to such effect, whereupon the clerk of the court shall publish notice of the hearing addressed to "the Unknown Owner of ............," filling in the blank space with a reasonably detailed description of the property subject to forfeiture. Service by publication shall be completed in the same manner as is provided in the code of civil procedure for the service of process in civil actions in the district courts of this state.

(11) No proceedings instituted pursuant to this section shall proceed to hearing unless the judge conducting the hearing is satisfied that this section has been complied with. Any answer received from an inquiry required by this section shall be introduced into evidence at the hearing.

(12)(a) An owner of property that has been seized shall file an answer within thirty days after the completion of service of process. If an answer is not filed, the court shall hear evidence that the property is subject to forfeiture and forfeit the property to the seizing law enforcement agency. If an answer is filed, a time for hearing on forfeiture shall be set within thirty days after filing the answer or at the succeeding term of court if court would not be in session within thirty days after filing the answer. The court may postpone the forfeiture hearing to a date past the time any criminal action is pending against the owner upon request of any party.

(b) If the owner of the property has filed an answer denying that the property is subject to forfeiture, then the burden is on the petitioner to prove that the property is subject to forfeiture. However, if an answer has not been filed by the owner of the property, the petition for forfeiture may be introduced into evidence and is prima facie evidence that the property is subject to forfeiture. The burden of proof placed upon the petitioner in regard to property forfeited under this section shall be by clear and convincing evidence.

(c) At the hearing any claimant of any right, title, or interest in the property may prove his or her lien, encumbrance, security interest, other interest in the nature of a security interest, mortgage, or deed of trust to be bona fide and created without actual knowledge or consent that the property was to be used so as to cause the property to be subject to forfeiture.

(d) If it is found that the property is subject to forfeiture, then the judge shall forfeit the property. However, if proof at the hearing discloses that the interest of any bona fide lienholder, any secured party, any other person holding an interest in the property in the nature of a security interest, or any holder of a bona fide encumbrance, mortgage, or deed of trust is greater than or equal to the present value of the property, the court shall order the property released to him or her. If the interest is less than the present value of the property and if the proof shows that the property is subject to forfeiture, the court shall order the property forfeited.

(13) Unless otherwise provided in this section, all personal property which is forfeited under this section shall be liquidated and, after deduction of court costs and the expense of liquidation, the proceeds shall be remitted to the county treasurer of the county in which the seizure was made. The county treasurer shall remit all such proceeds from property forfeited pursuant to this section to the State Treasurer for distribution in accordance with Article VII, section 5, of the Constitution of Nebraska.

(14) All money forfeited under this section shall be remitted in the same manner as provided in subsection (13) of this section.

(15) All real estate forfeited under this section shall be sold to the highest bidder at a public auction for cash, the auction to be conducted by the county sheriff or his or her designee at such place, on such notice, and in accordance with the same procedure, as far as practicable, as is required in the case of sales of land under execution at law. The proceeds of the sale shall first be applied to the cost and expense in administering and conducting the sale, then to the satisfaction of all mortgages, deeds of trust, liens, and encumbrances of record on the property. The remaining proceeds shall be remitted in the same manner as provided in subsection (13) of this section.

(16) The forfeiture procedure set forth in this section is the sole remedy of any claimant, and no court shall have jurisdiction to interfere therewith by replevin, by injunction, by supersedeas, or by any other manner.

**Sec. 9.** Section 27-1301, Reissue Revised Statutes of Nebraska, is amended to read:

27-1301 (1) In any judicial or administrative proceeding, any property or material that constitutes child sexual abuse material a visual depiction of sexually explicit conduct, as defined in section 2 of this act 28-1463.02, and which has a child, as defined in such section, as one of its participants or portrayed observers, shall remain constantly and continuously in the care, custody, and control of law enforcement, the prosecuting attorney, or the court having properly received it into evidence, except as provided in subsection (3) of this section.

(2) All courts and administrative agencies shall unequivocally deny any request by the defendant, his or her attorney, or any other person, agency, or organization, regardless of whether such defendant, attorney, or other person, agency, or organization is a party in interest or not, to acquire possession

of, copy, photograph, duplicate, or otherwise reproduce any property or material that constitutes child sexual abuse material a visual depiction of sexually explicit conduct, as defined in section 2 of this act 28-1463.02, and which has a child, as defined in such section, as one of its participants or portrayed observers, so long as the state makes the property or material reasonably available to the defendant in a criminal proceeding. Nothing in this section shall be deemed to prohibit the review of the proscribed materials or property by a federal court when considering a habeas corpus claim.

(3)(a) For purposes of this section, property or material are deemed to be reasonably available to a defendant if the state provides ample opportunity for inspection, viewing, examination, and analysis of the property or material, at a law enforcement or state-operated facility, to the defendant, his or her attorney, and any individual the defendant seeks to use for the purpose of furnishing expert testimony.

(b) Notwithstanding the provisions of this subsection, a court may order a copy of the property or material to be delivered to a person identified as a defense expert for the purpose of evaluating the evidence, subject to the same restrictions placed upon law enforcement. The defense expert shall return all copies and materials to law enforcement upon completion of the evaluation.

(4) The On or before July 1, 2009, the Supreme Court shall adopt and promulgate rules and regulations regarding the proper control, care, custody, transfer, and disposition of property or material that constitutes child sexual abuse material a visual depiction of sexually explicit conduct, as defined in section 2 of this act 28-1463.02, and which has a child, as defined in such section, as one of its participants or portrayed observers, that has been received into evidence at any judicial or administrative proceeding. Among the issues addressed by these rules and regulations, the Supreme Court should devise procedures regarding the preparation and delivery of bills of exception containing evidence as described in this section, as well as procedures for storing, accessing, and disposing of such bills of exception after preparation and receipt.

**Sec. 10.** Section 28-116, Reissue Revised Statutes of Nebraska, is amended to read:

28-116 The changes made to the sections listed in this section by Laws 2015, LB605, shall not apply to any offense committed prior to August 30, 2015. Any such offense shall be construed and punished according to the provisions of law existing at the time the offense was committed. For purposes of this section, an offense shall be deemed to have been committed prior to August 30, 2015, if any element of the offense occurred prior to such date. The following sections are subject to this provision: Sections 9-262, 9-352, 9-434, 9-652, 23-135.01, 28-105, 28-106, 28-201, 28-204, 28-305, 28-306, 28-309, 28-310.01, 28-311, 28-311.01, 28-311.04, 28-311.08, 28-320, 28-322.02, 28-322.03, 28-322.04, 28-323, 28-393, 28-394, 28-397, 28-416, 28-504, 28-507, 28-514, 28-518, 28-519, 28-603, 28-604, 28-611, 28-611.01, 28-620, 28-621, 28-622, 28-627, 28-631, 28-638, 28-639, 28-703, 28-707, 28-813.01, 28-912, 28-932, 28-1005, 28-1009, 28-1102, 28-1103, 28-1104, 28-1212.03, 28-1222, 28-1224, 28-1344, 28-1345, 28-1463.05, 29-1816, 29-2204, 29-2260, 29-2308, 29-4011, 60-6,197.03, 60-6,197.06, 68-1017, 68-1017.01, 71-2228, and 71-2229 and sections 3 and 4 of this act.

**Sec. 11.** Section 28-320.02, Reissue Revised Statutes of Nebraska, is amended to read:

28-320.02 (1) No person shall knowingly solicit, coax, entice, or lure (a) a child sixteen years of age or younger or (b) a peace officer who is believed by such person to be a child sixteen years of age or younger, by means of an electronic communication device as that term is defined in section 28-833, to engage in an act which would be in violation of section 28-319, 28-319.01, or 28-320.01 or subsection (1) or (2) of section 28-320. A person shall not be convicted of both a violation of this subsection and a violation of section 28-319, 28-319.01, or 28-320.01 or subsection (1) or (2) of section 28-320 if the violations arise out of the same set of facts or pattern of conduct and the individual solicited, coaxed, enticed, or lured under this subsection is also the victim of the sexual assault under section 28-319, 28-319.01, or 28-320.01 or subsection (1) or (2) of section 28-320.

(2) A person who violates this section is guilty of a Class ID felony. If a person who violates this section has previously been convicted of a covered offense as defined in section 2 of this act violation of this section or section 28-308, 28-309, 28-310, 28-311, 28-313, 28-314, 28-315, 28-319, 28-319.01, 28-320.01, 28-813.01, 28-833, 28-1463.03, or 28-1463.05 or subsection (1) or (2) of section 28-320, the person is guilty of a Class IC felony.

**Sec. 12.** Section 28-813.02, Reissue Revised Statutes of Nebraska, is amended to read:

28-813.02 Any commercial film and photographic print processor who has knowledge of or observes, within the scope of his or her professional capacity or employment, and who participates in an investigation or the making of any report pertaining to any film, photograph, videotape, negative, or slide depicting child sexual abuse material a child under the age of eighteen years engaged in an act of sexually explicit conduct, as defined in section 2 of this act 28-1463.02, or participates in a judicial proceeding resulting from such participation shall be immune from any liability, civil or criminal, that might otherwise be incurred or imposed, except for maliciously false statements.

**Sec. 13.** Section 28-833, Reissue Revised Statutes of Nebraska, is amended to read:

LB383
2025

LB383
2025

28-833 (1) A person commits the offense of enticement by electronic communication device if he or she is nineteen years of age or over and knowingly and intentionally utilizes an electronic communication device to contact a child under sixteen years of age or a peace officer who is believed by such person to be a child under sixteen years of age and in so doing:

(a) Uses or transmits any indecent, lewd, lascivious, or obscene language, writing, or sound;

(b) Transmits or otherwise disseminates any visual depiction of sexually explicit conduct as defined in section 28-1463.02; or

(c) Offers or solicits any indecent, lewd, or lascivious act.

(2) Enticement by electronic communication device is a Class IV felony.

(3) Enticement by electronic communication device is deemed to have been committed either at the place where the communication was initiated or where it was received.

(4) For purposes of this section: .

(a) Electronic electronic communication device means any device which, in its ordinary and intended use, transmits by electronic means writings, sounds, visual images, or data of any nature to another electronic communication device; .

(b) Sexually explicit conduct has the same meaning as in section 2 of this act; and

(c) Visual depiction has the same meaning as in section 2 of this act.

**Sec. 14.** Section 28-1354, Revised Statutes Cumulative Supplement, 2024, is amended to read:

28-1354 For purposes of the Public Protection Act:

(1) Enterprise means any individual, sole proprietorship, partnership, corporation, trust, association, or any legal entity, union, or group of individuals associated in fact although not a legal entity, and shall include illicit as well as licit enterprises as well as other entities;

(2) Pattern of racketeering activity means a cumulative loss for one or more victims or gains for the enterprise of not less than one thousand five hundred dollars resulting from at least two acts of racketeering activity, one of which occurred after August 30, 2009, and the last of which occurred within ten years, excluding any period of imprisonment, after the commission of a prior act of racketeering activity;

(3) Until January 1, 2017, person means any individual or entity, as defined in section 21-2014, holding or capable of holding a legal, equitable, or beneficial interest in property. Beginning January 1, 2017, person means any individual or entity, as defined in section 21-214, holding or capable of holding a legal, equitable, or beneficial interest in property;

(4) Prosecutor includes the Attorney General of the State of Nebraska, the deputy attorney general, assistant attorneys general, a county attorney, a deputy county attorney, or any person so designated by the Attorney General, a county attorney, or a court of the state to carry out the powers conferred by the act;

(5) Racketeering activity includes the commission of, criminal attempt to commit, conspiracy to commit, aiding and abetting in the commission of, aiding in the consummation of, acting as an accessory to the commission of, or the solicitation, coercion, or intimidation of another to commit or aid in the commission of any of the following:

(a) Offenses against the person which include: Murder in the first degree under section 28-303; murder in the second degree under section 28-304; manslaughter under section 28-305; assault in the first degree under section 28-308; assault in the second degree under section 28-309; assault in the third degree under section 28-310; terroristic threats under section 28-311.01; kidnapping under section 28-313; false imprisonment in the first degree under section 28-314; false imprisonment in the second degree under section 28-315; sexual assault in the first degree under section 28-319; and robbery under section 28-324;

(b) Offenses relating to controlled substances which include: To unlawfully manufacture, distribute, deliver, dispense, or possess with intent to manufacture, distribute, deliver, or dispense a controlled substance under subsection (1) of section 28-416; possession of marijuana weighing more than one pound under subsection (12) of section 28-416; possession of money used or intended to be used to facilitate a violation of subsection (1) of section 28-416 prohibited under subsection (17) of section 28-416; any violation of section 28-418; to unlawfully manufacture, distribute, deliver, or possess with intent to distribute or deliver an imitation controlled substance under section 28-445; possession of anhydrous ammonia with the intent to manufacture methamphetamine under section 28-451; and possession of ephedrine, pseudoephedrine, or phenylpropanolamine with the intent to manufacture methamphetamine under section 28-452;

(c) Offenses against property which include: Arson in the first degree under section 28-502; arson in the second degree under section 28-503; arson in the third degree under section 28-504; burglary under section 28-507; theft by unlawful taking or disposition under section 28-511; theft by shoplifting under section 28-511.01; theft by deception under section 28-512; theft by extortion under section 28-513; theft of services under section 28-515; theft by receiving stolen property under section 28-517; criminal mischief under section 28-519; and unlawfully depriving or obtaining property or services using a computer under section 28-1344;

(d) Offenses involving fraud which include: Burning to defraud an insurer under section 28-505; forgery in the first degree under section 28-602; forgery

in the second degree under section 28-603; criminal possession of a forged instrument under section 28-604; criminal possession of written instrument forgery devices under section 28-605; criminal impersonation under section 28-638; identity theft under section 28-639; identity fraud under section 28-640; false statement or book entry under section 28-612; tampering with a publicly exhibited contest under section 28-614; issuing a false financial statement for purposes of obtaining a financial transaction device under section 28-619; unauthorized use of a financial transaction device under section 28-620; criminal possession of a financial transaction device under section 28-621; unlawful circulation of a financial transaction device in the first degree under section 28-622; unlawful circulation of a financial transaction device in the second degree under section 28-623; criminal possession of a blank financial transaction device under section 28-624; criminal sale of a blank financial transaction device under section 28-625; criminal possession of a financial transaction forgery device under section 28-626; unlawful manufacture of a financial transaction device under section 28-627; laundering of sales forms under section 28-628; unlawful acquisition of sales form processing services under section 28-629; unlawful factoring of a financial transaction device under section 28-630; and fraudulent insurance acts under section 28-631;

(e) Offenses involving governmental operations which include: Abuse of public records under section 28-911; perjury or subornation of perjury under section 28-915; bribery under section 28-917; bribery of a witness under section 28-918; tampering with a witness or informant or jury tampering under section 28-919; bribery of a juror under section 28-920; assault on an officer, an emergency responder, a state correctional employee, a Department of Health and Human Services employee, or a health care professional in the first degree under section 28-929; assault on an officer, an emergency responder, a state correctional employee, a Department of Health and Human Services employee, or a health care professional in the second degree under section 28-930; assault on an officer, an emergency responder, a state correctional employee, a Department of Health and Human Services employee, or a health care professional in the third degree under section 28-931; and assault on an officer, an emergency responder, a state correctional employee, a Department of Health and Human Services employee, or a health care professional using a motor vehicle under section 28-931.01;

(f) Offenses involving gambling which include: Promoting gambling in the first degree under section 28-1102; possession of gambling records under section 28-1105; gambling debt collection under section 28-1105.01; and possession of a gambling device under section 28-1107;

(g) Offenses relating to firearms, weapons, and explosives which include: Carrying a concealed weapon under section 28-1202; transportation or possession of machine guns, short rifles, or short shotguns under section 28-1203; unlawful possession of a handgun under section 28-1204; unlawful transfer of a firearm to a juvenile under section 28-1204.01; possession of a firearm by a prohibited juvenile offender under section 28-1204.05; using a deadly weapon to commit a felony, possession of a deadly weapon during the commission of a felony, or carrying a firearm or destructive device during the commission of a dangerous misdemeanor under section 28-1205; possession of a deadly weapon by a prohibited person under section 28-1206; possession of a defaced firearm under section 28-1207; defacing a firearm under section 28-1208; unlawful discharge of a firearm under section 28-1212.02; possession, receipt, retention, or disposition of a stolen firearm under section 28-1212.03; unlawful possession of explosive materials in the first degree under section 28-1215; unlawful possession of explosive materials in the second degree under section 28-1216; unlawful sale of explosives under section 28-1217; use of explosives without a permit under section 28-1218; obtaining an explosives permit through false representations under section 28-1219; possession of a destructive device under section 28-1220; threatening the use of explosives or placing a false bomb under section 28-1221; using explosives to commit a felony under section 28-1222; using explosives to damage or destroy property under section 28-1223; and using explosives to kill or injure any person under section 28-1224;

(h) Any violation of the Securities Act of Nebraska pursuant to section 8-1117;

(i) Any violation of the Nebraska Revenue Act of 1967 pursuant to section 77-2713;

(j) Offenses relating to public health and morals which include: Prostitution under section 28-801; pandering under section 28-802; keeping a place of prostitution under section 28-804; labor trafficking, sex trafficking, labor trafficking of a minor, or sex trafficking of a minor under section 28-831; a violation of section 28-1005; and any act relating to the visual depiction of sexually explicit conduct prohibited in the <u>Child Sexual Abuse Material</u> ~~Child Pornography~~ Prevention Act; and

(k) A violation of the Computer Crimes Act;

(6) State means the State of Nebraska or any political subdivision or any department, agency, or instrumentality thereof; and

(7) Unlawful debt means a debt of at least one thousand five hundred dollars:

(a) Incurred or contracted in gambling activity which was in violation of federal law or the law of the state or which is unenforceable under state or federal law in whole or in part as to principal or interest because of the laws relating to usury; or

(b) Which was incurred in connection with the business of gambling in

violation of federal law or the law of the state or the business of lending money or a thing of value at a rate usurious under state law if the usurious rate is at least twice the enforceable rate.

Sec. 15. Section 28-1601, Reissue Revised Statutes of Nebraska, is amended to read:

28-1601 (1) For purposes of sections 28-1601 to 28-1603:

(a) Covered offense means a violation of the Child Sexual Abuse Material Prevention Act, subsection (1) of section 28-416, or section 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107;

(b) Electronic communication device has the same meaning as in section 28-833; and

(c) Gambling device has the same meaning as in section 28-1101.

(2) (1) In addition to existing penalties for a violation of a covered offense the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107, a court may order forfeiture of any money, securities, negotiable instruments, firearms, conveyances, or electronic communication devices; as defined in section 28-833, any equipment, components, peripherals, software, hardware, or accessories related to electronic communication devices; , or any gambling devices as defined in section 28-1101 if:

(a) The owner or possessor of the property has been convicted of a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107;

(b) The information charging such violation specifically requests the forfeiture of property upon conviction and is prepared pursuant to section 28-1602; and

(c) It The property is found by clear and convincing evidence that such property was to have been derived from, used, or intended to be used to facilitate a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107.

(3) (2) Following the filing of an information charging a violation of a covered offense the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107 that specifically seeks forfeiture of any property listed in subsection (2) (1) of this section, the defendant may request a pretrial hearing to determine the existence of probable cause to believe that the property specifically sought to be forfeited was derived from, used, or intended to be used to facilitate a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107. The request for a hearing pursuant to this section must be filed with the district court in which the criminal proceeding is pending within thirty days after the filing of the information.

(4)(a) (3) At any time after the filing of the information in district court and prior to final disposition of the criminal case, any person or entity, other than the defendant, with a claimed legal interest in the property may petition to intervene in the district court with jurisdiction over the criminal case for the specific and limited purpose of demonstrating such person's his, her, or its legal interest in the property and such person's his, her, or its lack of actual knowledge that such property was derived from, used, or intended to be used to facilitate a covered offense in violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107.

(b) In the petition to intervene, the intervening person or entity shall, at a minimum, state facts demonstrating such person's his, her, or its legal interest in the property and such person's his, her, or its lack of actual knowledge regarding the use or intended use of the property.

(5) Within thirty days after filing a motion to intervene, the district court shall conduct an evidentiary hearing on the matter. At the conclusion of such hearing, the court may order that any or all of the property be returned to the intervening claimant after it is no longer needed as evidence in the criminal case upon a showing by the claimant by a preponderance of the evidence:

(a) That the claimant that he, she, or it has a legally recognized interest in the property; and

(b) Either either (i) that such property was acquired by the claimant in good faith and the claimant he, she, or it did not have actual knowledge that such property was derived from, used, or intended to be used to facilitate a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107 or (ii) that the property seized was not derived from, used, or intended to be used to facilitate a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107.

(6) The court, on its own motion or upon application of the intervening claimant, may permit the claimant such person to proceed in forma pauperis under sections 25-2301 to 25-2310. The court, on its own motion or upon application of the intervening claimant, may appoint counsel to represent the claimant such person if the claimant such person is indigent. If the claimant he or she asserts indigency, the court shall make a reasonable inquiry to

determine the claimant's such person's financial condition and may require the claimant him or her to execute an affidavit of indigency for filing with the clerk of the court.

(7) (4) After conviction but prior to sentencing for a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107 in cases in which the prosecuting authority has specifically requested forfeiture of property, the district court shall conduct an evidentiary hearing at which the prosecuting authority must prove by clear and convincing evidence what specific amount or portion of the property specifically enumerated in the criminal information was derived from, used, or intended for use in furtherance of a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107. At the conclusion of such hearing, the court shall make specific findings of fact indicating what amount or portion of the property sought to be forfeited by the state was derived from, used, or intended to be used to facilitate a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107. The court shall order any amount or portion of the property not proven by the state to be derived from, used, or intended to be used to facilitate a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107 or the fair market value of the legally recognized interest in such property be returned to its rightful and legal owner or interest holder.

(8)(a) (5)(a) The court shall order that any amount or portion of property proven by the state by clear and convincing evidence to be derived from, used, or intended to be used to facilitate a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107 be forfeited to the state and disposition of such property be conducted in accordance with this subsection and section 28-1439.02 at such time as the property is no longer required as evidence in any criminal proceeding.

(b) As part of any disposition of property, the court may order that: (i) Any money, securities, or negotiable instruments be distributed as provided in Article VII, section 5, of the Constitution of Nebraska; (ii) any conveyances be sold or put to official use by the seizing agency for a period of not more than one year and when such property is no longer necessary for official use or at the end of two years, whichever comes first, such property shall be sold. Proceeds from the sale of any conveyance shall be distributed as provided in Article VII, section 5, of the Constitution of Nebraska; (iii) any electronic communication devices as defined in section 28-833, any equipment, components, peripherals, software, hardware, or accessories related to electronic communication devices, or any gambling devices as defined in section 28-1101 be destroyed by a law enforcement agency; and (iv) the disposition of firearms shall be effectuated pursuant to section 29-820.

(c) As used in this subsection, official use means use directly in connection with enforcement of the Child Sexual Abuse Material Child Pornography Prevention Act, the Uniform Controlled Substances Act, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107.

(9) (6) Any money, securities, negotiable instruments, firearms, conveyances, or electronic communication devices; as defined in section 28-833, any equipment, components, peripherals, software, hardware, or accessories related to electronic communication devices; , or any gambling devices as defined in section 28-1101 may be forfeited pursuant to a plea agreement between the state and the defendant subject to notice to or approval of the court.

(10) (7) Subdivision (2)(a) (1)(a) of this section does not apply if the owner or possessor of the property dies or is removed from the United States before charges are filed or a conviction obtained.

(11) (8) Subdivision (2)(b) (1)(b) of this section does not apply if the owner or possessor of the property dies or is removed from the United States before charges are filed so long as the statute of limitations for a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107 has not expired.

(12) (9) Subdivision (2)(a) (1)(a) of this section does not apply if the owner or possessor of the property is unknown or incapable of being determined for some legitimate reason or fails to appear in court as ordered after prosecution for a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107 is commenced and is not apprehended within twelve months after the failure to appear order was issued by the court.

(13) (10) If the owner or possessor of the property fails to appear in court as ordered after prosecution for a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107 is commenced but appears or is apprehended within twelve months after the failure to appear order was issued by the court, the court may order the owner or possessor of the property, as a part of any sentence imposed for either the failure to appear or the conviction for a covered offense of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section

28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107, to pay a storage fee of one hundred dollars per month for each month the property was held following the issuance of the failure to appear order.

Sec. 16. Section 28-1602, Reissue Revised Statutes of Nebraska, is amended to read:

28-1602 (1) The prosecuting authority must specifically plead its intent to seek forfeiture of any property upon a conviction for a covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107 in the same criminal information charging the underlying covered offense violation of the Child Pornography Prevention Act, subsection (1) of section 28-416, or section 28-813.01, 28-1102, 28-1103, 28-1104, 28-1105, 28-1105.01, or 28-1107.

(2) In pleading its intent to seek forfeiture, the information shall specifically (a) state the date the property was seized, (b) state the place the property was seized from, (c) describe the property sought to be forfeited, and (d) if known, state the name of the owner of the property, the name of the person or persons in possession of the property or in physical proximity to the property when it was seized, and the name of any other person or entity that may have a claim or interest in the property.

Sec. 17. Section 28-1701, Revised Statutes Cumulative Supplement, 2024, is amended to read:

28-1701 (1) A person shall not be arrested or prosecuted for an eligible alcohol or drug offense if such person witnessed or was the victim of a sexual assault and such person:

(a) Either:

(i) In good faith, reported such sexual assault to law enforcement; or

(ii) Requested emergency medical assistance for the victim of the sexual assault; and

(b) Evidence supporting the arrest or prosecution of the eligible alcohol or drug offense was obtained or discovered as a result of such person reporting such sexual assault to law enforcement or requesting emergency medical assistance.

(2) A person shall not be arrested or prosecuted for an eligible alcohol or drug offense if:

(a) Evidence supporting the arrest or prosecution of the person for the offense was obtained or discovered as a result of the investigation or prosecution of a sexual assault; and

(b) Such person cooperates with law enforcement in the investigation or prosecution of the sexual assault.

(3) For purposes of this section:

(a) Eligible alcohol or drug offense means:

(i) A violation of subsection (3) or (13) of section 28-416 or of section 28-441;

(ii) A violation of section 53-180.02 committed by a person older than eighteen years of age and under the age of twenty-one years, as described in subdivision (4)(a) of section 53-180.05;

(iii) A violation of a city or village ordinance similar to subdivision (3)(a)(i) or (ii) of this section; or

(iv) Attempt, conspiracy, solicitation, being an accessory to, aiding and abetting, aiding the consummation of, or compounding a felony with any of the offenses in subdivision (3)(a)(i), (ii), or (iii) of this section as the underlying offense; and

(b) Sexual assault means:

(i) A violation of section 28-316.01, 28-319, 28-319.01, 28-320, 28-320.01, 28-320.02, 28-322.01, 28-322.02, 28-322.03, 28-322.04, 28-322.05, or 28-703, or section 5 of this act 28-1463.03, sex trafficking or sex trafficking of a minor under section 28-831, or subdivision (1)(c) or (g) of section 28-386 or subdivision (1)(d), (e), or (f) of section 28-707; or

(ii) Attempt, conspiracy, solicitation, being an accessory to, aiding and abetting, aiding the consummation of, or compounding a felony with any of the offenses listed in subdivision (3)(b)(i) of this section as the underlying offense.

Sec. 18. Section 29-110, Revised Statutes Cumulative Supplement, 2024, is amended to read:

29-110 (1) Except as otherwise provided by law, no person shall be prosecuted for any felony unless the indictment is found by a grand jury within three years next after the offense has been done or committed or unless a complaint for the same is filed before the magistrate within three years next after the offense has been done or committed and a warrant for the arrest of the defendant has been issued.

(2) Except as otherwise provided by law, no person shall be prosecuted, tried, or punished for any misdemeanor or other indictable offense below the grade of felony or for any fine or forfeiture under any penal statute unless the suit, information, or indictment for such offense is instituted or found within one year and six months from the time of committing the offense or incurring the fine or forfeiture or within one year for any offense the punishment of which is restricted by a fine not exceeding one hundred dollars and to imprisonment not exceeding three months.

(3) Except as otherwise provided by law, no person shall be prosecuted for kidnapping under section 28-313, false imprisonment under section 28-314 or 28-315, child abuse under section 28-707, pandering under section 28-802, debauching a minor under section 28-805, or an offense under section 28-813

when the victim is under sixteen years of age at the time of the offense (a) unless the indictment for such offense is found by a grand jury within seven years next after the offense has been committed or within seven years next after the victim's sixteenth birthday, whichever is later, or (b) unless a complaint for such offense is filed before the magistrate within seven years next after the offense has been committed or within seven years next after the victim's sixteenth birthday, whichever is later, and a warrant for the arrest of the defendant has been issued.

(4) Except as otherwise provided by law, no person shall be prosecuted for a violation of subsection (2) or (3) of section 28-831 (a) unless the indictment for such offense is found by a grand jury within seven years next after the offense has been committed or within seven years next after the victim's eighteenth birthday, whichever is later, or (b) unless a complaint for such offense is filed before the magistrate within seven years next after the offense has been committed or within seven years next after the victim's eighteenth birthday, whichever is later, and a warrant for the arrest of the defendant has been issued.

(5) Except as otherwise provided by law, no person shall be prosecuted for an offense under section 3 or 4 of this act 28-813.01 or 28-1463.05 (a) unless the indictment for such offense is found by a grand jury within seven years next after the offense has been committed or within seven years next after the victim's eighteenth birthday, whichever is later, or (b) unless a complaint for such offense is filed before the magistrate within seven years next after the offense has been committed or within seven years next after the victim's eighteenth birthday, whichever is later, and a warrant for the arrest of the defendant has been issued.

(6) No person shall be prosecuted for a violation of the Securities Act of Nebraska under section 8-1117 unless the indictment for such offense is found by a grand jury within five years next after the offense has been done or committed or unless a complaint for such offense is filed before the magistrate within five years next after the offense has been done or committed and a warrant for the arrest of the defendant has been issued.

(7) No person shall be prosecuted for criminal impersonation under section 28-638, identity theft under section 28-639, or identity fraud under section 28-640 unless the indictment for such offense is found by a grand jury within five years next after the offense has been done or committed or unless a complaint for such offense is filed before the magistrate within five years next after the offense has been done or committed and a warrant for the arrest of the defendant has been issued.

(8) No person shall be prosecuted for a violation of section 68-1017 if the aggregate value of all funds and other benefits obtained or attempted to be obtained is five hundred dollars or more unless the indictment for such offense is found by a grand jury within five years next after the offense has been done or committed or unless a complaint for such offense is filed before the magistrate within five years next after the offense has been done or committed and a warrant for the arrest of the defendant has been issued.

(9) No person shall be prosecuted for knowing and intentional abuse, neglect, or exploitation of a vulnerable adult or senior adult under section 28-386 unless the indictment for such offense is found by a grand jury within six years next after the offense has been done or committed or unless a complaint for such offense is filed before the magistrate within six years next after the offense has been done or committed and a warrant for the arrest of the defendant has been issued.

(10) Except as otherwise provided by law, no person shall be prosecuted for an offense under section 28-717 (a) unless the indictment for such offense is found by a grand jury within one year and six months next after the offense has been committed or within one year and six months next after the child reaches the age of majority, whichever is later, or (b) unless a complaint for such offense is filed before the magistrate within one year and six months next after the offense has been committed or within one year and six months next after the child reaches the age of majority, whichever is later, and a warrant for the arrest of the defendant has been issued.

(11) There shall not be any time limitations for prosecution or punishment for treason, murder, arson, forgery, sexual assault in the first or second degree under section 28-319 or 28-320, sexual assault of a child in the second or third degree under section 28-320.01, incest under section 28-703, sexual assault of a child in the first degree under section 28-319.01, labor trafficking of a minor or sex trafficking of a minor under subsection (1) of section 28-831, or an offense under section 5 of this act 28-1463.03; nor shall there be any time limitations for prosecution or punishment for sexual assault in the third degree under section 28-320 when the victim is under sixteen years of age at the time of the offense.

(12) The time limitations prescribed in this section shall include all inchoate offenses pursuant to the Nebraska Criminal Code and compounding a felony pursuant to section 28-301.

(13) The time limitations prescribed in this section shall not extend to any person fleeing from justice.

(14) When any suit, information, or indictment for any crime or misdemeanor is limited by any statute to be brought or exhibited within any other time than is limited by this section, then the suit, information, or indictment shall be brought or exhibited within the time limited by such statute.

(15) If any suit, information, or indictment is quashed or the proceedings

set aside or reversed on writ of error, the time during the pendency of such suit, information, or indictment so quashed, set aside, or reversed shall not be reckoned within this statute so as to bar any new suit, information, or indictment for the same offense.

(16) The changes made to this section by Laws 2004, LB 943, shall apply to offenses committed prior to April 16, 2004, for which the statute of limitations has not expired as of such date and to offenses committed on or after such date.

(17) The changes made to this section by Laws 2005, LB 713, shall apply to offenses committed prior to September 4, 2005, for which the statute of limitations has not expired as of such date and to offenses committed on or after such date.

(18) The changes made to this section by Laws 2009, LB 97, and Laws 2006, LB 1199, shall apply to offenses committed prior to May 21, 2009, for which the statute of limitations has not expired as of such date and to offenses committed on or after such date.

(19) The changes made to this section by Laws 2010, LB809, shall apply to offenses committed prior to July 15, 2010, for which the statute of limitations has not expired as of such date and to offenses committed on or after such date.

(20) The changes made to this section by Laws 2016, LB934, shall apply to offenses committed prior to April 19, 2016, for which the statute of limitations has not expired as of such date and to offenses committed on or after such date.

(21) The changes made to this section by Laws 2019, LB519, shall apply to offenses committed prior to September 1, 2019, for which the statute of limitations has not expired as of such date and to offenses committed on or after such date.

**Sec. 19.** Section 29-119, Revised Statutes Cumulative Supplement, 2024, is amended to read:

29-119 For purposes of this section and sections 23-1201, 29-120, and 29-2261, unless the context otherwise requires:

(1) A plea agreement means that as a result of a discussion between the defense counsel and the prosecuting attorney:

(a) A charge is to be dismissed or reduced; or

(b) A defendant, if he or she pleads guilty to a charge, may receive less than the maximum penalty permitted by law; and

(2)(a) Victim means a person who has had a personal confrontation with an offender as a result of a homicide under sections 28-302 to 28-306, a first degree assault under section 28-308, a second degree assault under section 28-309, a third degree assault under section 28-310 when the victim is an intimate partner as defined in section 28-323, a first degree false imprisonment under section 28-314, a first degree sexual assault under section 28-319, a sexual assault of a child in the first degree under section 28-319.01, a second or third degree sexual assault under section 28-320, a sexual assault of a child in the second or third degree under section 28-320.01, domestic assault in the first, second, or third degree under section 28-323, or a robbery under section 28-324. Victim also includes a person who has suffered serious bodily injury as defined in section 28-109 as a result of a motor vehicle accident when the driver was charged with a violation of section 60-6,196 or 60-6,197 or with a violation of a city or village ordinance enacted in conformance with either section.

(b) In the case of a homicide, victim means the nearest surviving relative under the law as provided by section 30-2303 but does not include the alleged perpetrator of the homicide.

(c) In the case of a violation of <u>the Child Sexual Abuse Material Prevention Act</u> ~~section 28-813.01, 28-1463.03, 28-1463.04, or 28-1463.05~~, victim means a person who was a child as defined in section <u>2 of this act</u> ~~28-1463.02~~ and a participant or portrayed observer in the <u>child sexual abuse material that</u> ~~visual depiction of sexually explicit conduct which~~ is the subject of the violation and who has been identified and can be reasonably notified <u>and the parents, guardians, or duly appointed legal representative of the child victim but does not include the alleged perpetrator of the crime</u>.

(d) In the case of a sexual assault of a child ~~, a possession offense of a visual depiction of sexually explicit conduct, or a distribution offense of a visual depiction of sexually explicit conduct~~, victim means the child victim and the parents, guardians, or duly appointed legal representative of the child victim but does not include the alleged perpetrator of the crime.

(e) Victim also includes a person who was the victim of a theft under section 28-511, 28-512, 28-513, or 28-517 when (i) the value of the thing involved is five thousand dollars or more and (ii) the victim and perpetrator were intimate partners as defined in section 28-323.

(f) Victim also includes a sexual assault victim as defined in section 29-4309.

**Sec. 20.** Section 29-4003, Revised Statutes Cumulative Supplement, 2024, is amended to read:

29-4003 (1)(a) The Sex Offender Registration Act applies to any person who on or after January 1, 1997:

(i) Has ever pled guilty to, pled nolo contendere to, or been found guilty of any of the following:

(A) Kidnapping of a minor pursuant to section 28-313, except when the person is the parent of the minor and was not convicted of any other offense in this section;

(B) False imprisonment of a minor pursuant to section 28-314 or 28-315;

(C) Sexual assault pursuant to section 28-319 or 28-320;

(D) Sexual abuse by a school employee pursuant to section 28-316.01;

(E) Sexual assault of a child in the second or third degree pursuant to section 28-320.01;

(F) Sexual assault of a child in the first degree pursuant to section 28-319.01;

(G) Sexual abuse of a vulnerable adult or senior adult pursuant to subdivision (1)(c) of section 28-386;

(H) Incest of a minor pursuant to section 28-703;

(I) Pandering of a minor pursuant to section 28-802;

(J) Conduct relating to child sexual abuse material under section 5 of this act Visual depiction of sexually explicit conduct of a child pursuant to section 28-1463.03 or subdivision (2)(b) or (c) of section 4 of this act 28-1463.05;

(K) Knowingly possessing or receiving any child sexual abuse material visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers pursuant to subsection (1) or (5) (4) of section 3 of this act 28-813.01;

(L) Criminal child enticement pursuant to section 28-311;

(M) Child enticement by means of an electronic communication device pursuant to section 28-320.02;

(N) Debauching a minor pursuant to section 28-805; or

(O) Attempt, solicitation, aiding or abetting, being an accessory, or conspiracy to commit an offense listed in subdivisions (1)(a)(i)(A) through (1)(a)(i)(N) of this section;

(ii) Has ever pled guilty to, pled nolo contendere to, or been found guilty of any offense that is substantially equivalent to a registrable offense under subdivision (1)(a)(i) of this section by any village, town, city, state, territory, commonwealth, or other jurisdiction of the United States, by the United States Government, by court-martial or other military tribunal, or by a foreign jurisdiction, notwithstanding a procedure comparable in effect to that described under section 29-2264 or any other procedure to nullify a conviction other than by pardon;

(iii) Is incarcerated in a jail, a penal or correctional facility, or any other public or private institution or is under probation or parole as a result of pleading guilty to or being found guilty of a registrable offense under subdivision (1)(a)(i) or (ii) of this section prior to January 1, 1997; or

(iv) Enters the state and is required to register as a sex offender under the laws of another village, town, city, state, territory, commonwealth, or other jurisdiction of the United States.

(b) In addition to the registrable offenses under subdivision (1)(a) of this section, the Sex Offender Registration Act applies to any person who on or after January 1, 2010:

(i)(A) Except as provided in subdivision (1)(b)(i)(B) of this section, has ever pled guilty to, pled nolo contendere to, or been found guilty of any of the following:

(I) Murder in the first degree pursuant to section 28-303;

(II) Murder in the second degree pursuant to section 28-304;

(III) Manslaughter pursuant to section 28-305;

(IV) Assault in the first degree pursuant to section 28-308;

(V) Assault in the second degree pursuant to section 28-309;

(VI) Assault in the third degree pursuant to section 28-310;

(VII) Stalking pursuant to section 28-311.03;

(VIII) Violation of section 28-311.08 requiring registration under the act pursuant to subsection (6) of section 28-311.08;

(IX) Kidnapping pursuant to section 28-313;

(X) False imprisonment pursuant to section 28-314 or 28-315;

(XI) Sexual abuse of an inmate or parolee in the first degree pursuant to section 28-322.02;

(XII) Sexual abuse of an inmate or parolee in the second degree pursuant to section 28-322.03;

(XIII) Sexual abuse of a protected individual pursuant to section 28-322.04;

(XIV) Incest pursuant to section 28-703;

(XV) Child abuse pursuant to subdivision (1)(d) or (e) of section 28-707;

(XVI) Enticement by electronic communication device pursuant to section 28-833; or

(XVII) Attempt, solicitation, aiding or abetting, being an accessory, or conspiracy to commit an offense listed in subdivisions (1)(b)(i)(A)(I) through (1)(b)(i)(A)(XVI) of this section.

(B) In order for the Sex Offender Registration Act to apply to the offenses listed in subdivisions (1)(b)(i)(A)(I), (II), (III), (IV), (V), (VI), (VII), (IX), and (X) of this section, a court shall have found that evidence of sexual penetration or sexual contact, as those terms are defined in section 28-318, was present in the record, which shall include consideration of the factual basis for a plea-based conviction and information contained in the presentence report;

(ii) Has ever pled guilty to, pled nolo contendere to, or been found guilty of any offense that is substantially equivalent to a registrable offense under subdivision (1)(b)(i) of this section by any village, town, city, state, territory, commonwealth, or other jurisdiction of the United States, by the United States Government, by court-martial or other military tribunal, or by a

foreign jurisdiction, notwithstanding a procedure comparable in effect to that described under section 29-2264 or any other procedure to nullify a conviction other than by pardon; or

(iii) Enters the state and is required to register as a sex offender under the laws of another village, town, city, state, territory, commonwealth, or other jurisdiction of the United States.

(c) In addition to the registrable offenses under subdivisions (1)(a) and (b) of this section, the Sex Offender Registration Act applies to any person who on or after January 1, 2020:

(i) Has ever pled guilty to, pled nolo contendere to, or been found guilty of sexual abuse of a detainee under section 28-322.05; or

(ii) Has ever pled guilty to, pled nolo contendere to, or been found guilty of any offense that is substantially equivalent to a registrable offense under subdivision (1)(c)(i) of this section by any village, town, city, state, territory, commonwealth, or other jurisdiction of the United States, by the United States Government, by court-martial or other military tribunal, or by a foreign jurisdiction, notwithstanding a procedure comparable in effect to that described under section 29-2264 or any other procedure to nullify a conviction other than by pardon.

(d) In addition to the registrable offenses under subdivisions (1)(a), (b), and (c) of this section, the Sex Offender Registration Act applies to any person who on or after January 1, 2023:

(i) Has ever pled guilty to, pled nolo contendere to, or been found guilty of human trafficking under subsection (1) or (2) of section 28-831, and the court determines either by notification of sex offender registration responsibilities or notation in the sentencing order that the human trafficking was sex trafficking or sex trafficking of a minor and not solely labor trafficking or labor trafficking of a minor; or

(ii) Has ever pled guilty to, pled nolo contendere to, or been found guilty of any offense that is substantially equivalent to a registrable offense under subdivision (1)(d)(i) of this section by any village, town, city, state, territory, commonwealth, or other jurisdiction of the United States, by the United States Government, by court-martial or other military tribunal, or by a foreign jurisdiction, notwithstanding a procedure comparable in effect to that described under section 29-2264 or any other procedure to nullify a conviction other than by pardon.

(2) A person appealing a conviction of a registrable offense under this section shall be required to comply with the act during the appeals process.

**Sec. 21.** Section 29-4309, Revised Statutes Cumulative Supplement, 2024, is amended to read:

29-4309 For the purposes of the Sexual Assault Victims' Bill of Rights Act:

(1)(a) Advocate means:

(i) Any employee or supervised volunteer of a domestic violence and sexual assault victim assistance program or of any other agency, business, or organization that is not affiliated with a law enforcement or prosecutor's office, whose primary purpose is assisting domestic violence and sexual assault victims. This includes employees or supervised volunteers of an Indian tribe or a postsecondary educational institution;

(ii) A representative from a victim and witness assistance center as established in sections 81-1845 to 81-1847 or a similar entity affiliated with a law enforcement agency or prosecutor's office; or

(iii) An advocate who is employed by a child advocacy center that meets the requirements of subsection (2) of section 28-728.

(b) If reasonably possible, an advocate shall speak the victim's preferred language or use the services of a qualified interpreter;

(2) Health care provider means any individual who is licensed, certified, or registered to perform specified health services consistent with state law;

(3) Sexual assault means a violation of section 28-319, 28-319.01, 28-320, 28-320.01, 28-320.02, 28-322.01, 28-322.02, 28-322.03, 28-322.04, 28-322.05, or 28-703, or section 5 of this act 28-1463.03, sex trafficking or sex trafficking of a minor under section 28-831, or subdivision (1)(c) or (g) of section 28-386 or subdivision (1)(d), (e), or (f) of section 28-707;

(4) Sexual assault forensic evidence means evidence collected by a health care provider contained within any sexual assault forensic evidence collection kit, including a toxicology kit, or any forensic evidence collected by law enforcement through the course of an investigation; and

(5)(a) Sexual assault victim or victim means any person who is a victim of sexual assault who reports such sexual assault:

(i) To a health care provider, law enforcement, or an advocate, including anonymous reporting as provided in section 28-902; and

(ii) In the case of a victim who is under eighteen years of age, to the Department of Health and Human Services.

(b) Sexual assault victim or victim also includes, if the victim described in subdivision (5)(a) of this section is incompetent, deceased, or a minor who is unable to consent to counseling services, such victim's parent, guardian, or spouse, unless such person is the reported assailant.

**Sec. 22.** Section 29-4316, Revised Statutes Cumulative Supplement, 2024, is amended to read:

29-4316 (1) For purposes of this section:

(a) Criminal justice agency has the same meaning as in section 29-3509;

(b) Sex trafficking means sex trafficking or sex trafficking of a minor in violation of section 28-831; and

LB383                                                                                                    LB383
2025                                                                                                      2025

(c) Sexual assault means a violation of section 28-319, 28-319.01, 28-320, 28-320.01, 28-320.02, 28-322.01, 28-322.02, 28-322.03, 28-322.04, 28-322.05, or 28-703, or section 5 of this act 28-1463.03 or subdivision (1)(c) or (g) of section 28-386 or subdivision (1)(d), (e), or (f) of section 28-707.

(2) Except as provided in subsection (3) of this section, and unless otherwise required by statute, a criminal justice agency and any attorney involved in the investigation or prosecution of an alleged sexual assault or sex trafficking violation shall maintain the confidentiality of the identity and personal identifying information of the alleged victim. Such information may be shared by such criminal justice agencies and between such criminal justice agencies and attorneys as necessary to carry out their duties.

(3) The confidentiality required by subsection (2) of this section does not apply:

(a) To the extent waived by the alleged victim;

(b) If criminal charges involving the alleged sexual assault or sex trafficking are filed;

(c) If the victim has died as a result of, or in connection with, the alleged sexual assault or sex trafficking;

(d) In cases where personal identifying information or the identity of the victim are released as part of a child abduction alert system used by law enforcement agencies, such as the AMBER Alert system;

(e) To a person making a report of suspected child abuse or neglect as required in section 28-711;

(f) To the sharing of reports and information regarding child abuse and neglect with a child abuse and neglect investigation team or child abuse and neglect treatment team provided for in section 28-728;

(g) To the Department of Health and Human Services and other assisting agencies as necessary to carry out their duties in investigations of child abuse or neglect;

(h) To communication with an individual that an educational entity, as defined in section 79-1201.01, has designated:

(i) As a Title IX coordinator; or

(ii) To receive reports related to sexual assault or sex trafficking or to provide supportive measures related to such reports; or

(i) To communication with advocates and health care providers as defined in section 29-4309.

**Sec. 23.** Section 83-174.02, Reissue Revised Statutes of Nebraska, is amended to read:

83-174.02 (1) The Department of Correctional Services shall order an evaluation of the following individuals by a mental health professional to determine whether or not the individual is a dangerous sex offender:

(a) Individuals who have been convicted of (i) sexual assault of a child in the first degree pursuant to section 28-319.01 or (ii) sexual assault in the first degree pursuant to section 28-319;

(b) Individuals who have been convicted of two or more offenses requiring registration as a sex offender under section 29-4003 if one of the convictions was for any of the following offenses: (i) Kidnapping of a minor pursuant to section 28-313, except when the person is the parent of the minor and was not convicted of any other offense; (ii) sexual assault in the first degree pursuant to section 28-319 or sexual assault in the second degree pursuant to section 28-320; (iii) sexual assault of a child pursuant to section 28-320.01; (iv) sexual assault of a child in the first degree pursuant to section 28-319.01; (v) sexual assault of a child in the second or third degree pursuant to section 28-320.01; (vi) sexual assault of a vulnerable adult or senior adult pursuant to subdivision (1)(c) of section 28-386; (vii) incest of a minor pursuant to section 28-703; (viii) conduct relating to child sexual abuse material under section 5 of this act visual depiction of sexually explicit conduct of a child pursuant to section 28-1463.03; or (ix) any offense that is substantially equivalent to an offense listed in this section by any state, territory, commonwealth, or other jurisdiction of the United States, by the United States Government, or by court-martial or other military tribunal, notwithstanding a procedure comparable in effect to that described in section 29-2264 or any other procedure to nullify a conviction other than by pardon;

(c) Individuals convicted of a sex offense against a minor who have refused to participate in or failed to successfully complete the sex offender treatment program offered by the Department of Correctional Services or the Department of Health and Human Services during the term of incarceration. The failure to successfully complete a treatment program due to time constraints or the unavailability of treatment programming shall not constitute a refusal to participate in treatment; and

(d) Individuals convicted of failure to comply with the registration requirements of the Sex Offender Registration Act who have previously been convicted for failure to comply with the registration requirements of the act or a similar registration requirement in another state.

(2) The evaluation required by this section shall be ordered at least one hundred eighty days before the scheduled release of the individual. Upon completion of the evaluation, and not later than one hundred fifty days prior to the scheduled release of the individual, the department shall send written notice to the Attorney General, the county attorney of the county where the offender is incarcerated, and the prosecuting county attorney. The notice shall contain an affidavit of the mental health professional describing his or her findings with respect to whether or not the individual is a dangerous sex offender.

**Sec. 24.** Section 84-205, Reissue Revised Statutes of Nebraska, is amended to read:

84-205 The duties of the Attorney General shall be:

(1) To appear and defend actions and claims against the state;

(2) To investigate, commence, and prosecute any and all actions resulting from violations of sections 32-1401 to 32-1417;

(3) To consult with and advise the county attorneys, when requested by them, in all criminal matters and in matters relating to the public revenue. He or she shall have authority to require aid and assistance of the county attorney in all matters pertaining to the duties of the Attorney General in the county of such county attorney and may, in any case brought to the Court of Appeals or Supreme Court from any county, demand and receive the assistance of the county attorney from whose county such case is brought;

(4) To give, when required, without fee, his or her opinion in writing upon all questions of law submitted to him or her by the Governor, head of any executive department, Secretary of State, State Treasurer, Auditor of Public Accounts, Board of Educational Lands and Funds, State Department of Education, Public Service Commission, or Legislature;

(5) At the request of the Governor, head of any executive department, Secretary of State, State Treasurer, Auditor of Public Accounts, Board of Educational Lands and Funds, State Department of Education, or Public Service Commission, to prosecute any official bond or any contract in which the state is interested which is deposited with any of them and to prosecute or defend for the state all civil or criminal actions and proceedings relating to any matter connected with any of such officers' departments if, after investigation, he or she is convinced there is sufficient legal merit to justify the proceeding. Such officers shall not pay or contract to pay from the funds of the state any money for special attorneys or counselors-at-law unless the employment of such special counsel is made upon the written authorization of the Governor or the Attorney General;

(6) To enforce the proper application of money appropriated by the Legislature to the various funds of the state and prosecute breaches of trust in the administration of such funds;

(7) To prepare, when requested by the Governor, Secretary of State, State Treasurer, or Auditor of Public Accounts or any other executive department, proper drafts for contracts, forms, or other writings which may be wanted for the use of the state and report to the Legislature, whenever requested, upon any business pertaining to the duties of his or her office. The report submitted to the Legislature shall be submitted electronically;

(8) To pay all money received, belonging to the people of the state, immediately upon receipt thereof, into the state treasury;

(9) To keep a record in proper books provided for that purpose at the expense of the state, a register of all actions and demands prosecuted or defended by him or her in behalf of the state and all proceedings had in relation thereto, and deliver the same to his or her successor in office;

(10) To appear for the state and prosecute and defend all civil or criminal actions and proceedings in the Court of Appeals or Supreme Court in which the state is interested or a party. When requested by the Governor or the Legislature, the Attorney General shall appear for the state and prosecute or defend any action or conduct any investigation in which the state is interested or a party before any court, officer, board, tribunal, or commission;

(11) To prepare and promulgate model rules of procedure appropriate for use by as many agencies as possible. The Attorney General shall add to, amend, or revise the model rules as necessary for the proper guidance of agencies;

(12) To include within the budget of the office sufficient funding to assure oversight and representation of the State of Nebraska for district court appeals of administrative license revocation proceedings under section 60-498.04;

(13)(a) To create a Child Protection Division to be staffed by at least three assistant attorneys general who each have five or more years of experience in the prosecution or defense of felonies or misdemeanors, including two years in the prosecution or defense of crimes against children. Upon the written request of a county attorney, the division shall provide consultation and advise and assist in the preparation of the trial of any case involving a crime against a child, including, but not limited to, the following offenses:

(i) Murder as defined in sections 28-303 and 28-304;

(ii) Manslaughter as defined in section 28-305;

(iii) Kidnapping as defined in section 28-313;

(iv) False imprisonment as defined in sections 28-314 and 28-315;

(v) Child abuse as defined in section 28-707;

(vi) Pandering as defined in section 28-802;

(vii) Debauching a minor as defined in section 28-805; and

(viii) Offenses listed in the Child Sexual Abuse Material Prevention Act or section sections 28-813 , 28-813.01, and 28-1463.03.

(b) Any offense listed in subdivisions (13)(a)(i) through (viii) of this section shall include all inchoate offenses pursuant to the Nebraska Criminal Code and compounding a felony pursuant to section 28-301. Such crimes shall not include matters involving dependent and neglected children, infraction violations, custody, parenting time, visitation, or other access matters, or child support. If the county attorney declines in writing to prosecute a case involving a crime against a child because of an ethical consideration, including the presence or appearance of a conflict of interest, or for any other reason, the division shall, upon the receipt of a written request of the

-18-

county attorney, the Department of Health and Human Services, the minor child, the parents of the minor child, or any other interested party, investigate the matter and either decline to prosecute the matter or initiate the appropriate criminal proceedings in a court of proper jurisdiction.

(c) For purposes of this subdivision (13), child or children shall mean an individual or individuals sixteen years of age or younger; and

(14) To enforce the Foreign-owned Real Estate National Security Act.

**Sec. 25.** Section 87-302, Reissue Revised Statutes of Nebraska, is amended to read:

87-302 (a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, he or she:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) Uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

(6) Represents that goods or services do not have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they have or that a person does not have a sponsorship, approval, status, affiliation, or connection that he or she has;

(7) Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand, except that sellers may repair damage to and make adjustments on or replace parts of otherwise new goods in an effort to place such goods in compliance with factory specifications;

(8) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(9) Disparages the goods, services, or business of another by false or misleading representation of fact;

(10) Advertises goods or services with intent not to sell them as advertised or advertises the price in any manner calculated or tending to mislead or in any way deceive a person;

(11) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(12) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(13) Uses or promotes the use of or establishes, operates, or participates in a pyramid promotional scheme in connection with the solicitation of such scheme to members of the public. This subdivision shall not be construed to prohibit a plan or operation, or to define a plan or operation as a pyramid promotional scheme, based on the fact that participants in the plan or operation give consideration in return for the right to receive compensation based upon purchases of goods, services, or intangible property by participants for personal use, consumption, or resale so long as the plan or operation does not promote or induce inventory loading and the plan or operation implements an appropriate inventory repurchase program;

(14) With respect to a sale or lease to a natural person of goods or services purchased or leased primarily for personal, family, household, or agricultural purposes, uses or employs any referral or chain referral sales technique, plan, arrangement, or agreement;

(15) Knowingly makes a false or misleading statement in a privacy policy, published on the Internet or otherwise distributed or published, regarding the use of personal information submitted by members of the public;

(16) Uses any scheme or device to defraud by means of:

(i) Obtaining money or property by knowingly false or fraudulent pretenses, representations, or promises; or

(ii) Selling, distributing, supplying, furnishing, or procuring any property for the purpose of furthering such scheme;

(17) Offers an unsolicited check, through the mail or by other means, to promote goods or services if the cashing or depositing of the check obligates the endorser or payee identified on the check to pay for goods or services. This subdivision does not apply to an extension of credit or an offer to lend money;

(18) Mails or causes to be sent an unsolicited billing statement, invoice, or other document that appears to obligate the consumer to make a payment for services or merchandise he or she did not order;

(19)(i) Installs, offers to install, or makes available for installation or download a covered file-sharing program on a computer not owned by such person without providing clear and conspicuous notice to the owner or authorized user of the computer that files on that computer will be made available to the public and without requiring intentional and affirmative activation of the file-sharing function of such covered file-sharing program by the owner or authorized user of the computer; or

(ii) Prevents reasonable efforts to block the installation, execution, or disabling of a covered file-sharing program;

-19-

(20) Violates any provision of the Nebraska Foreclosure Protection Act;

(21) In connection with the solicitation of funds or other assets for any charitable purpose, or in connection with any solicitation which represents that funds or assets will be used for any charitable purpose, uses or employs any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or concealment, suppression, or omission of any material fact;

(22)(i) In the manufacture, production, importation, distribution, promotion, display for sale, offer for sale, attempt to sell, or sale of a substance:

(A) Makes a deceptive or misleading representation or designation, or omits material information, about a substance or fails to identify the contents of the package or the nature of the substance contained inside the package; or

(B) Causes confusion or misunderstanding as to the effects a substance causes when ingested, injected, inhaled, or otherwise introduced into the human body.

(ii) A person shall be deemed to have committed a violation of the Uniform Deceptive Trade Practices Act for each individually packaged product that is either manufactured, produced, imported, distributed, promoted, displayed for sale, offered for sale, attempted to sell, or sold in violation of this section. A violation under this subdivision (a)(22) shall be treated as a separate and distinct violation from any other offense arising out of acts alleged to have been committed while the person was in violation of this section;

(23)(i) Manufactures, produces, publishes, distributes, monetizes, promotes, or otherwise makes publicly available any visual depiction of sexually explicit conduct, any obscene material, or any material that is harmful to minors in which any person depicted as a participant or observer:

(A) Is under eighteen years of age;

(B) Is a trafficking victim;

(C) Has not expressly and voluntarily consented to such person's depiction; or

(D) Participated in any act depicted without consent.

(ii) This subdivision (a)(23) does not apply to any telecommunications service.

(iii) For purposes of this subdivision (a)(23):

(A) Harmful to minors has the same meaning as in 47 U.S.C. 254, as such section existed on January 1, 2024;

(B) Obscene material has the same meaning as in section 28-807;

(C) Promote means to use any mechanism or publication, or take any action, that suggests, highlights, advertises, markets, curates, backlinks, hashtags, or otherwise directs, attempts to direct, or encourages traffic toward specific materials, including acts carried out affirmatively, through automation, algorithmically, and via other technical means both known and unknown at this time;

(D) Publish means to communicate or make information available to another person via an Internet website, regardless of whether the person consuming, viewing, or receiving the material gives any consideration for the published material;

(E) Trafficking victim has the same meaning as in section 28-830;

(F) Visual depiction of sexually explicit conduct has the same meaning as in section 2 of this act 28-1463.02; and

(G) Without consent has the same meaning as in section 28-318; or

(24) Offers or enters into a right-to-list home sale agreement as defined in section 81-885.01.

(b) In order to prevail in an action under the Uniform Deceptive Trade Practices Act, a complainant need not prove competition between the parties.

(c) This section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this state.

**Sec. 26.**  Sections 26 to 30 of this act shall be known and may be cited as the Parental Rights in Social Media Act.

**Sec. 27.**  For purposes of the Parental Rights in Social Media Act:

(1) Account holder means a person who, on or after the operative date of this section, creates an account or profile on a social media platform;

(2) Content includes a text, an image, or a video;

(3) Digitized identification card means a data file that contains all of the data elements visible on the face and back of a government-issued operator's license or government-issued identification document and displays the current status of the license or document;

(4)(a) Interactive computer service means an information service as defined in 47 U.S.C. 153, an information system, or an information access software that:

(i) Provides or enables access by multiple users to a computer server; and

(ii) Provides access to the Internet.

(b) An interactive computer service includes an Internet service, an Internet system, an Internet application, an Internet portal, and a website;

(5) Minor means an individual who is:

(a) Known or reasonably believed by a social media platform to be under eighteen years of age;

(b) Not emancipated; and

(c) A resident of this state;

(6) Parent means the parent or legal guardian of a minor;

(7) Person means an individual or entity;

(8) Post means content that an account holder makes available on a social

media platform for other account holders and users to view;

(9) Reasonable age verification method includes requiring presentation of a digitized identification card or any commercially reasonable age verification method to confirm an individual's age;

(10) Social media company means a person that is an interactive computer service and that provides a social media platform;

(11)(a) Social media platform means a website or Internet application that:

(i) Allows a person to create an account; and

(ii) Enables an account holder to communicate with other account holders and users through posts.

(b) Social media platform does not include:

(i) A broadband Internet access service, as defined in 47 C.F.R. 8.1(b);

(ii) An email service;

(iii) An Internet service, Internet application, or website:

(A) That consists primarily of content that is not generated by account holders, but rather is preselected by the service, application, or website provider; and

(B) For which interactive functionality is incidental to, directly related to, or dependent upon, such preselected content;

(iv) Online shopping, if the interaction with other account holders or users is predominantly limited to the ability to (A) send, receive, request, or settle funds, (B) comment on transactions, (C) display goods for sale, (D) engage as consumers about products and reviews, or (E) post a wish list;

(v) An Internet service, Internet application, or website that primarily provides career development opportunities;

(vi) A cloud storage or cloud computing service;

(vii) An online service, application, or website in which interaction between users is predominately (A) used for technical support or (B) limited to reviewing products offered for sale by means of electronic commerce or commenting on such reviews posted by other users; or

(viii) Peer-to-peer payment platforms, if the interaction with other users or account holders is generally limited to the ability to send, receive, or request funds and to like or comment on such transactions, or other functions that are focused on sending, receiving, requesting, or settling payments between users or account holders; and

(12) User means a person who consumes posts on a social media platform but who is not an account holder.

Sec. 28.   (1)(a) Except as provided in subsection (2) of this section, a social media company shall not permit a minor to become an account holder. A social media platform shall use a reasonable age verification method to verify the age of an individual seeking to become an account holder on the company's social media platform. A social media company may use a third-party vendor to perform such verification.

(b) A social media company or third-party vendor conducting such verification shall not retain any identifying information of an individual after verification is complete.

(2) A social media company may allow a minor to become an account holder if the parent of such minor provides express parental consent authorizing such minor to become an account holder. A social media company or third-party vendor shall verify the express parental consent which shall include:

(a) Age verification of the parent through a reasonable age verification method; and

(b) An oath, affirmation, or form signed by the parent and returned to the social media company or third-party vendor by common carrier, facsimile, or electronic scan stating that the consenting adult is the minor user's parent and authorizes such minor to become an account holder.

(3)(a) Once age and parental consent, if applicable, are verified, the social media company may permit the minor to become an account holder. Reverification of an account holder is not required unless parental consent is revoked by a parent.

(b) A social media company shall develop a method for a parent to revoke consent for a minor to be an account holder. If consent is revoked, a social media company shall remove the account of such parent's minor and prohibit such minor from becoming an account holder until additional express parental consent is provided.

(4) A social media company shall provide a parent of a minor account holder with methods for the parent to supervise the minor's account. Such methods shall include options for the parent to:

(a) View all posts the minor account holder makes under the social media platform account;

(b) View all responses and messages sent to or by the minor account holder in the social media platform account;

(c) Control the minor's privacy and account settings; and

(d) Monitor and limit the amount of time the minor account holder spends using the social media platform.

Sec. 29.   (1) A person aggrieved by a violation of section 28 of this act may bring a civil action against the social media company or third-party vendor which engaged in the violation to recover such relief as may be appropriate.

(2) In an action under this section, appropriate relief includes:

(a) Such preliminary and other equitable or declaratory relief as may be appropriate;

(b) Damages under subsection (3) of this section; and

(c) At the discretion of the court, reasonable attorney's fees and other litigation costs reasonably incurred.

(3)(a) An individual whose information was retained in violation of subdivision (1)(b) of section 28 of this act may recover actual damages caused by such violation.

(b) A minor or a parent of such minor aggrieved by any other violation of section 28 of this act may recover actual damages caused by such violation.

**Sec. 30.** The Attorney General shall enforce the Parental Rights in Social Media Act and may impose a penalty of up to two thousand five hundred dollars per violation. All penalties collected pursuant to this section shall be remitted to the State Treasurer for distribution in accordance with Article VII, section 5, of the Constitution of Nebraska.

**Sec. 31.** Sections 26, 27, 28, 29, and 30 of this act become operative on July 1, 2026. The other sections of this act become operative on their effective date.

**Sec. 32.** If any section in this act or any part of any section is declared invalid or unconstitutional, the declaration shall not affect the validity or constitutionality of the remaining portions.

**Sec. 33.** Original sections 25-21,291, 25-21,302, 27-1301, 28-116, 28-320.02, 28-813.02, 28-833, 28-1463.01, 28-1463.02, 28-1463.06, 28-1601, 28-1602, 83-174.02, 84-205, and 87-302, Reissue Revised Statutes of Nebraska, and sections 28-813.01, 28-1354, 28-1463.03, 28-1463.05, 28-1701, 29-110, 29-119, 29-4003, 29-4309, and 29-4316, Revised Statutes Cumulative Supplement, 2024, are repealed.

**Sec. 34.** The following section is outright repealed: Section 28-1463.04, Reissue Revised Statutes of Nebraska.