**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| NETCHOICE,<br><br>     *Plaintiff*,<br><br>     v.<br><br>MICHAEL HILGERS, in his official capacity as Attorney General of the State of Nebraska,<br><br>     *Defendant*. | Case No. 4:26-cv-03149 |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 4

      A.      Adults and Minors Alike Engage in First Amendment Activity on Online Services Covered by the Act .......................................................... 4

      B.      Parents Have Many Ways to Supervise How Their Minor Children Use the Internet ......................................................................................... 5

      C.      Nebraska Enacts the Social Media Act .............................................. 7

ARGUMENT ................................................................................................................. 10

I.      NetChoice Is Likely To Succeed On Its Claim That The Parental Supervision And Age Verification Requirements (L.B. 383 §28(1)-(3)) Violate The First Amendment................................................................................................... 10

      A.      The Parental Supervision and Age Verification Requirements Restrict a Breathtaking Amount of Core First Amendment Activity ................................... 10

      B.      The Social Media Act Triggers Strict Scrutiny ....................................... 16

      C.      The Age-Verification and Parental-Consent Requirements Cannot Survive Any Level of Heightened Scrutiny ........................................... 18

II.     NetChoice Is Likely To Succeed On Its Claim That The Parental-Surveillance Requirements (§28(4)(a) and (b)) Violate The First Amendment.................................... 24

III.    The Other Preliminary Injunction Factors Overwhelmingly Support Maintaining The Status Quo ...................................................................... 28

CONCLUSION.................................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
 594 U.S. 758 (2021) ........................................................................................ 29

*Ams. for Prosperity Found. v. Bonta*,
 594 U.S. 595 (2021) ..................................................................................... 25, 26

*Ashcroft v. ACLU*,
 542 U.S. 656 (2004) ..................................................................................... 15, 22

*Brown v. Ent. Merchs. Ass'n*,
 564 U.S. 786 (2011) ..................................................................................... *passim*

*Brown v. Socialist Workers '74 Campaign Comm.*,
 459 U.S. 87 (1982) ............................................................................................ 25

*Citizens United v. FEC*,
 558 U.S. 310 (2010) .......................................................................................... 17

*City of Austin v. Reagan Nat'l Advert. of Aus.*,
 596 U.S. 61 (2022) ....................................................................................... 16, 17

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
 747 F.Supp.3d 1011 (W.D. Tex. 2024) .......................................................... 1, 13

*Dakotans for Health v. Noem*,
 52 F.4th 381 (8th Cir. 2022) ........................................................................ 25, 26

*Elrod v. Burns*,
 427 U.S. 347 (1976) .......................................................................................... 28

*Erznoznik v. City of Jacksonville*,
 422 U.S. 205 (1975) ..................................................................................... 11, 13

*FEC v. Cruz*,
 596 U.S. 289 (2022) ................................................................................... 3, 23, 28

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
 146 S.Ct. 1114 (2026) ....................................................................................... 26

*Free Speech Coal. v. Paxton*,
 606 U.S. 461 (2025) ..................................................................................... *passim*

*Hurley v. Ir.-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
 515 U.S. 557 (1995) .......................................................................................... 24

ii

*Interactive Digit. Software Ass'n v. St. Louis Cnty.*,
   329 F.3d 954 (8th Cir. 2003) .................................................................... 19

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ................................................................................. 18

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ............................................................ 18, 22, 23, 27

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995) .................................................................... 24, 25

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
   692 F.3d 864 (8th Cir. 2012) ................................................................. 28

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) ............................................................ 5, 10, 15, 20

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   78 F.4th 1011 (8th Cir. 2023) ............................................................... 10

*NAACP v. Ala. ex rel. Patterson*,
   357 U.S. 449 (1958) ................................................................................. 25

*NetChoice v. Bonta*,
   770 F.Supp.3d 1164 (N.D. Cal. 2025) ................................................ 13

*NetChoice v. Carr*,
   789 F.Supp.3d 1200 (N.D. Ga. 2025) .......................................... *passim*

*NetChoice v. Jones*,
   2026 WL 561099 (E.D. Va. Feb. 27, 2026) ................................... 1, 13

*NetChoice v. Murrill*,
   812 F.Supp.3d 594 (M.D. La. 2025) ..................................................... 1

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024) ..................................................... 13, 23

*NetChoice, LLC v. Griffin*,
   2025 WL 978607 (W.D. Ark. Mar. 31, 2025) .......................... 1, 13, 18, 27

*NetChoice, LLC v. Reyes*,
   748 F.Supp.3d 1105 (D. Utah 2024) ............................................ *passim*

*NetChoice, LLC v. Yost*,
   716 F.Supp.3d 539 (S.D. Ohio 2024) ...................................... 13, 15, 23

iii

*NetChoice, LLC v. Yost*,
    778 F.Supp.3d 923 (S.D. Ohio 2025)..........................................................................1, 18, 27

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)......................................................................................................*passim*

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)............................................................................................................ 16

*Reno v. ACLU*,
    521 U.S. 844 (1997)..................................................................................................... 15, 22

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
    487 U.S. 781 (1988)........................................................................................................... 24

*Rodgers v. Bryant*,
    942 F.3d 451 (8th Cir. 2019)............................................................................................. 29

*Schmitt v. Rebertus*,
    148 F.4th 958 (8th Cir. 2025)...................................................................................... 28, 29

*SEAT v. Paxton*,
    765 F.Supp.3d 575 (W.D. Tex. 2025)................................................................................ 18

*Shelton v. Tucker*,
    364 U.S. 479 (1960)........................................................................................................... 25

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)........................................................................................................... 20

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969)........................................................................................................... 11

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994)........................................................................................................... 17

*United States v. Hansen*,
    599 U.S. 762 (2023)........................................................................................................... 13

*United States v. Stevens*,
    559 U.S. 460 (2010)........................................................................................................... 13

*Video Software Dealers Ass'n v. Webster*,
    968 F.2d 684 (8th Cir. 1992)............................................................................................. 19

*Wooley v. Maynard*,
    430 U.S. 705 (1977)........................................................................................................... 24

iv

**Statutes**

Ark. Code §4-88-1502(a) ................................................................................................ 22

Fla. Stat. §501.1736(1)(e) ............................................................................................. 22

**Other Authorities**

Cindy Gonzalez, *Gov. Pillen, Lawmakers Take Aim at Youth Social Media and Cellphone Use*, Nebraska Examiner (Jan. 13, 2025), https://perma.cc/J5HD-7RH9 ............. 19

College Confidential, *The Real Deal on Applying to College*, https://perma.cc/39MA-J8SE ................................................................................. 22

Denise Paolucci, *Mississippi Site Block, Plus A Small Restriction on Tennessee New Accounts*, Dreamwidth (Aug. 31, 2025), https://perma.cc/MD99-W9GS ............................... 5

Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and Religion*, 75 Emory L.J. (forthcoming 2026), https://perma.cc/LFX6-XMX4 ....................... 21

Instagram, Help Center, *About Supervision on Instagram*, https://perma.cc/7F6Q-D2SP ................................................................................ 7

Meta, *Supervision on Facebook*, https://perma.cc/Z7ZF-MKQX ................................................ 7

SSRN, *Welcome to SSRN*, https://perma.cc/WA7P-D9GL ......................................................... 22

## INTRODUCTION

Nebraska's Parental Rights in Social Media Act ("Social Media Act" or "the Act"), which takes effect July 1, 2026, is the latest attempt in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors. Books, movies, television, rock music, video games, and the Internet have all been accused in the past of posing risks to minors. Today, similar debates rage about "social media" websites. These debates are important, and the government may certainly take part in them. But the First Amendment does not take kindly to government efforts to resolve them.

Nevertheless, several states have recently taken it upon themselves to try to restrict minors' access to constitutionally protected speech on some of the most popular "social media" services. Courts across the country have rejected those efforts as inconsistent with the First Amendment. *See, e.g.*, *NetChoice v. Jones*, 2026 WL 561099, at \*10-12 (E.D. Va. Feb. 27, 2026), *appeal filed*, No. 26-1252 (4th Cir.); *NetChoice v. Murrill*, 812 F.Supp.3d 594, 643 (M.D. La. 2025), *appeal filed*, No. 23-30016 (5th Cir.); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at \*7-10, 17 (W.D. Ark. Mar. 31, 2025), *appeal filed*, No. 25-1889 (8th Cir.); *NetChoice, LLC v. Yost*, 778 F.Supp.3d 923, 947-57 (S.D. Ohio 2025), *appeal filed*, No. 25-3371 (6th Cir.); *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1220-23, 1234 (N.D. Ga. 2025), *appeal filed*, No. 25-12436 (11th Cir.); *NetChoice, LLC v. Reyes*, 748 F.Supp.3d 1105, 1120-23, 1134 (D. Utah 2024), *appeal filed*, No. 24-4100 (10th Cir.); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F.Supp.3d 1011, 1032-34, 1044 (W.D. Tex. 2024), *appeal filed*, No. 24-50721 (5th Cir.). And rightly so. States may certainly take steps to protect minors who use "social media," but requiring minors to obtain parental consent before accessing those websites is not a narrowly tailored means of advancing a legitimate governmental interest. While the state perhaps "has the power to *enforce* parental prohibitions—

to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend"—"it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to proselytize young people." *Id.* They "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

Like similar state efforts, the Social Media Act violates the First Amendment. *See* 2025 Neb. Laws L.B. 383 §§26-30.[1] The Act requires "social media platform[s]" to verify every user's age and obtain parental consent before allowing a minor to create an account. §28(1)(a), (1)(b)(2). The Act, however, does not limit its reach to "social media" as that term is commonly understood. It defines "social media" broadly to reach video-sharing platforms like YouTube, blogging platforms like Dreamwidth, messaging boards like College Confidential, and services for sharing research papers like Social Science Research Network (SSRN). By restricting the ability of minors (and adults, who must now prove their age) to access these websites, Nebraska has "with one broad stroke" restricted access to valuable sources for speaking and listening, learning about current events, "and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

On top of that, the Act requires targeted companies to provide parents with tools to monitor every single post the minor makes, as well as all responses and messages sent to or by the minor on social media. §28(4)(a)-(b). That remarkable requirement burdens First Amendment activity as well. Minors are far more likely to self-censor if they know that their parents are monitoring

---

[1] Unless otherwise indicated, all statutory citations are to L.B. 383.

every post and private message they send and receive. Worse still, if the minor is speaking with another minor in Nebraska, the Act requires covered websites to give *other parents* access to the minor's private messages too—even if the minor is discussing solutions for dealing with an abusive parent, or engaging in sensitive conversations with friends or a significant other.

The state cannot begin to show that its age verification, parental consent, and parental surveillance provisions are necessary to advance any legitimate interest it may assert. Parents already have a wealth of tools at their disposal to limit what online services their minor children use, what they can do on those services, and how often they can use them. Indeed, other provisions of the Social Media Act already require covered websites to provide parents with tools to protect their minors (including tools to limit the amount of time their minors spend on the websites)—requirements that NetChoice does not challenge. §28(4)(c)-(d). Nebraska has not explained why those existing tools do not suffice to serve its interests. A "prophylaxis-upon-prophylaxis approach" is "a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *FEC v. Cruz*, 596 U.S. 289, 306 (2022). And Nebraska's felt need to impose access restrictions confirms that the point of its law is not to "support … what some parents of the restricted children actually want." *Brown*, 564 U.S. at 804. It is instead an impermissible attempt to impose "what the State thinks parents *ought* to want." *Id.*

For these reasons and others, the Court should preliminarily enjoin the Attorney General of Nebraska from enforcing §28(1), (2), (3), and (4)(a)-(b) of the Social Media Act against NetChoice's members.

3

## BACKGROUND

**A.      Adults and Minors Alike Engage in First Amendment Activity on Online Services Covered by the Act.**

NetChoice is an Internet trade association whose members operate many online services, including Facebook, Instagram, YouTube, Snapchat, Pinterest, Reddit, TikTok, Nextdoor, and Dreamwidth.  These services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107.  "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104.  On Instagram, users can share photos of everyday moments and express themselves with short, fun videos.  On X, "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05.  YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.  On Snapchat, users can communicate with friends and family in fun and casual ways.  On Pinterest, users can discover ideas for recipes, style, home décor, and more.  On Reddit, users can join communities dedicated to shared interests and make their knowledge accessible to each other.  On TikTok, users can find advice, support, and empathy.  On Nextdoor, users can connect with neighbors, share local news, and borrow tools.  And on Dreamwidth, users can share blog or journal entries or creative work with friends and family.

Like adults, minors use these websites to engage in an array of First Amendment activity on a wide range of topics.  Minors use online services to read the news, connect with friends, explore new interests, follow their favorite sports teams, and research their dream colleges.  Some use online services to hone a new skill or showcase their creative talents, including photography, writing, or other forms of expression.  Others use them to raise awareness about social causes and to participate in public discussions on salient topics of the day.  Still others use them to build

4

communities and connect with others who share similar interests or experiences.

These websites also engage in their own First Amendment activity. They curate and disseminate third-party speech to their users and, as a result, produce a "distinctive expressive offering." *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024). Facebook, Instagram, Snapchat, Nextdoor, and TikTok curate and disseminate third-party content to their users based on their judgment about what content is appropriate for them, as well as their judgment about what content users are likely to enjoy seeing. Cleland.Decl.¶¶4, 14; Baird.Decl.¶¶12-15; Geary.Decl.¶7. Snapchat's Spotlight feature allows users to make videos that, after moderation, are curated and can be distributed more broadly. Geary.Decl.¶4. Dreamwidth likewise removes content across its service that it deems objectionable under the standards in its terms of service and also provides a single limited forum on a separate page where users can go to view suggestions for accounts that they may be interested in based on what accounts their friends follow. Paolucci.Decl.¶¶5-6, 15. These websites also engage in speech when they post their own speech on the service. For example, Dreamwidth's owners post updates on important topics to their users directly through the service so that users and visitors can stay abreast of issues impacting the service. *See, e.g.*, Denise Paolucci, *Mississippi Site Block, Plus A Small Restriction on Tennessee New Accounts*, Dreamwidth (Aug. 31, 2025), https://perma.cc/MD99-W9GS.

> ### B. Parents Have Many Ways to Supervise How Their Minor Children Use the Internet.

Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree online services like Facebook, Instagram, X, YouTube, TikTok, Snapchat, Pinterest, Reddit, Dreamwidth, and Nextdoor are appropriate for minors. Concerns that new means of communication may be harmful to minors, however, are hardly new. The same basic concerns

animating discussion about minors' access to the Internet have been raised repeatedly in the past about other types of speech and other mediums of expression, from "penny dreadfuls" to "motion pictures," "[r]adio dramas," "comic books," and more. *Brown*, 564 U.S. at 797-98.

While the government can certainly participate in those debates, the Supreme Court has repeatedly rejected government efforts to try to resolve them by decreeing what speech minors may access. After all, "[m]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id*. at 794-95. And while states have an interest in protecting minors from harm, that interest "does not include a free-floating power to restrict the ideas to which [they] may be exposed." *Id.* In a Nation that values the First Amendment, the preferred response is to let parents decide what constitutionally protected speech their children may access, and how and when they may access it.

Parents have many tools at their disposal to control their children's access to speech on the Internet should they choose to do so. Parents can decide whether and when to let their children use computers, tablets, and smartphones in the first place. And those who choose to do so have many ways to control what their children see and do. Device manufacturers (e.g., Apple, Google) offer settings that parents may use to limit the time that their children spend on applications and websites. *See* Cleland.Decl.¶8. And many third-party applications allow parents to control and monitor their children's use of Internet-connected devices and online services. *See* Cleland.Decl.¶11. Cell carriers and broadband providers (e.g., Verizon, AT&T, and Comcast Xfinity) provide parents with tools to block apps and websites from their children's devices, ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours. Cleland.Decl.¶9. Most wireless routers (e.g., NetGear, TP-Link) contain

6

parental control settings as well. *Id.* As do Internet browsers (e.g., Google Chrome, Mozilla Firefox). Cleland.Decl.¶10.

On top of all that, Plaintiff's members have devoted extensive resources to protecting minors who use their services and providing their parents with tools to monitor what their children do and see on the Internet. Some, like Dreamwidth and Snapchat, prohibit minors under 13 from accessing their main services, while others, like YouTube and TikTok, offer separate experiences geared specifically toward minors. *See* Cleland.Decl.¶11; Paolucci.Decl.¶¶14-15; Baird.Decl.¶16. Reddit, Instagram, TikTok, and YouTube have implemented "age gating" features to ensure that users are able to view only age-appropriate content. Cleland.Decl.¶13. On Snapchat, parents can link their Snapchat account to their teen's account to see which friends their teen has communicated with on Snapchat, view their list of friends, restrict sensitive content, and report suspicious accounts. Geary.Decl.¶9. On Instagram, parents similarly can review their teens' activity and limit their ability to send direct messages. Instagram, Help Center, *About Supervision on Instagram*, https://perma.cc/7F6Q-D2SP (last visited May 20, 2026). TikTok allows parents to link their account to their teen's and limit their exposure to certain content and restrict who (if anyone) can send their teen private messages. Cleland.Decl.¶11. And on Facebook, parents can see their teens' usage, privacy settings, and content preferences, and the people and pages they have blocked. *See, e.g.*, Meta, *Supervision on Facebook*, https://perma.cc/Z7ZF-MKQX (last visited May 20, 2026).

### C.   Nebraska Enacts the Social Media Act.

Notwithstanding the long line of cases striking down government efforts to decree what constitutionally protected speech minors may access, and the wealth of tools available to help parents tailor and restrict their minor children's Internet access should they choose to do so,

Nebraska has taken it upon itself to decide what is appropriate for minors on the Internet.  Nebraska enacted the Social Media Act, which dramatically restricts minors' access to "social media platform[s]," significantly curtailing (and in some cases, eliminating) their ability to engage in core First Amendment activities on many of the most popular online services, as well as burdening adult "social media" users by requiring that they provide identification to verify their age.

The Act defines "[s]ocial media company" as a website or Internet application "that is an interactive computer service and that provides a social media platform."  §27(10).  It defines a "[s]ocial media platform," in turn, as a "website or Internet application" that allows users to create an account and "[e]nables" them to "communicate with other account holders and users through posts."  §27(11)(a).  That definition is extremely broad.  It appears to sweep in everything from traditional "social media platform[s]" like Facebook and Instagram, to blogging websites like Dreamwidth, to neighborhood-focused websites like Nextdoor, to messaging boards on websites like College Confidential, to research paper websites like Social Science Research Network (SSRN).

At the same time, the Social Media Act exempts websites based on the content on those sites.  For example, the Act excludes any website that "consists primarily of content that is not generated by account holders, but rather is preselected by the service, application, or website," as well as "[o]nline shopping" sites, websites that "primarily provide[] career development opportunities," and websites where user interaction is "limited to reviewing products offered for sale" or "technical support."  *Id*. §27(11)(b)(iii)-(vii).

The Social Media Act imposes several sweeping restrictions on access to covered "social media platform[s]" that are relevant here.  The Act specifies that "a social media company shall not permit a minor to become an account holder" unless "the parent of such minor provides express

8

parental consent." §28(1)(a), (2).  To determine whether someone is a "minor"—defined as someone under the age of 18, §27(5)—the Act requires social media companies to "use a reasonable age verification method to verify the age of an individual seeking to become an account holder," a phrase it does not define.  §28(1)(a).  Social media companies must then verify the parent's age, §28(2)(a), and obtain an "oath, affirmation, or form signed by the parent and returned to the social media company or third-party vendor by common carrier, facsimile, or electronic scan," §28(2)(b).  The Act also requires a "social media company" to "develop a method for a parent to revoke consent."  §28(3)(b).

In addition to the age-verification and parental consent requirements, the Social Media Act requires "social media platform[s]" to "provide a parent of a minor account holder" with the ability to "[v]iew all posts the minor account holder makes under the social media platform account" and "[v]iew all responses and messages sent to or by the minor account holder in the social media platform account."  §28(4)(a)-(b).  In other words, "social media platform[s]" not only must give a minor's parent the ability to monitor the minor's private messages; if the minor is speaking to another minor, the "social media platform" must give the other minor's parents the ability to monitor that conversation as well.[2]

The Social Media Act gives the Attorney General enforcement authority.  The Attorney General may "impose a penalty of up to two thousand five hundred dollars per violation" of the Act's substantive provisions.  *Id*. §30.  The Act is scheduled to take effect on July 1, 2026.

---

[2] The Act also requires "social media platform[s]" to provide parents with the ability to "[c]ontrol the minor's privacy and account settings" and "[m]onitor and limit the amount of time the minor account holder spends using the social media platform."  §28(4)(c)-(d).  NetChoice does not challenge those requirements.

9

**ARGUMENT**

To obtain a preliminary injunction, NetChoice must show that it (1) "is likely to succeed on the merits;" (2) "is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in [its] favor;" and (4) "an injunction is in the public interest." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1016 (8th Cir. 2023). NetChoice makes that showing easily here.

I.      **NetChoice Is Likely To Succeed On Its Claim That The Parental Supervision And Age Verification Requirements (L.B. 383 §28(1)-(3)) Violate The First Amendment.**

      A.      **The Parental Supervision and Age Verification Requirements Restrict a Breathtaking Amount of Core First Amendment Activity.**

1. "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody*, 603 U.S. at 733. And a "fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. Today, those places include the "vast democratic forums of the Internet." *Id*. The Supreme Court has therefore held that the First Amendment limits the government's ability to restrict access to "social media" websites, even when its ostensible aim is to protect minors. *Id*. at 106-08.

In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment. The state tried to justify the law on the ground that it served its interest in keeping convicted sex offenders away from minors. *Id.* at 106. While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment on its face even assuming intermediate scrutiny applied. *Id.* at 107-08. By barring sex offenders from accessing "social networking" websites altogether, the state had "enact[ed] a prohibition unprecedented in the scope

10

of First Amendment speech it burdens." *Id.* at 106-07. Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107. For the government to "foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

For the same reasons, the First Amendment constrains the government's authority to restrict minors' access to those websites. The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975), and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Just as the "the First Amendment strictly limits [the government's] power" to "selectively … shield the public from some kinds of speech," it prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 209, 213-14. While "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95.

The Court has recognized some narrow exceptions to those principles. But it has emphasized that "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Erznoznik*, 422 U.S. at 212-13. The government may, for example, "adjust the boundaries of an existing category of unprotected speech"—like obscenity—to "ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. After all, something that is not obscene for adults may still be obscene for children. *See Free Speech Coal. v. Paxton* (*FSC*), 606 U.S. 461, 477-87 (2025).

But that does not give the government carte blanche to restrict wide swaths of "fully protected speech," *id.* at 484-85, or "create a wholly new category of content-based regulation that is permissible only for speech directed at children," *Brown*, 564 U.S. at 794.

Indeed, outside of those narrow and well-defined circumstances, courts have routinely struck down government efforts to protect minors from purportedly harmful speech on new forms of media—including by requiring minors to obtain parental consent before accessing speech. In *Brown*, for example, the Supreme Court held a California law prohibiting the sale of violent video games to minors facially unconstitutional under the First Amendment. 564 U.S. at 804-05. While California (and the dissent) resisted the notion that "persons under 18 have any constitutional right to speak or be spoken to without their parents' consent," the Court disagreed. *Id.* at 795 n.3. Of course, "parents have traditionally had the power to control what their children hear and say." *Id.* And the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id.* "But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* Otherwise, states could make it "criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors." *Id.* Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to" engage with them. *Id.* They "do not enforce *parental* authority over children's speech," they "impose *governmental* authority, subject only to a parental veto." *Id.*

*Brown* does not stand alone. In *Erznoznik*, the Court struck down on its face a city ordinance prohibiting drive-in theaters from showing films containing nudity. The city tried to

12

save the ordinance from facial invalidation by arguing that it could constitutionally apply the statute to films "deemed obscene … as to minors."  422 U.S. at 213.  But the Court held the ordinance unconstitutional on its face because it was "demonstrably overbroad." *Id.* at 216.  "The ordinance," the Court explained, "is not directed against sexually explicit nudity, nor is it otherwise limited." *Id.* at 213.  Rather, the statute by its terms "sweepingly forbids display of all films containing any uncovered buttocks or breasts, irrespective of context or pervasiveness," including "a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous." *Id.* at 213.  Just as "the First Amendment strictly limits [the government's] power" when it "undertakes selectively to shield the public from some kinds of speech," it prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable."  422 U.S. at 209, 213-14.

2. Given those long-settled principles, it is unsurprising that courts around the country have concluded that state laws restricting minors' access to "fully protected speech," *FSC*, 606 U.S. at 484, on "social media" websites—including laws requiring parental consent to access them—are unconstitutional.  *See, e.g.*, *Jones*, 2026 WL 561099, at *10-12; *Carr*, 789 F.Supp.3d at 1223-27; *Reyes*, 748 F.Supp.3d at 1120-23; *Paxton*, 747 F.Supp.3d at 1032-34; *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117-22 (9th Cir. 2024); *NetChoice, LLC v. Yost*, 716 F.Supp.3d 539, 552-58 (S.D. Ohio 2024); *Griffin*, 2025 WL 978607, at *17; *NetChoice v. Bonta*, 770 F.Supp.3d 1164, 1185-93 (N.D. Cal. 2025).  The Social Media Act should meet the same fate.

The first step in a facial analysis is to determine "what [the statute] covers." *United States v. Hansen*, 599 U.S. 762, 770 (2023).  The Social Media Act is a statute of "alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010).  It restricts minors under 18 from creating accounts on "social media platform[s]" unless they obtain "express parental consent" to do so.

13

§28(1)-(3).  The Act defines "social media platform" extremely broadly to include a "website or Internet application" that "[a]llows a person to create an account" and "[e]nables an account holder to communicate with other account holders and users through posts."  §27(11).  The Social Media Act thus requires minors to obtain parental consent before creating accounts on all manner of websites, be it "social media" websites like Instagram, video-sharing websites like YouTube, blogging websites like Dreamwidth, a neighborhood-focused website like Nextdoor, messaging boards like College Confidential, or research paper websites like the Social Sciences Research Network (SSRN).

By restricting minors from creating accounts on websites featuring "fully protected speech," *FSC*, 606 U.S. at 484, Nebraska has "prevent[ed] … user[s] from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108.  The law does so, moreover, in all of its applications, as it restricts by its terms access to websites where people engage in vast quantities of unquestionably protected speech.  In fact, the Social Media Act does not even attempt to "adjust the boundaries of an existing category of unprotected speech" (like obscenity) "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794; *see also FSC*, 606 U.S. at 483-84.  It instead restricts minors from creating accounts on any "social media platform," even if all a minor wants to do is attend online church services, participate in the launch of a presidential campaign, or communicate with friends and family.  Cleland.Decl.¶¶18, 34, 40, 43; Paolucci.Decl.¶¶31, 39-40; Baird.Decl.¶¶26-27.

On top of that, by requiring all users to verify their age, the Act burdens the rights of *adults* to create accounts on those websites too.  §28(1).  As the Supreme Court recently reaffirmed, requiring adults to submit proof of age before accessing speech (even speech that is unprotected as to minors) "is a burden on the exercise of" their First Amendment rights.  *FSC*, 606 U.S. at 483.

14

Notably, the Court reached that conclusion without engaging in any analysis of whether some of the websites covered by the law at issue there might contain some speech that was not protected *even as to adults*. The fact that the law, on its face, covered websites that *do* disseminate speech that is protected vis-à-vis adults was enough to conclude that it implicated the First Amendment across the board (and thus triggered intermediate scrutiny). Here, too, by forcing adults to either surrender sensitive personal information to access vast quantities of speech that are unquestionably protected for users of all ages or drastically curtail their consumption of that speech, the Act "discourage[s] users from accessing" online services and may even "completely bar" some adults from doing so. *Reno v. ACLU*, 521 U.S. 844, 856 (1997); *see Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004).

The unique aspects of the online services regulated by the Social Media Act only heighten the First Amendment values at stake. While government restrictions on books, magazines, movies, and video games prohibit people from *receiving* speech, the Social Media Act also restricts users' ability to engage in speech and participate in the exchange of ideas. The Act's restrictions also interfere with the First Amendment rights of NetChoice members to disseminate both their own and third-party speech to their users—restricting their First Amendment rights as well. *See Moody*, 603 U.S. at 731-32, 741; *Carr*, 789 F.Supp.3d at 1223-27; *Reyes*, 748 F.Supp.3d at 1120-23; *Yost*, 716 F.Supp.3d at 551-52. NetChoice members curate and disseminate speech based on editorial decisions informed by what they think is appropriate and likely to be of value and interests to users. Cleland.Decl.¶¶4, 14; Baird.Decl.¶¶12-15; Geary.Decl.¶7. That is quintessential First Amendment activity. *See Moody*, 603 U.S. at 735-38. By restricting minors from creating accounts on "social media platforms" (and requiring adults to verify their age before they do so), the Social Media Act interferes with NetChoice members' First Amendment rights as well.

15

**B.** **The Social Media Act Triggers Strict Scrutiny.**

Because the Social Media Act restricts access to protected speech in all of its applications, it is subject to at least intermediate scrutiny. *Packingham*, 582 U.S. at 105. But the Social Media Act's sweeping restrictions demand strict scrutiny because they are content based. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Even facially content-neutral laws will "be considered content-based" if they "cannot be justified without reference to the content of the regulated speech." *Id*. at 164 (quotation omitted). And if "there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction … that restriction may be content based." *City of Austin v. Reagan Nat'l Advert. of Aus.*, 596 U.S. 61, 76 (2022).

The Act is content based on its face because whether a website is covered by the Act turns on its content. The law covers websites that "[e]nable[] an account holder to communicate with other account holders and users through posts," but exempts "[o]nline shopping" websites, websites "that primarily provide[] career development opportunities," and websites where user interaction is predominately limited to technical support or reviewing products. §27(11). In other words, the Social Media Act covers YouTube, Reddit, Dreamwidth, College Confidential, SSRN, and others because they do not contain enough of the state's preferred content. But the Act appears to exempt eBay because it consists of online shopping content, LinkedIn because it includes primarily career development content, Yelp because it consists of product review content, and Stack Overflow (a question-and-answer website for computer programmers) because it consists of content related to technical support. That "overt subject-matter discrimination" renders the law

16

"facially content based." *City of Austin*, 596 U.S. at 74.

The Act is also content based because it defines "social media platform[s]" based on whether they permit users to "communicate with other account holders and users through posts," while exempting websites that consist "primarily of content … preselected by the service." §27(11)(a). A "regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin*, 596 U.S. at 74. That is what the Social Media Act does. Distinguishing between user-generated speech and provider-generated speech is a speaker-based distinction, and the Supreme Court has repeatedly warned that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Laws that "discriminate among media," moreover, "often present serious First Amendment concerns," particularly where the discrimination risks "distort[ing] the market for ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659-60 (1994). Those concerns are on full display here, as the Act's speaker-based distinctions are a means to control content.

To be sure, websites focused on user-generated speech may contain some of the same subject matter as websites focused on provider-generated speech. But certain content and viewpoints are far more likely to proliferate on the former than the latter. For example, both Disney+ and YouTube might include videos from the same documentary film. But only YouTube will include user-generated videos critiquing the Disney-produced film and responsive comments from other viewers. ESPN and Reddit both include content about sports. But while ESPN publishes news about sports, Reddit will include all sorts of other content and viewpoints about the topic—everything from memes to parodies to unfiltered discussion among fans praising their favorite teams, trash-talking opposing teams, and offering real-time reactions to the latest

17

highlight. Hulu and Dreamwidth might both include content related to politics. But only the latter will include the sort of diverse viewpoints and perspectives that proliferate when users engage in debates with other users on the hottest topics of the day. In fact, "social media" is popular in part because it provides a forum for less filtered discussions and a broader array of subjects and viewpoints than are typically reflected in websites that provide content preselected by the provider.

Laws like the Social Media Act, in other words, impermissibly "privilege[] institutional content creators—movie and TV studios, mainstream media outlets, and traditional journalists— over the Soundcloud artist, the TikTok chef, and the citizen journalist." *Griffin*, 2025 WL 978607, at *9. As many courts have held, "[t]he elevation of … provider-generated content over user-generated content is a content-based regulation." *SEAT v. Paxton*, 765 F.Supp.3d 575, 592 (W.D. Tex. 2025); *Reyes*, 748 F.Supp.3d at 1122-23; *Yost*, 778 F.Supp.3d at 953.

### C.    The Age-Verification and Parental-Consent Requirements Cannot Survive Any Level of Heightened Scrutiny.

The Social Media Act cannot satisfy any level of heightened scrutiny, let alone strict scrutiny. Strict scrutiny requires Nebraska to demonstrate that the Act is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Intermediate scrutiny requires it to show that the Act is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06. Even under intermediate scrutiny, the state's interest must be "unrelated to the suppression of free speech." *FSC*, 606 U.S. at 495-96. And its chosen solution may not "burden substantially more speech than necessary to further those interests." *Id*. at 496. The Social Media Act flunks both levels of scrutiny.

The Social Media Act does not include any legislative findings or statement of purpose explaining the point of its restrictions. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) ("Government 'justification[s]' for interfering with First Amendment rights 'must be

genuine, not hypothesized or invented *post hoc* in response to litigation."). To the extent Nebraska seeks to justify the Act's restrictions on the theory that it "assist[s] parents to be the guardians of their children's well-being," however, that is squarely foreclosed by Eighth Circuit precedent. *See Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 959 (8th Cir. 2003). As the Eighth Circuit concluded, "the government cannot silence protected speech by wrapping itself in the cloak of parental authority." *Id*. at 960. Accepting such a "broadly-drawn interest as a compelling one would be to invite legislatures to undermine the first amendment rights of minors willy-nilly under the guise of promoting parental authority." *Id*.; *see also Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 689-90 (8th Cir. 1992). The Supreme Court, too, has expressed serious "doubts that punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Brown*, 564 U.S. at 802. Far from "support[ing] … what some parents of the restricted children actually want," the Act's "entire effect is only in support of what the State thinks parents ought to want," which is not a permissible ground for government interference with First Amendment rights. *Id*. at 804.

Nor can Nebraska justify the Social Media Act on the theory that it has an important interest in protecting minors from the "inherent risk" that social media allegedly poses. Cindy Gonzalez, *Gov. Pillen, Lawmakers Take Aim at Youth Social Media and Cellphone Use*, Nebraska Examiner (Jan. 13, 2025), https://perma.cc/J5HD-7RH9. To the extent the state is concerned about particular content on "social media," *id.* (referencing "bullying" and "unhealthy obsessions with body flaws"), its interest is plainly related "to the suppression of free speech," *FSC*, 606 U.S. at 471, as there is no way to understand such concerns as anything other than an effort "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 795.

19

To the extent the state is concerned about "addiction" to "social media," that concern is also "very much related to the suppression of free expression." *Moody*, 603 U.S. at 740. After all, the Act is not seeking to protect minors from "addiction" to *nonspeech* products like drugs and gambling. It seeks to protect minors from supposed risks from websites that allow them to access, engage in, and interact with *speech*. The state has no legitimate interest in restricting access to speech just because minors find it especially appealing. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 576 (2011). Nebraska could not, for example, validly restrict minors from accessing Disney+ because it offers too many shows that "contain … catchy jingles." *Id*. at 578. Nor could it validly restrict access to books that are page-turners or use shorter chapters to keep readers more engaged. As the Supreme Court has repeatedly made clear, "the fear that speech might persuade provides no lawful basis for quieting it." *Id.* at 576. Burdening access to protected speech that citizens find especially interesting is especially inconsistent with the First Amendment.

Indeed, if Nebraska could restrict access to mediums of expression that it deems too engaging, then it is hard to see why that power would be limited to restricting access to "social media." Nebraska is hardly the first state to try to restrict access to new mediums of expression on the theory that they harm minors. *See Brown*, 564 U.S. at 797. Under Nebraska's view, states could seemingly prohibit minors from playing alluring video games on Xbox Live, watching engaging cartoons on Disney+, or listening to captivating podcasts on Spotify—so long as it predicted that engaging in that core First Amendment activity could be "addicting" and/or harmful. And "what is good for First Amendment rights of speech must be good for First Amendment rights of religion." *Id.* at 795 n.3. Under Nebraska's logic, then, the government could prohibit minors from attending church or reading religious tracts without their parents' consent so long as it believed (as plenty of people do) that certain religions or religious practices can be "addictive"

20

and/or harmful.  *See* Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and Religion*, 75 Emory L.J. (forthcoming 2026) (manuscript at 2-9), https://perma.cc/LFX6-XMX4.  Such laws "are obviously an infringement upon the religious freedom of young people and those who wish to proselytize young people." *Brown*, 564 U.S. at 795 n.3.

In all events, the Social Media Act is not narrowly tailored to achieve (let alone the least restrictive means of achieving) any legitimate interest Nebraska could assert.  Nebraska's law "straddles the fence" between "helping concerned parents control their children" and addressing what it thinks is a "serious social problem." *Id.* at 805.  As a means of assisting concerned parents, the Act "burden[s] substantially more speech than necessary, *FSC*, 606 U.S. at 471, as "it abridges the First Amendment rights of young people whose parents" think social media is harmless, or even an affirmatively good thing for their children, *Brown*, 564 U.S. at 805.  "Not all of the children who are forbidden" to create an account on social media without parental consent "have parents who *care* whether" they do so. *Id.* at 804.  "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want." *Id.*  That is "not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.*

As a means of protecting minors from purported "harm" on "social media," the Act likewise "burden[s] substantially more speech than necessary." *FSC*, 606 U.S. at 471.  The Act restricts access to all manner of protected First Amendment activity that has no conceivable connection to any of the harms Nebraska identifies.  Unlike other state laws, the Social Media Act does not confine its reach to websites on which minors spend a significant amount of time, or

21

utilize features that Nebraska thinks are "addictive."[3]  The Act appears to sweep in everything from Dreamwidth to Pinterest to messaging boards on College Confidential (a community of current and aspiring college students), *see* College Confidential, *The Real Deal on Applying to College*, https://perma.cc/39MA-J8SE (last visited May 20, 2026), and research-sharing websites like SSRN, *see* SSRN, *Welcome to SSRN*, https://perma.cc/WA7P-D9GL (last visited May 20, 2026), even though there is no basis to think that those websites pose any of its concerns.  In short, the Act flunks narrow tailoring because its "wide sweep precludes access to a large number of websites that are most unlikely" to trigger Nebraska's stated concerns.  *Packingham*, 582 U.S. at 114 (Alito, J., concurring).

The Act, for instance, would bar a 15-year-old from watching online church services on YouTube, even if the minor does not spend time on YouTube otherwise.  It would require a 16-year-old to obtain parental consent before watching a candidate's speech or a political debate on X, even if the minor does not use social media otherwise.  It would require a 17-year-old to get her parent's approval before discussing college applications with other teenagers on College Confidential, despite the fact that Nebraska can point to no risk associated with joining college-admissions chat boards.  By demanding age-verification, the Social Media Act also has the practical effect of hindering adults' access to those services, even though Nebraska has no legitimate reason to do so since the speech in question is *protected* vis-à-vis minors and adults alike.  *See FSC*, 606 U.S. at 483; *Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-57.  All of that is breathtakingly overinclusive measured against *any* interest the state could assert.

On top of that, Nebraska has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech.  *McCullen*, 573 U.S. at 490.  While

---

[3] *See* Fla. Stat. §501.1736(1)(e); Ark. Code §4-88-1502(a).

22

Nebraska does not have to use the least intrusive means of achieving its interests to survive intermediate scrutiny, it must show that it "seriously undertook to address the problem with less intrusive tools readily available to it," and that "alternative measures that burden substantially less speech would fail to achieve the government's interests." *Id.* at 494-95. Nebraska cannot make that showing. Parents already have many tools to protect their minors on the Internet generally and "social media" specifically should they choose to do so. *See, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 748 F.Supp.3d 1126-30; *Yost*, 716 F.Supp.3d at 560; *Carr*, 789 F.Supp.3d at 1230. In fact, Nebraska itself uses such tools when it comes to limiting minors' access to "social media" in schools, including by restricting the use of cell phones during instruction time. *See* L.B. 140, §2(a)(i). And the Social Media Act requires covered websites to provide many of those tools—in provisions that NetChoice has not challenged. Nebraska cannot explain why the Act's separate provisions requiring covered websites to provide parents supervision tools (including tools to limit the amount of time their minors spend on the websites) are insufficient to achieve its goals. *See Brown*, 564 U.S. at 803 (explaining that in light of existing solutions, "[f]illing the remaining modest gap in concerned parents' control can hardly be a compelling state interest").

Unlike the Act's access restriction provisions—which apply to all minors across the board, regardless of whether they are susceptible to the state's concerns—existing tools are a far more useful and tailored way to protect minors on "social media," as parents can make decisions about what restrictions are appropriate for their particular minor based on the minor's age, maturity, and more. Even under intermediate scrutiny, "a prophylaxis-upon-prophylaxis approach" is "a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *Cruz*, 596 U.S. at 306; *see McCullen*, 573 U.S. at 490-91. That Nebraska insists on layering additional restrictions on top of those existing ones underscores that its real concern is that some

parents choose not to utilize those tools to prevent their minor children from creating accounts on "social media" websites.  But the First Amendment does not tolerate speech restrictions "in support of what the State thinks parents ought to want."  *Brown*, 564 U.S. at 804.

## II.    NetChoice Is Likely To Succeed On Its Claim That The Parental-Surveillance Requirements (§28(4)(a) and (b)) Violate The First Amendment.

The Social Media Act also requires "social media compan[ies]" to provide parents with the ability to "[v]iew all posts the minor account holder makes," and "all responses and messages sent to or by the minor account holder."  L.B. 383 §28(4)(a)-(b).[4]  That remarkable requirement is inconsistent with the First Amendment too.  The First Amendment's guarantee of free speech "includes both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  In "the context of fully protected expression," the "constitutional equivalence of compelled speech and compelled silence" is well "established."  *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796-97 (1988); *see also Hurley v. Ir.-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).  The freedom to refrain from speaking, moreover, includes the freedom to choose with whom to speak.  And because one who chooses to speak may "desire to preserve as much of one's privacy as possible," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995), both the Supreme Court and the Eighth Circuit have repeatedly held that compelled disclosure of First Amendment activity may chill that activity just as much as direct restrictions on it.

In *McIntyre*, for example, the Court struck down an Ohio statute that banned anonymous political speech.  "Despite readers' curiosity" in "identifying" a speaker of a particular message, the speaker "generally is free to decide whether or not to disclose his or her true identity" while speaking.  514 U.S. at 341.  "The decision in favor of anonymity may be motivated … merely by

---

[4] NetChoice does not challenge the requirements in §28(4)(c)-(d).

24

a desire to preserve as much of one's privacy as possible." *Id.* at 342. But "[w]hatever the motivation may be," a speaker's "decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.* The Court has not limited that logic to laws compelling disclosure of the speaker's identity, but has extended it to laws that compel disclosure of the identity of speech recipients as well. *See Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 95 (1982).

In *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), the Court similarly struck down on its face a California regulation that required charities to disclose the names and addresses of their major donors. "[I]t is hardly a novel perception," the Court explained, "that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.* at 606 (quoting *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958)). Such disclosure requirements have an "inevitable" "deterrent effect on the exercise of First Amendment rights." *Id.* at 607. "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—[b]ecause First Amendment freedoms need breathing space to survive." *Id.* at 609; *see also Shelton v. Tucker*, 364 U.S. 479, 485-85 (1960) (noting that requiring an individual "to disclose his every associational tie is to impair" the "right of free association, a right closely allied to freedom of speech").

Likewise in *Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022), the Eighth Circuit invalidated a state law that required individuals paid to circulate ballot petitions to disclose a host of information, including their names, addresses, and voter registration state. *Id*. at 384. As the court explained, compelled disclosure laws like that one trigger—and almost invariably fail—First Amendment scrutiny because they eliminate the very "breathing space" First Amendment

25

freedoms need "to survive." *Id*. at 391 (quoting *Bonta*, 594 U.S. at 609).

The Social Media Act's parental-surveillance requirements burden First Amendment rights for similar reasons. By requiring social media websites to provide parents with the ability to monitor all their minors' posts and private messages, the requirements unquestionably "discourage [minors] from exercising rights protected by the Constitution." *Bonta*, 594 U.S. at 610. Just as compelled disclosures of donor information "encourage groups and individuals to cease or modify protected First Amendment advocacy the government disfavors," *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S.Ct. 1114, 1125 (2026), the parental surveillance requirements will encourage minors to self-censor if they know that their parents are monitoring every post and private message they send and receive. Worse still, if the minor is speaking with another minor in Nebraska, the parental-surveillance requirements demand that NetChoice members give *other parents* access to the minor's private messages as well. That is so even if the minors are discussing an abusive parent, who may be listening in because Nebraska requires Plaintiff's members to give that parent the ability to do so. That also means covered entities must give parents total insight into a teen's most intimate relationships, even if that teen's parents disapprove of her romantic partner or closest friends. By "effectively restricting how [minors] may interact privately" with others, the parental-surveillance requirements directly burdens their First Amendment rights. *First Choice*, 146 S.Ct. at 1129.

Because the parental-surveillance requirements will "inevitab[ly] deter[] the exercise of First Amendment rights," *id.* at 1125, they trigger (at a minimum) intermediate scrutiny. *See Bonta*, 594 U.S. at 611-12; *Dakotans for Health*, 52 F.4th at 388-89. In fact, the parental-surveillance requirements trigger strict scrutiny because whether they apply turns on the content on the website. As explained, the Social Media Act's definition of "social media platform" is

26

content based in multiple respects. Because the parental-surveillance requirements turn on that definition, they trigger strict scrutiny too. *See Griffin*, 2025 WL 978607, at *9-10; *Carr*, 789 F.Supp.3d at 1219-23; *Yost*, 778 F.Supp.3d at 953-54.

In all events, whatever level of scrutiny applies, the parental-surveillance requirements do not survive because they are nowhere close to narrowly tailored to achieve any important interest Nebraska could assert. Again, the Act does not include any legislative findings or statement of purpose. But to the extent the state's interest is protecting minors from particular content or individuals on social media, such as "online abuse" and "sexual predators," Gonzalez, *supra*, the parental-surveillance requirements are not tailored. They apply to everything from blogging platforms like Dreamwidth to messaging boards on College Confidential—websites that do not come close to raising any of the state's concerns. *See Packingham*, 582 U.S. at 107; *Griffin*, 2025 WL 978706, at *8, 13. And they cover all speech in which minors engage with anyone, not just speech with, e.g., account holders not known to the parents—whom parents could already prevent their minor children from communicating with anyway using the many tools that are available— including the state-mandated privacy setting tools that NetChoice has not challenged, §28(4)(c).

As that underscores, moreover, Nebraska has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490. As discussed, Plaintiff's members already take active steps to give parents and minor users tools to protect them from cyberbullying, sexual predators, and the other dangers Nebraska might be concerned with. For instance, Snapchat offers parents the ability to supervise whom their teenagers have befriended and communicated with, limit sensitive content, and report suspicious accounts. Geary.Decl.¶¶6-7. Snapchat also works proactively to detect and remove unlawful content and elevate concerns to the relevant authorities. Geary.Decl.¶10; Cleland.Decl.¶11.

TikTok allows parents to limit their teen's exposure to certain types of content and limit who may contact them. Cleland.Decl.¶11. NetChoice members generally remove content that violates their content-moderation policies, including harassment and other offensive content. Cleland.Decl.¶¶4, 14; Baird.Decl.¶¶12-15; Geary.Decl.¶7. And to the extent Nebraska considers existing protections insufficient, it cannot explain why its concerns are not sufficiently addressed by the Act's separate requirement that covered services provide parents with tools to control the privacy settings on their minor children's accounts. Again, "a prophylaxis-upon-prophylaxis approach" is "a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *Cruz*, 596 U.S. at 306.

### III. The Other Preliminary Injunction Factors Overwhelmingly Support Maintaining The Status Quo.

The other preliminary injunction factors favor maintaining the status quo while this case is litigated to final judgment. "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012). After all, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025) (quoting same). And the First Amendment harm here is not just to NetChoice's members, but to millions of Nebraskan minors who will be cut off from vital channels of communication, education, and self-expression that their peers in other states may still access. If the Attorney General is not enjoined from enforcing the law, the Act's restrictions will cause an irreparable loss of First Amendment freedoms on a massive scale. On top of that, moreover, the Social Media Act will impose significant irrecoverable compliance costs on NetChoice's members if it takes effect.

28

The harms here are especially acute because the Act imposes severe sanctions of up to $2,500 in civil penalties per uncorrected violation and allows private litigants to pursue damages and attorney fees. §§29-30. And complying with the Act's burdensome requirements would require significant changes to existing services and impose significant costs that cannot be recouped at the conclusion of this lawsuit. *See* Cleland.Decl.¶¶29, 31; Paolucci.Decl.¶¶28-30; Baird.Decl.¶¶27-29; Geary.Decl.¶11. Unless the Attorney General is preliminary enjoined from enforcing L.B. 383 §28(1), (2), (3), and (4)(a)-(b) while the lawsuit proceeds, Plaintiff's members who are covered by the law will face a perilous choice between exposing themselves to massive liability for disseminating speech to minors and unverified adults, which is sufficient to chill the speech of even the bravest, or taking costly and burdensome steps that will drastically curtail access to their services—all before a court decides the merits of their claims. These harms are both severe and irreparable.

The balance of equities and the public interest also favor an injunction. For one, "it is always in the public interest to protect constitutional rights." *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019). On the flip side, Nebraska has no valid interest because it may not "act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021) (per curiam). And "the balance of the equities generally favors the constitutionally-protected freedom of expression." *Schmitt*, 148 F.4th at 970. Maintaining the status quo until the constitutional problems with the Social Media Act can be fully adjudicated will thus cause little if any harm to the state.

## CONCLUSION

The Court should preliminarily enjoin the Nebraska Attorney General, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing

L.B. 383 §28(1), (2), (3), and (4)(a)-(b) against NetChoice's members.  NetChoice respectfully requests that this Court issue a decision before July 1, 2026, which is the earliest date on which Attorney General Hilgers can bring an enforcement action.

NETCHOICE, Plaintiff

By:  s/Erin E. Murphy
Erin E. Murphy* (D.C. #995953)
James Y. Xi* (D.C. #1617537)
Camilo Garcia* (D.C. #90004901)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
camilo.garcia@clementmurphy.com
* *Admitted pro hac vice*

and

Nathan D. Clark (#25857)
CLINE WILLIAMS WRIGHT
  JOHNSON & OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, NE 38508
(404) 474-6900
nclark@clinewilliams.com

## Certificate of Service

I certify that on May 22, 2026, I served the foregoing on counsel for the plaintiff by e-mail and by U.S. First Class mail, postage prepaid at:

Michael Hilgers
Office of the Nebraska Attorney General
c/o Zachary Pohlman, Assistant Solicitor General
1445 K Street
Lincoln, Nebraska 68508
Zachary.Pohlman@nebraska.gov

30

s/Erin E. Murphy

### **Certificate of Compliance**

The undersigned certifies that the word count of this brief complies with local rule NECivR 7.1(d). The Word-count function of Microsoft Word states that this brief, inclusive of all text, contains 9,338 words. The undersigned further certifies that generative artificial intelligence was not used to prepare this brief.

s/Erin E. Murphy