## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **NETCHOICE,** | Case No. 4:26-cv-3149 |
| **Plaintiff,** | |
| v. | **DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| **MICHAEL HILGERS, in his official capacity as Attorney General for the State of Nebraska,** | |
| **Defendant.** | |

Defendant Michael Hilgers, in his official capacity as Attorney General for the State of Nebraska, by and through counsel, hereby submits the following brief in opposition to Plaintiff's Motion for Preliminary Injunction. (Filing 17).

## Introduction

The age of social media has consisted of unrestrained growth and access to users and their data. But this growth comes with a cost; a cost that social media companies have known about for years. Today, adolescent social media use is nearly universal—95% of teenagers, and nearly 40% of children ages 8-12, report using it. Filing 24-21, ¶ 114; Filing 24-22 at 4. Screen time has continuously increased. And excessive use is linked to sleep problems, attention problems, depression, anxiety, and neuroticism. As the former Surgeon General put it, "[o]ur children have become unknowing participants in a decades-long experiment." *Id.* at 11.

Society is beginning to wake up to the serious harm social media is causing children. Already, Meta has been found liable in California and New Mexico for the

addictive design of their platform, and many other lawsuits are still working their way through the courts. Several states have also passed laws to rein in social media companies' interactions with children. Nebraska is one such state that made the policy choice to prohibit social media companies from contracting with minors absent parental consent. This policy choice is the Nebraska Legislature's prerogative, and it does not run afoul of the First Amendment.

NetChoice is an internet trade association bringing this suit on behalf of their members, social media companies. Ninety-nine percent of NetChoice's challenge, however, asserts the rights of social media users. But NetChoice lacks standing to assert the rights of non-members. And the claimed injury to NetChoice's members falls flat as well. NetChoice claims their members' First Amendment right is violated because they cannot speak to minors. Filing 18 at 15. The First Amendment does not guarantee an audience with minors.

NetChoice attempts to paint LB 383—Nebraska's Parental Rights in Social Media Act—as an unconstitutional restriction on the speech of their members and social media users. But the Parental Rights Act does not target speech at all. It does not intrude on social media companies' editorial judgment and control. Nor does it target the content that may be posted. It does not even target who can post. Rather, the Parental Rights Act is a content-neutral regulation on conduct. That makes it subject to less judicial scrutiny, which the Act easily passes. Its age verification requirement is consistent with a state's ability to regulate the venues children can access. Its parental consent requirement is consistent with a state's ability to ensure

children cannot contract without parent approval. And if the parent does consent, a social media company must provide monitoring tools to a parent. This does not violate the First Amendment.

Even under heightened scrutiny, the Parental Rights Act survives. Nebraska has a compelling interest in protecting minors from the harms of social media and the Parental Rights Act is narrowly tailored to advance that interest. The First Amendment does not impede Nebraska's ability to protect its children here.

## Background

On May 14, 2025, the Nebraska Legislature passed L.B. 383, the Parental Rights in Social Media Act, 109th Leg., § 28(1)-(4)(b) (2025) (operative July 1, 2026), by a vote of 46 to 3.[1] Thirteen months later, NetChoice now challenges four provisions: (1) the age verification requirement, (2) the requirement for a minor to obtain parental consent before creating an account, (3) the requirement that parents must be able to revoke their child's account, and (4) the requirement to allow a parent to supervise their child's account. NetChoice claims these four provisions facially violate the First Amendment.

The Parental Rights Act defines a social media company as any entity that operates a social media platform. § 27(10). And a social media platform, in turn, is defined as "a website or Internet application that (i) allows a person to create an account; and (ii) enables an account holder to communicate with other account

---

[1] https://nebraskalegislature.gov/bills/view_votes.php?KeyID=12629.

holders and users through posts." § 27(11)(i)–(ii). This does not include broadband internet access, § 27(11)(b)(i); email services, § 27(11)(b)(ii); websites "[t]hat consist primarily of content that is not generated by account holders" but is preselected by the "website provider," § 27(11)(b)(iii)(A)–(B); online shopping, § 27(11)(b)(iv); websites primarily providing career development opportunities, § 27(11)(b)(v); cloud storage, § 27(11)(b)(vi); websites that predominantly provide technical support or user interactions are limited "to reviewing products offered for sale," § 27(11)(b)(vii); or peer-to-peer payment platforms, § 27(11)(b)(viii). A minor is defined as a person under eighteen years of age, who is "[n]ot emancipated; and a resident of [Nebraska]." § 27(5).

The Parental Rights Act distinguishes between an account holder and a user. A user is "a person who consumes posts on a social media platform" but does not have an account. § 27(12). By contrast, an account holder is "a person who, on or after July 1, 2026, creates an account or profile on a social media platform." § 27(1). A user does not specifically agree to the platform's terms of service, whereas an account holder must.

The Parental Rights Act imposes a requirement on social media companies to verify an account holder's age. This ensures that social media companies cannot contract with minors without parental consent. Starting July 1, 2026, "a social media company shall not permit a minor to become an account holder," § 28(1)(a), without parental consent. § 28(2). NetChoice's members all require a user to agree to their terms of service before becoming an account holder. This will require social media

companies to "use a reasonable age verification method" to verify a person's age before an account is created. § 28(1)(a). Age verification can be done through an identification card "or any commercially reasonable age verification method to confirm an individual's age." § 27(9).

Currently, several cost-effective age verification methods are commercially available. Many methods are already deployed at scale and utilized by social media. Filing 24-20, ¶¶ 43-45. User data is secure, *id.* ¶¶ 48, 57-62 , and costs approximately twelve cents ($0.12) per check, *id.* ¶ 56. This is a meager price for these multi-billion- and trillion-dollar companies to pay when it comes to commercial transactions with Nebraska children. *See, e.g.*, Meta Platforms, Inc. Class A Common Stock (META), Nasdaq (June 3, 2026), https://www.nasdaq.com/market-activity/stocks/meta ($1.57 trillion market cap); Reddit, Inc. Class A Common Stock (RDDT), Nasdaq (June 3, 2026), https://www.nasdaq.com/market-activity/stocks/rddt ($31 billion market cap); Snap Inc. Class A Common Stock (SNAP), Nasdaq (June 3, 2026), https://www.nasdaq.com/market-activity/stocks/snap ($9 billion market cap); Alphabet Inc. Class A Common Stock (GOOGL), Nasdaq (June 3, 2026), https://www.nasdaq.com/market-activity/stocks/googl ($4 trillion market cap).

If a parent consents, a minor may create a social media account. The social media company must verify the age "of the parent through a reasonable age verification method" and receive an "oath, affirmation, or form signed by the parent … stating that the consenting adult is the minor user's parent and authorizes such minor to become an account holder." § 28(2)(a)–(b). Once these criteria are met "the

social media company may permit the minor to become an account holder." § 28(3)(a). The social media company must also "develop a method for a parent to revoke consent for a minor to be an account holder," § 28(3)(b); and "provide a parent of a minor account holder with methods for the parent to supervise the minor's account," § 28(4); including viewing the minor's posts and "all responses and messages sent to or by the minor account holder" on the platform. § 28(4)(a)-(b).

The Parental Rights Act was designed to protect children online and support parental rights. Filing 24-16 at 52. The Nebraska Legislature relied on the 2023 advisory from the U.S. Surgeon General, which explained that social media presented a profound risk of harm to the mental health and well-being of children and adolescents. *Id.* One purpose of the bill was to provide parents "with the power to oversee their children's social media accounts and ensure they make healthy decisions." *Id.* at 53. The Parental Rights Act eliminates the ineffective age verification these platforms currently utilize by requiring age verification and parental consent before an account is created. *Id.*; *see also* Filing 24-14 at 60.

**Legal Standard**

"A preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023) (quoting *Progressive Techs., Inc. v. Chaffin Holdings, Inc.*, 33 F.4th 481, 485 (8th Cir. 2022)). The burden is on the Plaintiff to show "such extraordinary relief is warranted." *Id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). The party seeking a preliminary injunction must show: "(1) the threat of irreparable

harm; (2) the state of balance between the harm and the injury granting an injunction will inflict on other parties; (3) the probability it will succeed on the merits; and (4) the public interest." *Id.* (citations omitted).

**Argument**

A party bringing a First Amendment facial challenge has a significant burden to show that "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice*, 603 U.S. 707, 732 (2024) (citation omitted) (cleaned up). The challenger must demonstrate "the law's unconstitutional applications *substantially outweigh* its constitutional ones." *Id.* at 724 (emphasis added). As the Court explained in *Moody*, this is a "rigorous standard." *Id.* at 723.

And courts are placed in a difficult situation. First, it must be determined "what activities, by what actors, do[es] the law[] prohibit or otherwise regulate." *Id.* at 724. Next, the court must consider "[w]hich of the law['s] applications violate the First Amendment, and to measure them against the rest." *Id.* at 725. The "full range" of the law's applications must be explored—"the constitutionally impermissible and permissible—and compare the two sets." *Id.* at 726. To succeed, the unconstitutional applications must "substantially outweigh its constitutional ones." *Id.* at 724.

As explained in more detail below, NetChoice has failed to carry its burden to overcome the "rigorous standard" to show the Parental Rights Act is facially unconstitutional. Their claims are based on pure speculation; they failed to present a single user who claims their speech would be chilled. Instead, NetChoice's General

Counsel believes users will not post on any social media platform because an identification will be required for all new accounts after July 1, 2026. Filing 19-1, ¶¶ 34, 42. This belief is insufficient "to short circuit the democratic process," *Moody*, 603 U.S. at 732, and enjoin enforcement of the age verification, parental consent, and parental supervision sections of the Act.

**I.    NetChoice lacks standing to bring claims on behalf of social media users because it does not have a close relationship with those users.**

NetChoice lacks standing to assert claims on behalf of Nebraska social media users. NetChoice's relationship is with its members—the social media companies—not with the users of those sites. NetChoice thus lacks standing to claim the age verification, parental consent, and parental supervision requirements violate the First Amendment rights of social media users.

Throughout the Complaint, NetChoice repeatedly claims the Parental Rights Act will violate a social media user's First Amendment rights. And NetChoice explicitly claims that it "brings this action on behalf of its members to vindicate their First Amendment rights *and the First Amendment rights of their users.*" Filing 1, ¶ 7 (emphasis added). But NetChoice is an association, claiming an injury to their members' First Amendment rights. *Id.* That does not permit an association to also assert the rights of *non-members*. To do so would eviscerate Article III requirements that only parties who are directly injured by a defendant's conduct may bring a suit to court. *Cf. FDA. v. All. for Hippocratic Med.*, 602 U.S. 367, 399-401 (2024) (Thomas, J. concurring).

NetChoice cannot rely upon third-party standing to assert its members' users' rights, either. "Our third-party standing precedents allow a plaintiff to assert the rights of another person when the plaintiff has a 'close relationship with the person who possess the right' and 'there is a hindrance to the possessor's ability to protect his own interests.'" *All. for Hippocratic Med.*, 602 U.S. at 397 (Thomas, J. concurring) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). "Within the First Amendment context" third-party standing requirements "justify a lessening of prudential limitations on standing." *Kowalski*, 543 U.S. at 567. Those justifications arise "when there is a danger of chilling free speech" because "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Sec. of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984). These justifications are not met here.

NetChoice not only lacks a direct relationship with social media users, *id.* at 958 , but the existence of the Parental Rights Act does not create "a danger of chilling free speech" because no provision of the law prevents a person from engaging in "constitutionally protected speech or expression." *Id.* Instead, NetChoice merely speculates on the Act "chilling" the protected speech of social media users. Filing 19-1, ¶¶ 34, 42. But NetChoice has not produced any user who claims any of the challenged provisions would chill their speech. Because the law is a content-neutral regulation on non-expressive conduct, it cannot be determined what, if any, speech may be "chilled." If speech, the account holder is the proper party to bring a suit, not an unrelated trade association representing the social media companies. NetChoice

cannot invoke associational standing to assert its members' First Amendment rights and then primarily focus on the speculative effects the Act may (or may not) have on social media users.

## II. NetChoice is unlikely to succeed on the merits because the challenged provisions are reasonable restrictions on non-expressive conduct.

The Parental Rights Act regulates non-expressive conduct that "is not afforded First Amendment protection." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010). Expressive conduct includes verbal and written statements, and conduct "sufficiently imbued with elements of communication[.]" *Texas v. Johnson*, 491 U.S. 397, 404 (1989). The conduct must intend "to convey a particularized message … and … the message would be understood by those who viewed it." *Id.* (citation and quotation omitted). None of the challenged provisions target expressive conduct. *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969). Heightened scrutiny is therefore not warranted.

The challenged provisions are valid exercises of Nebraska's police power to regulate commercial transactions with minors. States have long had broad authority to regulate the activities of children. *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976) (citing *Prince v. Mass.*, 321 U.S. 158, 170 (1944)); *see also Nebbia v. People of N.Y.*, 291 U.S. 502, 523 (1934). Nearly sixty years ago, the Supreme Court recognized that states "are entitled to the support of laws designed to aid discharge" of a parent's responsibility for their child's wellbeing. *Ginsberg v. State of N.Y.*, 390 U.S. 629, 639 (1968). Age verification and parental consent and

revocation regulate non-expressive conduct—contracts with minors without parental consent. Parental supervision provides parents with the ability to monitor their child's social media usage. All challenged provisions thus relate to non-expressive conduct. Surely parents have a right to know who their child contracts with and to supervise their conduct online. *Cf. id.* at 641.

> A. *Age verification, parental consent, and revocation are reasonable regulations on the ability to contract with minors.*

Nebraska has legitimate reasons to restrict a social media companies' ability to contract with minors. Creating an account on a social media platform requires the user to agree to onerous terms and conditions and an expansive privacy policy. Filing 24-1, ¶¶ 4-14; Filing 24-2 at 1; Filing 24-3 at 1; Filing 24-4 at 1; Filing 24-5 at 1; Filing 24-6 at 1; Filing 24-7 at 1; Filing 24-8 at 1; Filing 24-9 at 2; Filing 24-10 at 2; Filing 24-11 at 2. For instance, account holders (1) waive liability for an amount "greater than $100 or the amount [the user] has paid" in the past 12 months, Filing 24-11 at 14; (2) waive the right to participate in class actions, Filing 24-9 at 6; (3) consent to personal jurisdiction in a specific state even if inconvenient, *id.*; (4) grant the company the right to collect, obtain, and use your data for any reason at all, Filing 24-8 at 2; (5) agree to resolve "any cause of action, legal claim, or dispute … by arbitration," Filing 24-4 at 4; and (6) grant a "non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of [the user's] content," *id.* at 3. Agreeing to a social media platform's terms of service thus waives a significant number of the account holder's rights. A minor is not equipped to

understand the full extent of legal consequences when they create an account without parental consent.

The right to contract, especially with a minor, is not protected by the First Amendment and is subject to the police power of the state. A corporation does not have the right to enter into a "contract which the laws of the community forbid, and the validity and effect of their contracts is what the existing laws give to them." *Ogden v. Saunders*, 25 U.S. 213, 283 (1827). The Court has noted in a variety of contexts that minors require different treatment under the law, even when constitutional elements are involved. "[T]he legal disqualifications placed on children as a class – e.g. limitations on their ability to alienate property, enter a binding contract enforceable against them, and marry without parental consent – exhibit the settled understanding that the differentiating characteristics of youth are universal." *J.D.B. v. North* Carolina, 564 U.S. 261, 273 (2011). An age verification requirement to prevent minors from contracting without parental consent does not implicate protected activity.

The right to contract with children is not absolute. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000). "[C]hildren 'generally are less mature and responsible than adults; that they often lack the experience, perspective, and judgement to recognize and avoid choices that could be detrimental to them; that they are more vulnerable or susceptible to outside pressures than adults; and so on." J.*D.B. v. N. Carolina*, 564 U.S. 261, 272 (2011) (internal citations and quotations omitted) (cleaned up). And "an

infant does not have the capacity to bind himself absolutely by contract." *Webster St. P'ship, Ltd. v. Sheridan*, 220 Neb. 9, 12, 368 N.W.2d 439, 442 (1985).

NetChoice relies on *Brown v. Entertainment Merchants Association* to claim the challenged provisions are unconstitutional. 564 U.S. 786 (2011). *Brown*, however, is entirely distinguishable. *Brown* involved an obvious content-based law. 564 U.S. at 789. Here, the challenged provisions are "agnostic as to content." *City of Austin v. Reagan Nat'l Advert. of Austin*, LLC, 596 U.S. 61, 69 (2022). And *Brown* rejected California's parental rights argument because minors whose parents did not object were still prohibited from purchasing the video game. *Brown*, 564 U.S. at 804. Unlike *Brown*, the challenged provisions allow minors to become account holders with parental consent.

Age verification, parental consent, and revocation do not directly restrict a minor's access to a social media platform. YouTube and Nextdoor, for example, provide limited access to their platforms without creating an account. Filing 24-1, ¶ 24; Filing 24-5 at 1; Filing 24-10 at 2. The challenged provisions still permit this to occur. Nowhere in the law does an absolute bar to minors accessing social media exist. Instead, the text is clear that it only restricts a minor's ability to become an account holder. L.B. 383 § 28(1)(a). Without the challenged provisions, parents are left powerless over the social media platforms with whom their child contracts. *See, e.g.*, Filing 24-8 at 1. And children are incapable of grasping the complex terms of service they agree to beforehand.

Age verification and content filtering currently deployed by social media companies are ineffective and far too easy for a minor to bypass. Filing 24-20, ¶¶ 63-79. Ninety five percent (95%) of teenagers use social media, and despite many platforms having an age limit of thirteen (13), forty percent (40%) of 8–12-year-olds actively use social media. Filing 24-22 at 4. And minors have learned how to bypass current restrictions. Filing 24-20, ¶¶ 65-71.

If a social media company wants to condition access to its platform on agreeing to the terms of service, it is the platform—not Nebraska—that is denying access. The law regulates conduct—it prohibits a social media company from contracting with a minor without parental consent. This is a reasonable limitation that recognizes minors cannot fully comprehend the legal consequences of the contracts social media companies require would-be account holders to agree to before accessing the platform. NetChoice has not shown how the unconstitutional application of these provisions substantially outweighs the constitutional applications, thus the Court should decline to preliminarily enjoin the law.

> B.    *Parental consent and supervision do not target a platform's content but provide parents with reasonable controls over their child's social media usage.*

The Parental Rights Act is valid for another reason. The First Amendment does not give social media companies the right of unfettered access to children against the will of parents, who have their own constitutional right to direct and protect their children. The Act's parental consent and supervision provisions recognize the unique harm minors face from social media and provides parents with a reasonable method

of protecting their child from social media's negative effects. Minors suffer detrimental harm caused by unrestricted social media use and parental consent and supervision gives parents the power to regulate and monitor their child's usage. The law does not target the content on the platform. Parental supervision recognizes that parents require effective tools to monitor their child's social media usage, which the law supplies. This is a reasonable regulation empowering parents.

Social media's design features have led to significantly worse mental health outcomes for adolescents. Filing 24-22 at 9-10. This is because these features are designed to hold a minor's attention for as long as possible. Filing 24-21, ¶ 39. The result is that children suffer—from 2010 until now, Nebraska saw a 36% increase in adolescent suicide, *id.* ¶ 32; a 35% increase in suicidal thoughts, *id.* ¶ 34; a 79% increase in depression rates for adolescent girls, *id.* ¶ 35; and a 51% increase in anxiety for adolescent boys, *id.* ¶ 36. These figures are not unique to Nebraska. *Id.* ¶¶ 27-31, 36. Social media companies generate their revenue by keeping eyeballs glued to their screens for as much time as possible. The harm arises from such compulsive and excessive use. *Id.* ¶¶ 37-39. The social media companies are not oblivious to this and understand that teens blame social media for exacerbating their mental health problems. *Id.* ¶ 83; Filing 27-17 at 3; Filing 24-18 at 24-25; Filing 24-19 at 7-8.

And platforms, such as Meta, have already been found liable for their addictive design features. *See New Mexico v. Meta Platforms, Inc.*, No. D-101-cv-2023-02838 (1st Jud. Dist., Cnty. of Sante Fe 2026) (returning a jury verdict finding Meta engaged

in unfair, deceptive, and unconscionable trade practices);[2] *A D, et al. v. Meta Platforms, Inc.*, No. 25STCV13260 (Superior Ct., Los Angeles Cnty. 2026) (finding Meta and YouTube liable for intentionally addicting a young woman and injuring her mental health). These addictive design features are a causal factor of the negative mental health outcomes. Filing 24-22 at 9-10; Filing 24-21, ¶ 133.

Social media platforms retain enormous amounts of personal data and information. Concerns about collecting a minor's data are heightened, considering how the data is used. For many platforms, a minor's location, interests and likes, and other personal identifiable information are all kept and maintained. *E.g.*, Filing 24-4 at 2 (explaining an Instagram account holder must agree to the privacy policy); *see also Privacy Policy*, Meta (effective Dec. 15, 2025), https://www.facebook.com/privacy/policy/. This data can be sold to third parties who may use it for any reason at all. *See, e.g.*, Filing 24-9 at 2.

This rapidly evolving technology has led legislatures across the country to put guardrails on social media use by minors. Contrary to NetChoice's claims, social media is fundamentally different from legacy media and video games of the past. *See Brown*, 564 U.S. at 806 (Alito, J. concurrence). Unlike social media, newspapers, television, and video games are not specifically designed to trigger the same reward centers in a person's brain as substance abuse or gambling. Filing 24-22 at 9. The

---

[2] Defendants ask that the Court take judicial notice of the record in this case. The trial exhibits can be found at https://drive.google.com/drive/folders/1veMrMss0NftVmLoY-o7jyRxdkOqdUbYx.

result is that repeated use becomes habitual scrolling, which becomes compulsive behavior in search of that next "hit."

Parental consent before engaging in conduct deemed inappropriate for children is common. For example, a person under eighteen may not get a tattoo or piercing without parental consent. Neb. Rev. Stat. § 38-10,165. But no one argues that because tattooing is entitled to First Amendment protections, *see Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1059-60 (9th Cir. 2010); *Buehrle v. City of Key West*, 813 F.3d 973, 976 (11th Cir. 2015), parental consent for a minor to receive a tattoo is presumptively unconstitutional.

The challenged provisions do not violate a platform's First Amendment right because they do not alter or disrupt a covered platform's algorithm. *Moody*, 603 U.S. at 728. A social media company's First Amendment right arises from the presentation and compilation "of speech originally created by others." *Id.* The challenged provisions do not (1) alter or disrupt a platform's algorithm, (2) dictate the type of content that may be displayed, (3) require any warning or labels to be attached to posts, or (4) prevent a platform from exercising its discretion and judgment over the type of content on a user's feed. *Id.* at 734-36. Nor do the challenged provisions regulate what an account holder can see, post, or interact with on a social media platform. Regulations on children are not subject to heightened scrutiny. *Ginsberg v. State of N.Y.*, 390 U.S. 629, 640 (1968). Any burden on adults is merely incidental to this purpose.

It is clearly established that a government cannot infringe upon parental rights. *See Bellotti v. Baird*, 443 U.S. 622, 643 (1979); *Mahmoud v. Taylor*, 606 U.S. 522 (2025); *Mirabelli v. Bonta*, 607 U.S. ---, 146 S.Ct. 797 (2026). If fundamental parental rights cannot be infringed, the government can certainly legislate to further them. *See Ginsberg*, 390 U.S. at 639. Here, the government has aligned itself with parents over contrary corporate interests. The Constitution clearly favors parental rights in this instance.

## III. If the First Amendment is implicated, the challenged provisions incidentally burden speech and survive intermediate scrutiny.

The challenged provisions are content-neutral regulations on commercial transactions with minors, not speech. If expressive activity is implicated, the challenged provisions impose only an incidental burden—thus, intermediate scrutiny applies. And here, the challenged provisions survive intermediate scrutiny.[3] Nebraska has important interests in protecting the psychological well-being of children and supporting parental control of their child's social media use. The challenged provisions are the only effective way to achieve these important interests.

### A. *The challenged provisions are content-neutral regulations on conduct.*

The challenged provisions are content-neutral regulations governing commercial activity with children, not speech. They do not ban adults or minors from

---

[3] On June 4, 2026, the Fifth Circuit stayed a district court's preliminary injunction because a Texas law requiring age verification and parental consent before a minor can download an app from an app store likely survives intermediate scrutiny. *Students Engaged in Advancing Tx. v. Paxton*, No. 25-51073, at 5 (5th Cir. 2026) (per curiam).

accessing any specific content online nor regulate expressive activity. The content on each platform is irrelevant.

A content-neutral law will be upheld "if it advances important government interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests. *TikTok*, 604 U.S. at 70 (quoting *Turner Broadcasting Sys., Inc v. FCC*, 520 U.S. 180, 189 (1997) (*Turner II*)). The challenged provisions are content-neutral because they do not "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *City of Austin*, 596 U.S. at 69. Nothing in the law references the ideas or views expressed on a social media platform. The provisions do not present a "substantial risk of excising certain ideas or viewpoints from the public dialogue." *TikTok v. Garland*, 604 U.S. 56, 70 (2025). An account holder or social media platform "'cannot avoid or mitigate' the effects of [LB 383] by altering their speech." *Id.* at 67 (quoting *Turner v. FCC*, 512 U.S. 622, 644 (1994) (*Turner I*)).

In the age of social media, the Court has not developed "a clear framework for determining whether a regulation of non-expressive activity that disproportionately burdens expressive activity triggers heightened review." *TikTok*, 604 U.S. at 69. But in Nebraska, a social media company cannot avoid or mitigate the effects of the challenged provisions by altering their speech. *Id.* at 67. And the requirements are significantly less burdensome than the de-facto ban in *TikTok*, and the must-carry provision in *Turner II*.

Content-based laws, on the other hand, are subject to strict scrutiny. Strict scrutiny requires the law to be "narrowly tailored to serve compelling state interests," *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015), and is the least restrictive means available and effective to achieve the interest. *Free Speech Coal.*, 606 U.S. at 471. Content-neutral laws that cannot be justified without reference to the content of the speech or were adopted because of government disagreement with the speech must also satisfy strict scrutiny. *Reed*, 576 U.S. at 164. Contracting with a minor is inherently content-neutral. It targets non-expressive conduct. If a website or application allows "a person to create an account and … communicate with other account holders and users, " L.B. 383 § 27(11)(a), through "texts, videos, or images," *id.* § 27(2), the challenged provisions apply. If applicable, a minor cannot create an account without parental consent. *Id.* § 28(2). To ensure parental consent is given, age verification is required. *Id.* § 28(1)(a).

Parental consent is entirely independent of a covered platform's content. *See TikTok*, 604 U.S. at 70. The content on Dreamwidth is materially different from the content on Reddit or X, but both platforms are covered because they require users to create an account. Filing 24-2 at 1; Filing 24-7 at 1; Filing 24-9 at 2. In various other areas of the law, parental consent is required. Neb. Rev. Stat. § 38-10,165 (parental consent before a person under eighteen gets a tattoo); Neb. Rev. Stat. § 42-105 (parental consent before minors get married). Parental consent ensures parents are aware of what social media platforms their child creates an account on and what

contractual terms they agree to, and it eliminates the possibility that children can bypass the restrictions. Filing 24-20, ¶¶ 65-71.

Parental supervision is "agnostic as to content." *City of Austin*, 596 U.S. at 69. In 2023, teens spent 4.8 hours per day on social media, Filing 24-21, ¶ 38; leading to deteriorating mental health. *Id.* ¶ 89. Parental supervision tools allow parents to control their child's social media usage. This provision regulates a child's social media use—a covered platform "cannot avoid or mitigate the effects of the [law] by altering their speech." *TikTok*, 604 U.S. at 67.

The law's exemptions do not automatically transform the challenged provisions into content-based restrictions. A content-based restriction seeks "to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Turner I*, 512 U.S. at 641. Laws that exempt certain mediums are "insufficient by itself to raise First Amendment concerns." *Turner I*, 512 U.S. at 660 (citing *Leathers v. Medlock*, 499 U.S.439, 452 (1991)). The question is whether Nebraska preferred the exempted sites over social media platforms "based on the content of [speech] each group offers." *Id.* at 659-58. The answer is clearly no. In any event, "such heightened scrutiny is unwarranted when the differential treatment is justified by some special characteristics of the particular medium being regulated." *Id.* at 660-61 (internal quotation and citation omitted).

The challenged provisions recognize the special characteristics of social media companies—lack of effective parental controls and age verification, unrestricted ability to contract with minors, and addictive design features. NetChoice asserts that

because Hulu, Disney+, or ESPN contain similar content to what may be found on YouTube, Reddit, or Dreamwidth, Nebraska must be making content-based preferences. Filing 18 at 23-24. But this fact makes the opposite point. The fact that Nebraska treats identical *content* differently based on the platform cements the fact that Nebraska is not concerned with the *content*, but the special characteristics of the *platform*. NetChoice ignores that Hulu, Disney+, and ESPN already require any new purchaser to be eighteen or older. Filing 24-1, ¶¶ 15-17. And social media captures a minor's attention with addictive design features unparalleled by Hulu, Disney+, and ESPN. Filing 24-21, ¶¶ 37-39.

User-generated speech versus provider-generator speech also fails to transform the challenged provisions into a content-based restriction. The "First Amendment does not impose a freestanding 'underinclusiveness' limitation." *Williams-Yulee v. Fl. Bar*, 575 U.S. 433, 449 (2015) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992)). "A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Id.* The challenged provisions arise from the understanding that social media and smartphones are worsening adolescent mental health. Filing 24-21, ¶¶ 89, 130. Since 2010, adolescent depression and anxiety rates, eating disorders, suicidal ideations and suicide attempts have markedly increased. *Id.* ¶¶ 26-37. The only plausible cause is the introduction of the smartphone and social media applications in 2010. *Id.* ¶ 63. The law addresses the deteriorating mental health of minors that is exacerbated by algorithmic personalized recommendations, now using artificial intelligence. *Id.*

¶¶ 39-40, 133; Filing 24-19 at 55 ("We're also focused on using existing data to inform our artificial intelligence technology."). In other words, the Nebraska Legislature was not targeting a particular type of content, but a particular business model that profits from child addiction. *See New Mexico v. Meta Platforms, Inc.*, *supra*; *A D, et al. v. Meta Platforms, Inc.*, *supra.*

NetChoice further claims the challenged provisions are content based because it restricts adults' and minors' access to social media sites. Filing 18 at 14-15. But this assertion is based on a false premise—none of the challenged provisions directly restrict access to any social media site. *Contra Packingham v. North Carolina*, 582 U.S. 98 (2017); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011). A covered platform may provide access to a minor (or an adult) without requiring age verification. None of the challenged provisions prevent a covered platform from granting access to a minor who is not an account holder. They only require age verification when a minor becomes an "account holder." L.B. 383 § 28(1)(a). Further, age verification does not create a material obstacle to becoming an account holder. There are various age assurance methods available to verify a new account holder's age, such as age inferences or biometric age estimation whereby the account holder waves their hand in front of the camera. Filing 24-20, ¶ 44; Filing 24-16 at 56. Although the method chosen must meet the reasonableness requirement, these methods can hardly be considered a burdensome "restriction" to creating an account.

The challenged provisions reflect the Nebraska Legislature's preference for parental consent and control over their child's social media use, not on the platform's

content. *See Turner I*, 512 U.S. at 658. The challenged provisions are a gatekeeping function. A covered platform cannot avoid or mitigate the effects of the challenged provisions by altering any content. And the legislative record clearly shows the legislators intended for the law to be content-neutral. Filing 24-14 at 54; Filing 24-16 at 54. And because the law is content-neutral, it is subject, at most, to intermediate scrutiny.

> *B.  Nebraska has an important interest in supporting parental rights and protecting the psychological well-being of minors.*

The Parental Rights Act survives intermediate scrutiny. Each of the challenged provisions give parents control over their child's social media usage to protect their child's metal health. This reinforces parental rights by recognizing the current systems are ineffective. There is no other way to give parents this control without an age check at the "digital doorway" and requiring parental consent and supervision for minors to enter this digital world.

If protecting the "psychological well-being of minors" is a compelling government interest, *Interactive Digit. Software Ass'n v. St. Louis Cnty., Mo.*, 329 F.3d 954, 958 (8th Cir. 2003), then it is certainly an important interest. Social media presents unique dangers to the well-being and mental health of minors. These platforms are designed to capture as much of a user's attention as possible, with disastrous effects on minors' mental health. Age verification, parental consent and revocation, and parental supervision give parents effective tools to regulate their child's screen time and proactively monitor the mental health effects before it is too

late. "36% more Nebraska adolescents took their own lives in 2021-24 than in 2006-10." Filing 24-21, ¶ 32.

Parental consent and supervision support a parent's fundamental rights to control their child. A parent's right to dictate their child's upbringing is deeply rooted in this Country's history. At its core, the Constitution recognizes "the fundamental right of parents concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Prince v. Mass.*, 321 U.S. 158, 166 (1944)). *Meyer v. Nebraska* recognized the right to "establish a home and bring up children" and "control the education of their own." 262 U.S. 390, 399 (1923). And *Pierce v. Society of Sisters* recognized that parents "have the right, coupled with the high duty, to recognize and prepare [their child] for additional obligations." 268 U.S. 510, 534-35 (1925).

Parental rights do not exist in a vacuum. "States may validly limit the freedom of children to choose for themselves in the making of important, affirmative choices with potentially serious consequences." *Bellotti v. Baird*, 443 U.S. 622, 635 (1979). A state could require doctors to notify the parents before performing an abortion, *id.* at 643; a state cannot withhold information about a child's mental health from a parent, *Mirabelli v. Bonta*, 607 U.S. ---, 146 S.Ct. 797 (2026); and a state cannot burden a parent's rights by interfering with their child's religious development. *Mahmoud v. Taylor*, 606 U.S. 522 (2025). Thus, the "role of parents in the upbringing of their children justifies limitations on the freedoms of minors." *Bellotti*, 443 U.S. at 637.

Parental rights do not take a back seat to their child's freedom of speech. A child's constitutional rights are not equal to an adult because of "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Bellotti*, 443 U.S. at 634. Parents "unique role in our society" requires "constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children." *Id.* The challenged provisions support the fundamental right of a parent to direct and control their child's upbringing and furthers this important government interest.

### C. Nebraska's important interests would be achieved less effectively absent the challenged provisions.

Without the challenged provisions, parents would continue to struggle to supervise their child's social media usage. The legislative record explains that the challenged provisions were enacted because the social media companies' parental tools were ineffective. Filing 24-16 at 53. These companies operate in a digital world without face-to-face encounters, so age verification and parental consent before entering this digital realm is the only way to ensure a minor does not contract without parental consent. Once on the platform, the current parental tools are ineffective because kids can easily bypass any router-level, network-level, and device-level restrictions that are imposed. Filing 24-20, ¶¶ 65-71.

To survive intermediate scrutiny, Nebraska need not adopt the least restrictive means of achieving its interests. *Free Speech Coal.*, 606 U.S. at 496. "[A] regulation

is adequately tailored so long as the government's interest 'would be achieved less effectively absent the regulation' and the regulation does not burden substantially more speech than is necessary to further that interest." *Id.* (quoting *TikTok*, 604 U.S. at 76). The challenged provisions are valid even if this Court does not agree "with the legislature concerning the most appropriate method promoting significant government interests' or the degree to which those interests should be promoted." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989)). The challenged provisions do not target expressive speech and Nebraska's important interests would be achieved less effectively absent the law. *Free Speech Coal.*, 606 U.S. at 496.

1. The only way to restrict social media companies from contracting with minors is to require age verification and parental consent.

Requiring parental consent before a minor creates a social media account directly is the only way to prevent social media companies from contracting with their child. Parental consent is not contingent on the content their child may view on social media but ensures a parent has control over the commercial transactions their child may enter. The First Amendment allows age verification and parental consent to supervise their child's online activities.

Age verification "is common when a law draws lines based on age." *Free Speech Coal., Inc.*, 606 U.S. at 479. Like many other states, Nebraska requires proof of age before purchasing alcohol, Neb. Rev. Stat. § 53-180.06; a lottery ticket, *id.* § 9-810(1); fireworks, Lincoln Mun. Code, ch. 9.44.030; and a driver's license, Neb. Rev. Stat. § 60-484(6). There are federal age requirements before obtaining certain medications

from a pharmacist, 21 C.F.R. §§ 1306.26(c), (d) (2024), selling tobacco, *id.* § 1140.14, or employing a minor, 29 C.F.R. § 570.5 (2024). "Fundamental rights that turn on age are no different." *Free Speech Coal., Inc.*, 606 U.S. at 479. Nebraska requires proof of age to purchase a handgun, Neb. Rev. Stat. § 69-2404; to marry, *id.* § 42-105, to get a tattoo or body piercing, *id.* § 38-10,165 (parental consent required if under eighteen years of age); and register to vote, *id.* § 32-308(5). "In none of these contexts is the constitutionality of a reasonable, bona fide age-verification requirement disputed." *Free Speech Coal., Inc.*, 606 U.S. at 479.

Parental consent before entering a contract is no different. For instance, parental consent is required before a minor opens a bank account. *See, e.g., Can a teenager have a bank account?*, Chase (last visited May 27, 2026) https://www.chase.com/personal/banking/education/basics/can-a-teenager-open-a-bank-account. In this context, social media companies do not get a constitutional pass to avoid age verification because their contracts are executed online.

Verifying the age of all new users and receiving parental consent before a minor creates a social media account does not target speech, but if there is a burden, it is merely incidental to the law's purpose. These provisions do not regulate the type of speech a user may engage in, nor impose a blanket prohibition on a minor's access to social media. *Contra Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 465-67 (2025). Age verification and parental consent complement the unchallenged provisions—if a parent does not know about their child's account, they cannot control their child's privacy or monitor and limit their child's screen time. It is no different than requiring

parental consent before a minor receives a tattoo or body piercing, which no one argues is unconstitutional. Neb. Rev. Stat. § 38-10,165; *see also Anderson*, 621 F.3d at 1059-60; *Buehrle*, 813 F.3d at 976. The Supreme Court has already found that age verification is constitutionally permissible even for adults accessing protected speech. *Paxton*, 606 U.S. at 465-67.

NetChoice's assertion that conditioning a minor's ability to contract with a social media company by requiring parental consent violates their members' First Amendment right because they cannot "speak" to a minor finds no support in the First Amendment. The First Amendment does not guarantee unconditional access to an audience. "Every individual's right to speak, precious and paramount as it is, does not include every individual's right to be given the possibility of an audience by government fiat[.]" *Midwest Video Corp. v. FCC*, 571 F.2d 1025, 1054 (8th Cir. 1978); *see also Phelps-Roper v. Ricketts*, 867 F.3d 883 (8th Cir. 2017). A NetChoice member's First Amendment right is to curate and compile third party speech, not the right to have an audience of minors with unconsenting parents. Age verification and parental consent do not "alter or disrupt" a social media company's compilation and curation of content.

2. Parental supervision is an effective way to ensure parents can protect their children from predatory behavior.

The parental supervision requirement does not *require* parents to supervise their children's communications, nor allow the State to monitor the child's communications. It merely provides parents with the same opportunity they have

when their children engage in expressive conduct in other forums. Even if it is possible this could cause the child to change their speech in some way, it does not unconstitutionally chill speech. It is the normal way a child behaves when a parent is watching. None of this is compelled by the legislation. It is only allowed.

NetChoice has not made a compelling case for why the Constitution requires a child's speech on the internet to be kept private and unobservable to parents who supervise all other aspects of their child's expressive conduct. This Court should be hesitant to make such a determination. As Justice Alito has cautioned, "[i]n considering the application of unchanging constitutional principles to new and rapidly evolving technology, this Court should proceed with caution." *Brown*, 564 U.S. at page (Alito, J. concurring).

To be clear, the possibility that some speech could be chilled is not enough for NetChoice to meet its burden, even if it were unconstitutional. NetChoice can only engage in speculation that speech will be chilled and does not account for the fact that many parents may not monitor their child's speech, or if speech will be chilled if they do. Filing 19-1, ¶ ¶ 34, 42. After all, parental supervision is not required, and it certainly does not provide for State supervision. NetChoice has no idea whether parents will monitor their children's communications, or how often, or how the child will respond. NetChoice's General Counsel—whose self-serving declaration that the challenged provisions violate the First Amendment is precisely the kind of interested testimony that carries no independent evidentiary value—can only speculate. *Id.* But even that speculation fails to consider the many cases where parents will not choose

to monitor their child's communications or where children will not care if they do. NetChoice has not, and cannot, meet its burden to show that it is unconstitutional in more applications than not. *Moody*, 603 U.S. at 724.

NetChoice has not, and cannot, point to any broad swath of speech that will be unconstitutionally chilled. And NetChoice has not accounted for the many ways in which speech will not be chilled at all. For instance, the broad category of parents that will choose not to monitor their child's communications and the broad category of children who will not care if the parents did. This realm of speculation is exactly what *Moody* said was insufficient to carry the burden of a facial challenge.

## IV. Even if strict scrutiny applies, the challenged provisions are narrowly tailored to further Nebraska's compelling interests.

The challenged provisions should not be subject to strict scrutiny because they are content-neutral and do not target any speech based on its communicative content. But even if strict scrutiny applied, the challenged provisions survive. Nebraska has enacted a narrowly tailored law that achieves its two compelling interests. First, the challenged provisions prevent the predatory business practice of contracting with minors without parental consent. Second, the challenged provisions protect minors' psychological well-being by giving parents the tools to protect their children as they see fit. The least restrictive means of preventing contracts with children without parental consent is to require parental consent. And requiring parental consent before an account is created and supervision of the account if consent is given is the least restrictive means to protect a minor's mental health, without prohibiting access.

NetChoice broadly claims that all the challenged provisions fail strict scrutiny. But its argument blurs the law's application to a social media company, and adult and minor account holders. NetChoice must show that there are substantially more unconstitutional applications than constitutional applications. *Moody*, 603 U.S. at 724. As stated above, the challenged provisions do not violate a NetChoice member's First Amendment right because it does not target the algorithm and there is no First Amendment right to an audience. *Midwest Video Corp.*, 571 F.2d at 1054. Thus, that leaves only the law's application to account holders.

Protecting the "psychological well-being of minors" is a compelling government interest. *Interactive Digit. Software Ass'n v. St. Louis Cnty., Mo.*, 329 F.3d 954, 958 (8th Cir. 2003). And parents have a fundamental right to control their child's upbringing and monitor their well-being. *See* § III(B), *supra*. The U.S. Surgeon General found in 2023, that up to ninety five percent of thirteen- to seventeen-year-olds in the United States use social media. Filing 24-22 at 4. And despite many social media platforms having a minimum age of thirteen, "nearly 40% of children ages 8-12 use social media." *Id.*; *see also* Filing 24-21, ¶ 85. Since 2012, youth unhappiness, depression, and suicidal ideation have noticeably increased. Filing 24-21, ¶¶ 27-36. Increased social media use leads to depression, body image issues and eating disorders, and low self-esteem. Filing 24-22 at 4. "Push notifications, autoplay, infinite scroll, 'likes', and algorithms that leverage user data … are some examples of features that maximize engagement." *Id.* at 9 (cleaned up).

Compulsive and repeated use leads to changes in brain structure like the changes seen in persons with substance abuse or gambling addictions. *Id.* This leads to negative downstream effects such as poor sleep, which is "linked to altered neurological development in adolescent brains, depressive symptoms, and suicidal thoughts and behaviors." *Id.* at 10. The devasting mental health effects are apparent in Nebraska adolescents. Filing 24-21, ¶¶ 32-36. Protecting minors from the harms associated with unfettered access to social media is a compelling government interest. And the challenged provisions are Nebraska's response to the growing problem presented by social media use.

These are profit-driven technology companies—more account holders equal more revenue. New Mexico's lawsuit against Meta demonstrates the little regard Meta has for teenagers' psychological well-being. Internal documents from Meta show that the company was aware that teenagers believe Instagram is causing severe mental health problems, Filing 24-17 at 3; the utter disregard for the mental health of teenage users, Filing 24-18 at 24-26, 50; and rather than implement effective systems to help teenagers, Meta chose to publicly deny the research showing the harm Instagram presents to teenagers all in an effort to retain as many teenage users as possible. Filing 24-19 at 18, 81-82.

The harm arises when a minor becomes an account holder. The addictive design features are triggered when an account is created, because that is when access to the platform occurs. Filing 24-8 at 1. So, creating an account and gaining access to the platform is when a minor's mental health is threatened.

To protect minors from the features designed to maximize engagement, parents must first consent before their child creates an account. If a parent does not want their child on social media, they may refuse to consent. The child could not then bypass their parent because the social media company must use a reasonable age verification method to verify the age of account holders. And if the parent does consent, the law mandates supervision tools be provided directly to the parent. The provisions are the least restrictive and most effective means to protect a minor's mental health without prohibiting access to the platforms.

The challenged provisions also further a compelling interest in protecting minors from the predatory business practices of social media companies. Creating an account triggers data collection and other oppressive contractual terms when applied to a minor. Filing 24-2 at 2-3. And contrary to NetChoice's assertion, once on the platform parents have ineffective tools to supervise and control their child's usage. Filing 24-20, ¶¶ 67-71.

The Constitution does not foreclose these reasonable, content-neutral regulations designed to protect minors and empower parents.

## V.   NetChoice cannot manufacture irreparable harm by waiting one year to challenge LB 383.

LB 383 was signed into law in May 2025, with an operative date of July 1, 2026. Rather than challenge the law at that time, NetChoice purposefully chose to wait until weeks before the operative date to seek preliminary injunctive relief. This

manufactured emergency does not justify issuing an injunction to prevent enforcement of a duly enacted law.

"[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). Failing to seek injunctive relief in a timely, reasonable manner is a reason to deny a party's request for a preliminary injunction. *See id.* ("At a minimum, Novus's failure to seek injunctive relief for a period of seventeen months after Dawson quit paying royalties 'vitiates much of the force of [Novus's] allegations of irreparable harm." (quoting *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977))); *Benisek*, 585 U.S. at 159.

On May 20, 2025, LB 383 was signed into law. Filing 1, Ex. A at 37. The operative date was approximately thirteen months later. Filing 24-12 at 2. Being dilatory does not equate to irreparable harm. They should not be able to now manufacture an emergency of their own doing. "At a minimum, [NetChoice's] failure to seek injunctive relief for a period of [twelve] months" after LB 383 was passed "vitiates much of the force of [NetChoice's] allegations of irreparable harm." *Novus Franchising, Inc.*, 725 F.3d at 895; *see also Benisek*, 585 U.S. at 159.

NetChoice has also failed to show it lacks an adequate remedy at law. *Gen. Motors Corp. v . Harry Brown's LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The challenged provisions are insignificant burdens on current operations,

notwithstanding the size of the company. A reasonable age verification method is a flexible, context-appropriate standard that accounts for commercially available processes. Filing 24-20, ¶¶ 40-53. Costs have decreased over the years as well, with international estimates approximating twelve cents ($0.12) per check. *Id.* ¶ 56. And the data in age verification is as secure as in financial transactions. *Id.* ¶ 58. The remaining systems that would need to be implemented to comply with the challenged provisions are "extensions of capabilities that already exist within social media platforms." *Id.* ¶¶ 92.

## VI. The balance of equities and public interest weigh in favor of allowing Nebraska to enforce the duly enacted Social Media Act.

NetChoice's manufactured emergency, combined with their unlikely success on the merits of their claims, weighs against enjoining enforcement of LB 383. The balance of equities and public interest merge into one factor "when a state official acting in her official capacity is the nonmoving party[.]" *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 929 (8th Cir. 2025) (citing *Eggers v. Evnen*, 48 F.4th 561, 564-65 (8th Cir. 2022)). The question on these factors is "whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place." *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025). Also, "the public interest is generally 'served by maintaining the ability to enforce the law adopted by the [State] Legislature,' [but] it is also 'always in the public interest to protect constitutional rights.'" *Ass'n for Accessible Medicines v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025) (quoting *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020)).

The status quo is permitting LB 383 to go into effect.[4] The law was duly enacted by the Nebraska Legislature and meant to prevent social media companies from contracting with minors without parental consent. The likely harm to Nebraska by preliminarily enjoining its ability to enforce LB 383 outweighs any manufactured harm to NetChoice members without a preliminary injunction. This is a case in which the public interest is served "by maintaining the ability to enforce law adopted by the [Nebraska] Legislature." *Ass'n for Accessible Medicines*, 140 F.4th at 961 (cleaned up). The countervailing public interest in protecting social media companies from regulation carries significantly less weight where NetChoice is not likely to succeed on their First Amendment claim. *Id.*

## Conclusion

For the above-mentioned reasons, the Court should deny NetChoice's request to preliminarily enjoin the enforcement of the challenged provisions in LB 383.

Dated June 5, 2026.

**MICHAEL HILGERS, in his official capacity as Attorney General of the State of Nebraska, Defendant.**

By: MICHAEL T. HILGERS, #24483
*Nebraska Attorney General*

By: *s/ Joseph W. McKechnie*
Joseph W. McKechnie, #27894
Joshua E. Dethlefsen, #24667
*Assistant Attorneys General*

---

[4] LB 383 contains a severability clause, which demonstrates the Nebraska Legislature "did not intend the validity of the statute … to depend on the validity of [any] constitutionally offensive provisions." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). If the Court finds any of the challenged provisions violate the First Amendment, Defendants ask the Court to sever the provision from the remainder of the law.

OFFICE OF THE ATTORNEY GENERAL
1445 K Street, Room 2115
Lincoln, NE 68509-8920
Telephone: (402) 471-2682
Fax: (402) 471-4725
Joseph.mckechnie@nebraska.gov
Joshua.dethlefsen@nebraska.gov

*Counsel for State of Nebraska.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to NE Civ. R. 7.1(d), the undersigned hereby certifies that the foregoing brief contains 9,828 words (including the caption, headings, footnotes, and quotations), as determined by the word count function of Microsoft Word for Microsoft Office 365.

By: *s/ Joseph W. McKechnie*
Joseph W. McKechnie, #27984
*Assistant Attorney General*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2026, I electronically filed the foregoing brief using the PACER/ECF electronic filing system, causing notice of such filing to be electronically served upon Plaintiff's counsel of record.

By: *s/ Joseph W. McKechnie*
Joseph W. McKechnie, #27894
*Assistant Attorney General*