IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| NETCHOICE,<br><br>        Plaintiff,<br><br>vs.<br><br>MICHAEL HILGERS, in his official capacity as Attorney General of the State of Nebraska,<br><br>        Defendant. | 4:26-CV-3149<br><br>MEMORANDUM AND ORDER |

The plaintiff, NetChoice, is an Internet trade organization representing companies who will be subject to the Nebraska Parental Rights in Social Media Act, L.B. 383, §§ 26-30, 109th Leg., 1st Sess. (Neb. 2025) (slip law) (hereinafter "LB 383"), which is expected to go into effect on July 1, 2026. This matter is before the Court on NetChoice's motion for a preliminary injunction to prevent the defendant, Michael Hilgers, the Attorney General of the State of Nebraska, from enforcing that law. The Court heard oral argument from both parties at a hearing on June 16, 2026.

For the reasons detailed below, the Attorney General is preliminarily enjoined from enforcing a section of the law, LB 383 § 28(1)(a), requiring a social media platform to "use a reasonable age verification method to verify the age of an individual seeking to become an account holder" on a social media platform. The Attorney General is also preliminarily enjoined from enforcing § 28(2), requiring "express parental consent authorizing" a minor to become an "account holder." The remaining provisions of LB 383 may be enforced, to the extent possible or practicable.

## I. STANDARD OF REVIEW

In determining whether to grant a preliminary injunction, the Court must consider the factors set forth in *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Those factors include: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id.* at 114. No single factor is dispositive, and the burden is on the movant to establish the propriety of the remedy. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

A plaintiff seeking to enjoin a state law must show it is "likely to prevail on the merits," a higher bar than "a fair chance." *See Iowa Safe Schs. v. Reynolds*, 172 F.4th 589, 594 (8th Cir. 2026). "In a First Amendment case, the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Id.*

In a facial challenge to a state law under the First Amendment, the Court's analysis is governed by *Moody v. NetChoice, LLC*:

> The first step in the proper facial analysis is to assess the state laws' scope. What activities, by what actors, do the laws prohibit or otherwise regulate? . . . Before a court can do anything else with a facial challenge, it must address that set of issues—in short, must determine what the law covers.
>
> The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest. . . . To decide [a] facial challenge, [district courts] must explore the laws' full range of applications—the

2

unconstitutionally permissible and the permissible both—and compare the two sets.

603 U.S. 707, 725-27 (2024) (internal quotations and citations omitted). The burden is on the plaintiff to show that unconstitutional applications outweigh constitutional ones. *Id.* at 744. The question is whether a "substantial number" of the law's applications are unlawful relative to the law's "plainly legitimate sweep." *Id.* at 723 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).

## II. BACKGROUND

### 1. LB 383

The Nebraska Unicameral passed LB 383 in May 2025. The law generally requires "social media companies" to obtain parental consent before allowing a minor[1] to open a social media account. *See* filing 24-15. It also requires those companies to "provide parents with oversight tools to monitor and manage their child's account activity" on social media platforms. *Id.*

LB 383 defines "social media company" as "a person that is an interactive computer service and that provides a social media platform." § 27(10). And a "social media platform" is "a website or Internet application that: (i) Allows a person to create an account; and (ii) Enables an account holder to communicate with other account holders and users through posts." § 27(11)(a). A "post" is "content"—that is, "a text, an image, or a video," § 27(2)(a)—"that an account

---

[1] "Minor means an individual who is: (a) Known or reasonably believed by a social media platform to be under eighteen years of age; (b) Not emancipated; and (c) A resident of [Nebraska]." § 27(5).

holder makes available on a social media platform for other account holders and users to view." § 27(8).

Certain types of platforms which otherwise meet the definition of "social media platform" are exempted, which are:

- email services;
- online shopping websites;
- websites that "provide[] primarily career development opportunities;"
- cloud storage websites; and
- websites "that consist[] primarily of content that is . . . preselected by the" website owner *and* where "interactive functionality is incidental to" that content.[2]

§ 27(11)(b).

Section 28 of LB 383 provides the substantive requirements for social media companies. A company "shall not permit a minor to become an account holder," unless "the parent of such minor provides express parental consent authorizing such minor to become an account holder." §§ 28(1)(a), 3(2). To prevent minors from creating accounts without consent, companies "must use a reasonable age verification method to verify the age of an individual seeking to become an account holder." § 28(1)(a). Parental consent also requires the company to verify the parent's age, and the parent to provide the company with a signed "oath, affirmation, or form." § 28(2)(b). Social media companies are not permitted to retain "any identifying information of an individual after verification is complete." § 28(1)(b).

---

[2] The parties appear to agree that this exception captures streaming services like Netflix, Disney+, Hulu, etc.

4

The bill also requires companies to provide parents of minor account holders "with methods for the parent to supervise the minor's account," including viewing all posts the minor makes and "all responses and messages sent to or by the minor account holder." § 28(4)(a)-(b). A parent must be able to control the minor's privacy and account settings and monitor the amount of time the minor spends using the platform. § 28(4)(c)-(d). And parents must be able to revoke consent for the minor's account. § 28(3).

The law is to be enforced by the Attorney General. § 29. Any individual, minor or adult, "aggrieved by any" violation of the law may seek certain damages, including if the social media company retains any identifying information pursuant to the age verification process. *See* § 29. The Attorney General may penalize social media companies that do not comply with the law, up to $2,500 "per violation." § 30.

## 2. LEGISLATIVE HISTORY

Nebraska is not alone in enacting statutes intended to protect minors from social media. In particular, the Nebraska bill was modeled after similar laws in Tennessee and Louisiana. Filing 24-13 at 64; *see NetChoice v. Murrill,* 812 F. Supp. 3d 594, 664 (M.D. La. 2025), *appeal docketed,* No. 26-30016 (5th Cir. Jan. 13, 2026) (permanently enjoining state from enforcing La. Rev. Stat. Ann. §§ 51:1751-1756 against certain NetChoice members); *NetChoice v. Skrmetti,* No. 3:24-cv-1191, 2025 WL 1710228 (M.D. Tenn. June 18, 2025) (denying motion for preliminary injunction as to Tenn. Code. Ann. § 47-18-5701 *et seq.*); *cf. NetChoice v. Griffin,* 812 F. Supp. 3d 905 (W.D. Ark. 2025), *appeal docketed,* No. 26-1096 (8th Cir. Jan. 16, 2026) (permanently enjoining similar law).

The sponsor for Nebraska's bill relied on a 2023 United States Surgeon General advisory involving the "effects of social media on youth mental health," filing 24-22. Filing 24-13 at 63; filing 24-16 at 52-53. That advisory indicated the "current body of evidence" supported the conclusion that social media "can have a profound risk of harm to the mental health and well-being of children and adolescents," based on the "harmful content exposure" of those sites, as well as harm from "excessive and problematic" use. Filing 24-22 at 4, 8.

The stated goal of the bill is to provide parents with more oversight tools and general authority over their children's social media usage. *See* filing 24-16 at 53. The bill's sponsor also discussed an interest in protecting minors from "predatory online behavior" and "the addictive and manipulative structure of social media." Filing 24-14 at 54.

### 3. OTHER EVIDENCE

According to the Attorney General's expert, an increased use of social media has caused a corresponding increase in mental health illnesses among adolescents. *See* filing 24-21 at 6, 17. The expert reviewed different research studies, with both regional Nebraska data and national data. While the datasets defined "social media" differently between studies, generally the data focused on platforms with "personalized feeds designed to maximize time spent" on the platform, and did not include "streaming services (such as Disney+, Netflix, or Hulu)." Filing 24-21 at 5.

The expert assessed that some material on social media sites was harmful to minors—such as "appearance-oriented videos" or "self-harm content." Filing 24-21 at 17. "Specific features of social media platforms," specifically "algorithmic (personalized) feed[s]," are linked to an increased use of social media and corresponding worsening mental health. Filing 24-21 at 19.

6

The expert report indicates that the more time minors spend on social media, the more likely they are to be depressed, to have body image issues, or to harm themselves. Filing 24-21 at 28, 30, 38, 39. The report also noted that individuals who deactivated or deleted social media accounts altogether had decreased depression and anxiety. *See* filing 24-21 at 43. The expert report did not discuss any scientific evidence regarding parental monitoring or control of social media use by minors.

According to NetChoice's evidence, at least some of NetChoice's members, who fall under the statutory definition of "social media platform," do not use personalized algorithmic feeds. *See* filing 19-2 at 4 (Dreamwidth.org); filing 19-3 at 5 (Nextdoor). Minors are also infrequent, minority users of Nextdoor. Filing 19-3 at 8. Several of NetChoice's members also provide tools for parents to monitor and restrict what their children can access on the platforms. Filing 19-1 at 10. Broader tools are available to parents who want to block access to certain websites altogether. Another of the Attorney General's experts asserts that the existing tools for parents are ineffective, and age-verification and parental consent are necessary for parents to adequately monitor their children's online activity. *See generally* filing 24-20.

## III. DISCUSSION

NetChoice is an organization that represents various companies indisputably captured by LB 383's definition of "social media company." It brings a pre-enforcement challenge to the law, seeking to enjoin certain provisions of LB 383 as facially unconstitutional. Specifically, it seeks to enjoin the State from enforcing § 28(1)-(3) of the law, requiring age verification and parental consent, and § 28(4)(a)-(b), requiring that a parent have the ability to view all posts and messages a minor makes, sends, or receives on the social

7

media platform. NetChoice does not challenge § 28(4)(c), requiring a parent be able to control a minor's privacy and account settings, nor § 28(4)(d), requiring a parent be able to monitor and limit the amount of time a minor spends using the platform.

The Attorney General argues that NetChoice lacks standing to assert the rights of minors or adults who use the platforms run by NetChoice's members. It also asserts that LB 383 does not regulate expressive conduct and therefore does not implicate the First Amendment. If the First Amendment does apply, the Attorney General argues LB 383 is content-neutral and only subject to intermediate scrutiny, which it survives. The State also argues it can survive strict scrutiny.

As outlined above, a preliminary injunction can only issue if a plaintiff can satisfy all of the *Dataphase* factors. And, a plaintiff can only prevail on a facial challenge to a state law under the First Amendment if it can prove the unconstitutional applications of the law outweigh the constitutional ones. *Moody*, 603 U.S. 707, 744.

Based on the evidence and argument provided by both parties, at this early, preliminary stage, NetChoice has met its burden of showing it is likely to succeed on the merits as to LB 383's age-verification and parental consent provisions. For the reasons explained below, NetChoice has shown that those provisions regulate expressive activity, are content-based and subject to strict scrutiny, and cannot survive that scrutiny. NetChoice has shown that the law is not narrowly tailored and its unconstitutional applications outweigh the constitutional ones. The remaining *Dataphase* factors are also satisfied.

However, NetChoice has not demonstrated that the challenged so-called "surveillance" requirements, § 28(4)(a) and (b), are constitutionally offensive.

Because LB 383 has a severability clause, the Attorney General may enforce those provisions, and the remaining, unchallenged provisions of the law.

### 1. LIKELIHOOD OF SUCCESS ON THE MERITS

### (a) Standing

Preliminarily, the Attorney General argues that, while NetChoice can assert the rights of its organizational members, *see, e.g., Iowa Ass'n of Bus. and Indus. v. Ommen*, 799 F. Supp. 3d 795, 818 (8th Cir. 2025), it cannot assert the rights of its member's users—that is, citizens (adults and minors) in Nebraska. Filing 25 at 8. NetChoice argues it does have standing on behalf of its members' users but, even if it did not, the First Amendment rights of its users are not only relevant, but a necessary part of the substantive *Moody* facial-challenge analysis.

"A plaintiff who has established a constitutional injury under a provision of a statute as applied to his set of facts may also bring a facial challenge, under the [First Amendment] overbreadth doctrine, to vindicate the rights of others not before the court under that provision." *See Sabri v. Whittier All.*, 833 F.3d at 995, 998-99 (8th Cir. 2016). To establish a constitutional injury, a plaintiff must show an injury in fact that is fairly traceable to the challenged conduct and is likely to be redressed by a favorable decision. *See id.* at 998.

It's undisputed that at least some of NetChoice's members will be directly regulated by LB 383, and will face monetary penalties for failing to comply with the law. And, at least one NetChoice member asserts that requiring age verification would cause a "significant number of prospective users to decline to join the platform." Filing 19-3 at 10. For reasons more thoroughly explained below, LB 383 regulates expressive conduct, and at least implicates NetChoice's members' First Amendment rights. Because NetChoice

9

can bring an as-applied challenge to the law, it has standing to raise this facial challenge. At this juncture, the Court need not determine whether NetChoice has standing to bring as-applied claims on behalf of social media users in Nebraska.[3]

### (b) *Moody* Analysis
### *(i) Scope of the Law*

The first step of the analysis to a facial overbreadth challenge is to determine what LB 383 actually covers. *Moody*, 603 U.S. 725. The parties dispute whether LB 383 regulates expressive or non-expressive activity. There's no "clear framework for determining whether a regulation of non-expressive activity that disproportionally burdens those in engaged in expressive activity triggers heightened review" under the First Amendment, *TikTok v. Garland*, 604 U.S. 58, 69 (2025), so the Court must address this threshold question.

According to the Attorney General, LB 383 applies only to non-expressive conduct: it regulates a social media company's ability to contract

---

[3] Generally, a plaintiff cannot assert the legal rights or interests of third parties. *Christian Lab. Ass'n v. Duluth*, 142 F.4th 1107, 1112 (8th Cir. 2025). An organization has standing to represent its members interests if at least some of its members possess individual standing to sue, the interests at stake relate to the organization's purposes, and neither the claims nor the requested relief requires individual member participation in the litigation. *Iowa Ass'n of Bus. and Indus.*, 799 F. Supp. 3d at 818. And, a vendor has standing to challenge the constitutionality of laws on behalf of its customers. *E.g., Craig v. Boren*, 429 U.S. 190 (1976). Courts have considered this relationship analogous to a social media platform and its users. *E.g., NetChoice v. Griffin*, No. 5:25-cv-5140, 2026 WL 1068565, at *5 (W.D. Ark. Apr. 20, 2026). At this point, the Court need not decide whether a vendor's standing in place of its customers satisfies the requirements for organizational standing.

with minors; it targets a website's functionality, not any speech; and it merely provides parents with "tools" to help monitor and control their minors' online activity. These, argues the Attorney General, are non-expressive activities outside of the scope of the First Amendment.

In general, access to social media platforms is protected by the First Amendment, as those platforms are one of the "most important places (in a spatial sense) for the exchange of views." *See Packingham v. North Carolina,* 582 U.S. 98, 104 (2017); *see also TikTok,* 604 U.S. at 68-69 (recognizing social media activities including "presentation of content," access to a "medium of expression," "association with another speaker or preferred editor," and "receipt of information and ideas," as protected activities) (collecting cases). While minors may be subject to more restrictions than adults, it's well-established that they nonetheless have substantial First Amendment rights, and "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials" to minors. *Brown v. Ent. Merch. Ass'n,* 564 U.S. 786, 795 (2011) (quoting *Erznoznik v. Jacksonville,* 422 U.S. 205, 212-13 (1975)).

The Supreme Court determined that the challenged law in *TikTok* regulated non-expressive conduct. Congress made it "unlawful for any entity to provide certain services to 'distribute, maintain, or update' a 'foreign adversary controlled application' in the United States," unless the application underwent a "'qualified divestiture.'" *Id.* at 65-66 (quoting Pub. L. 118-50, div. H, 138 Stat. 955). The Court characterized the law as a "regulation of corporate control," which was not a "*direct* regulation of expressive activity or semi-expressive conduct." *Id.* at 68.

On the other hand, in *Brown*, a state prohibited any person from selling or renting a "violent video game" to a minor, unless the game was "sold or

11

rented to a minor by the minor's parent, grandparent, aunt, uncle, or legal guardian." 564 U.S. at 789; Cal. Civ. Code. Ann. § 1746.1(c). While the law targeted sales—a commercial, arguably non-expressive act—the First Amendment was nonetheless implicated because the law directly restricted minors' access to certain content. *See Brown*, 564 U.S. at 799; *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 957 (8th Cir. 2003).

LB 383 regulates expressive conduct; it is more similar to the law at issue in *Brown* than the one in *TikTok.* By requiring age verification and parental consent to create an account, LB 383 has a direct impact on several protected First Amendment activities and materials. NetChoice has indicated account creation is necessary before a user can fully engage in the full range of expressive activity available on social media platforms. *See* filing 19-2 at 6; *cf. Felts v. Reed*, 504 F. Supp. 3d 978, 986 (E.D. Mo. 2020). Under the plain language of the statute, the age verification requirement is only triggered if account holders are able to "communicate with other account holders and users through posts." § 27(11)(a)(ii). It is expressive, communicative conduct inherent to a social media platform that triggers the law's restrictions, thereby implicating the First Amendment rights of both NetChoice members and their users. *See Moody*, 603 U.S. at 729-30 (a platform's "collection of third-party content," posts by account holders, "into a single speech product . . . is itself expressive, and intrusion into that activity must be specially justified under the First Amendment"); *cf. Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 812 (2019) (a private entity that hosts a place for public speech is able to "exercise editorial discretion over the speech and speakers in the forum"); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636-37 (1996).

Most courts have determined that restrictions like these warrant some level of First Amendment scrutiny. *E.g., NetChoice LLC v. Yost,* No. 25-3371,

12

2026 WL 1758907, at *10 (6th Cir. June 18, 2026); *Comp. & Commc'n Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *3 (11th Cir. Nov. 25, 2025) (citing *Minn. Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 581 (1983)); *NetChoice v. Reyes*, 748 F. Supp. 3d 1105, 1120 (D. Utah. 2024), *argued*, No. 24-4100 (10th Cir. Nov. 20, 2025); *cf. NetChoice v. Jones*, 822 F. Supp. 3d 656, 666 (E.D. Va. 2026), *appeal docketed*, No. 26-1252 (4th Cir. Mar. 6, 2026); *Brown*, 564 U.S. at 802; *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 482-83 (2025). *But see NetChoice, LLC v. Bonta*, 170 F.4th 744, 761-62 (9th Cir. 2026); *Students Engaged in Advancing Tex. v. Paxton*, No. 25-51073, 2026 WL 1615178, at *1 (5th Cir. June 4, 2026). This Court joins the majority.

*Moody* requires district courts to ask, "What activities, by what actors, do the laws prohibit or otherwise regulate?" 603 U.S. at 725. Here, the relevant activity directly regulated is a minor's account creation on a social media platform. NetChoice has indicated that the regulation inhibits a minor's ability to engage in protected First Amendment activity or see material protected by the First Amendment, and it restricts NetChoice's members' ability to exercise its discretion as to who may access its platforms. The actors directly regulated are social media companies, minors, and parents of minors, with an incidental burden on adults who must verify their age before making an account. That characterizes the scope of LB 383 as relevant to NetChoice's facial challenge. S*ome* form of First Amendment scrutiny is warranted.

### *(ii) Unconstitutional and Constitutional Applications*

The next step of the *Moody* analysis is to determine which applications of LB 383, if any, NetChoice can likely prove are unconstitutional, and weigh those applications against any constitutional ones. Because the law infringes on speech for the reasons explained above, the Court must first determine

13

which level of scrutiny applies, and then assess the law's "full range of applications." *Moody*, 603 U.S. at 727.

### (1) Scrutiny

Content-based laws—that is, laws that attempt to regulate speech "because of the topic discussed or the idea or message expressed"—are presumptively unconstitutional. *E.g., Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Such laws may be justified only if they can survive strict scrutiny: if the government proves the laws are narrowly tailored to serve compelling state interests. *Id.*

The "crucial first step in the content-neutrality analysis" is determining whether the law is content neutral on its face. *Id.* at 165. A facially content-based law is subject to strict scrutiny even in the presence of a benign government motive, a content-neutral justification, or a "lack of 'animus toward the ideas contained' in the regulated speech." *Id.* (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). The Supreme Court has consistently rejected the argument that a government must intend to suppress certain ideas or viewpoints to trigger strict scrutiny. *Id.*

But even laws requiring some evaluation of speech may nonetheless be content neutral. *E.g., Austin v. Reagan Nat'l Ad.*, 596 U.S. 61, 72 (2022). And, strict scrutiny is unwarranted if differential treatment is "justified by some special characteristic" of the particular "speaker" being regulated. *TikTok*, 604 U.S. at 73 (citing *Turner*, 512 U.S. at 661-62). But if a person can "avoid or mitigate its obligations" under a law by "altering" its subject matter, the law is likely content-based. *See id.*

The State asserts that LB 383 is content-neutral and subject to only intermediate scrutiny. Fatal to that argument are the exemptions in the

definitions of "social media platform" and "content." Exceptions in a law may render it content-based if the exceptions require consideration of the topic or subject matter to determine whether they apply. *Yost*, 2026 WL 1758907, at *11; *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (single content-based exception in ban on robocalls triggered strict scrutiny).

LB 383's exceptions require an evaluation of whether a platform "primarily provides career development opportunities," § 27(11)(b)(v). This exception, standing alone, demonstrates a facial governmental preference for career-related content over other types of protected material found on social media platforms.

The Attorney General argues that the law does not prefer the exempted sites over nonexempt sites based on the viewpoint or subject matter of the speech; the differential treatment is "justified by some special characteristics of the particular medium being regulated." *See* filing 25 at 21 (quoting *Turner*, 512 U.S. at 661); *see also TikTok*, 604 U.S. at 72. The State asserts the disparate treatment of nonexempt sites is because of those platforms' "lack of effective parental controls and age verification, unrestricted ability to contract with minors, and addictive design features." Filing 25 at 21

But the "special characteristics" identified in the Attorney General's brief aren't what LB 383 regulates. According to NetChoice's evidence, *see* filing 19-2 at 4, social media platforms without "addictive design features" are still subject to the age-verification and parental consent requirements—unless the platform involves specific subject matter, such as online shopping, career development opportunities, or discussions related or incidental to a platform's pre-selected content. The exempted platforms likewise lack age verification or restrictions on the ability to contract with minors.

In this case, to avoid or mitigate LB 383's requirements, a social media platform could alter its speech, and "primarily provide[] career development opportunities," § 27(11)(b)(v). The platform would not need to do anything else—such as change its design features, add more parental controls, or change its terms of service—to avoid enforcement. There's nothing "special" about the sites regulated compared to the sites exempted. The State's argument that the law is justifiable by "some special characteristic," at this early stage of the proceedings, is unpersuasive.

The Attorney General argues the exemptions are warranted because a government "need not address all aspects of a problem in one fell swoop," filing 25 at 22, but that argument goes to how narrowly tailored the legislation is, not whether or not it's content-based. LB 383 is facially content-based because determining whether it applies to a particular platform is based entirely on its "communicative content," *see Reed*, 576 U.S. at 164, not on any special function or feature of the platform.

Even if LB 383 *was* content neutral on its face, the legislative history indicates there was some effort to prevent minors from accessing speech about certain subject matter. The Attorney General himself testified, in committee, about the need to restrict the "inappropriate material" available to minors online; *e.g.,* content related to obscenity, drug use, body dysmorphia, and suicide. Filing 24-16 at 57. Much of that "inappropriate material" is presumptively protected by the First Amendment; only in "well-defined and narrowly limited classes of speech"—obscenity, defamation, fraud, incitement, and "speech integral to criminal conduct"—does the First Amendment allow content-based restrictions. *See United States v. Stevens*, 559 U.S. 460, 468-69 (2010); *cf. Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 191 (2021). The

16

evidence produced by the government further indicates a fear of some content being shown to minors, *see* filing 24-21 at 17.

At this early, preliminary injunction stage of the proceedings, LB 383 indicates a state preference for, at the very least, speech involving "career development" over other protected speech, such as discussion of religion or politics, *see, e.g., Packingham,* 582 U.S. at 104; filing 19-1 at 22. While there certainly may prove to be a legitimate—even compelling—reason to treat the exempted content differently from other speech on social media, the disparate treatment triggers strict scrutiny.

(2) Plainly Legitimate Sweep

There are likely some constitutional applications of LB 383. The law restricts a minor's access to social media platforms that contain unprotected speech, such as obscene, defamatory, fraudulent, inciteful, or criminal content. *See Free Speech Coal.,* 606 U.S. at 465 (states may require age verification to prevent children from accessing unprotected speech). But LB 383 also restricts access to speech about politics, religion, art, and other topics that make up "the very stuff of the First Amendment," *Republican Party of Minn. v. White,* 416 F.3d 738, 748 (8th Cir. 2005). Filing 19-1 at 22; *cf. Brown,* 564 U.S. at 795 n.3.

When asked whether the law had a "plainly legitimate sweep" at the hearing, the Attorney General reiterated that the law had a legitimate purpose; that is, the law was legitimate in all respects because it empowered parents to protect their children. The *Moody* analysis, then, seems to collapse into the strict scrutiny analysis. *See, e.g., Ams. for Prosperity Found.,* 594 U.S. at 615 (facial challenge was appropriate because, under exacting scrutiny, "[t]he lack of tailoring to the State's investigative goals is categorical—present in every case—as is the weakness of the State's interest"); *Students Engaged*

17

*in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 597 (W.D. Tex. 2025); *cf. Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1080 (8th Cir. 2024).

NetChoice can succeed on its facial challenge under *Moody*, if it can show that LB 383 has no legitimate sweep because, applying strict scrutiny, it is unconstitutional in all its applications. The State will prevail if it can show that LB 383 is narrowly tailored to serve a compelling interest of the government.

### (3) Strict Scrutiny

A content-based restriction on protected speech is invalid unless the government can demonstrate it passes strict scrutiny—that the law is justified by a compelling governmental interest and is narrowly drawn to serve that interest. *E.g., Brown*, 564 U.S. at 799; *Miller v. Ziegler*, 109 F.4th 1045, 1049 (8th Cir. 2024). These aren't necessarily two separate inquiries—whether an interest is sufficiently compelling "is informed by an examination of the regulation . . . purportedly addressing that end." *Republican Party of Minn. v. White*, 416 F.3d 738, 750 (8th Cir. 2005).

To show a "compelling interest," a government must do more than "simply posit the existence of the disease sought to be cured." *Interactive Digit.*, 329 F.3d at 958. Rather, a government "must come forward with empirical support" showing the restriction on speech will materially and directly alleviate some specific, concrete societal harm. *See id*. at 958-59. A narrowly tailored regulation "must be the least-restrictive alternative, not too under- or over-inclusive." *Miller*, 109 F.4th at 1052. A law that "regulates both too little and too much" fails strict scrutiny. *See id.*

Empirical data supports the Attorney General's contention that increased social media use has caused a "mental health crisis" in Nebraska and

18

other states. *See* filing 24-21 at 27. That is, the government has empirical evidence that increased social media use has caused increased "depressive symptoms, depression, self-harm, suicidal thoughts, suicide, and eating disorders" among adolescents since 2014. *See* filing 24-21 at 16-17, 27.

The Attorney General's expert asserts that increased social media use, in general, causes increased mental health problems among adolescents. Filing 24-21 at 50. That conclusion rests on how algorithmic, personalized feeds "can exacerbate existing mental health issues." *See* filing 24-21 at 17. The expert asserts that mental health disorders are driven by content about self-harm, suicide, and eating disorders, *see* filing 24-21 at 17, or when an adolescent receives "negative feedback, which is common on social media," filing 24-21 at 37.

The problem for the Attorney General is that LB 383 is not tailored, let alone narrowly tailored, to algorithmic, personalized feeds, nor any of the other specific features identified in the evidence. The Court is not persuaded, at this early stage of the proceeding, that every platform captured by LB 383—every platform that allows its account holders to share content with each other—is causing the harm identified. The Attorney General appears to contend that social media platforms, writ large, are causing endemic mental health problems. That's not borne out by the evidence at this early stage.

The Attorney General argues that a law is content-neutral, and constitutional, if it targets a platform's "addictive," harmful functions. That might be true, but that's not what LB 383 does. The definitions in the law cover platforms without those features, *see* filing 19-2 at 4, and exclude platforms that have them, *see* filing 31 at 13. Put another way, the law is not narrowly tailored to directly and materially alleviate the identified societal harm.

19

The Attorney General raises additional governmental interests that purportedly justify LB 383: preventing the "predatory business practice of contracting with minors without parental consent," and supporting parents' fundamental right to protect their children. Filing 25 at 31.

The State's purported interest in regulating contracts with minors is vague, and unsupported by any empirical evidence at this stage. That alone is insufficient to survive strict scrutiny. *See Interactive Digit.*, 329 F.3d at 958. Even if regulating such contracts was a compelling interest, there's no evidence showing that the contracts with social media platforms are driving the adolescent mental health crisis. Or, stated another way: The State's evidence indicates that some features of social media may be harmful to minors, but doesn't indicate that any of those features are *more* harmful if the minor enters into a contract.

Furthermore, there's no reference to "contracts" or any particularly onerous terms or conditions in the text of the legislation. *Cf. Yost*, 2026 WL 1758907, at *4 (Ohio law required certain websites to obtain parental consent "for any contract with a child"). Nor has the Attorney General explained why the existing body of contract law is insufficient to protect minors from social media companies' contracts. The law is not tailored, let alone narrowly tailored, to prevent harms associated with contracting with minors.

Supporting parents' rights to parent their children is also not a compelling interest. In reviewing a local ordinance barring minors from obtaining "graphically violent video games" unless they had parental consent, the Eighth Circuit wrote:

> While it is beyond doubt that "parents' claim to authority in their
> own household to direct the rearing of their children is basic in the

20

structure of our society," *Ginsberg v. New York*, 390 U.S. 629, 639 (1968), the question here is whether the County constitutionally may limit first amendment rights as a means of aiding parental authority. We hold that, under the circumstances presented in this case, it cannot.

. . . .

Nowhere in *Ginsberg* (or any other case that we can find, for that matter) does the Supreme Court suggest that the government's role in helping parents to be the guardians of their children's well-being is an unbridled license to governments to regulate what minors read and view.

We do not mean to denigrate the government's role in supporting parents, or the right of parents to control their children's exposure to graphically violent materials. We merely hold that the government cannot silence protected speech by wrapping itself in the cloak of parental authority.

*Interactive Digit.*, 329 F.3d at 959-60; *cf. Brown*, 564 U.S. at 802.

The Attorney General argues that LB 383 is unlike the laws in *Interactive Digital* and *Brown* because it is not a *complete* ban on minors' access to social media. According to the Attorney General, "*Brown* rejected California's parental rights argument because minors whose parents did not object were still prohibited from purchasing the video game . . . . Unlike *Brown*, the challenged provisions allow minors to become account holders with parental consent." Filing 25 at 13.

But that misunderstands the holding in *Brown*. The Supreme Court determined the "ban" on violent video games was "seriously underinclusive"

because it *wasn't* a complete ban—the state legislature was "perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent . . . says it's OK." *Brown,* 564 U.S. at 802. The unconstitutional law in *Interactive Digital* similarly allowed minors to access the proscribed material with a parent's consent. 329 F.3d at 956. LB 383 works just the same: it bars minors from participating in certain protected activities unless and until they obtain parental consent. This is an impermissible way for a government to support parental authority. *See Brown,* 564 U.S. at 804; *Interactive Digit.,* 329 F.3d at 960.

In at least one way, LB 383 is better tailored than the law in *Brown.* The Supreme Court determined that the video game industry had, itself, implemented a system that prevented minors from obtaining "adult" games. 564 U.S. at 803. That system already did "much to ensure that minors cannot purchase" the content proscribed by statute, so "parents who care about the matter can readily evaluate the games their children bring home" without the government's involvement. *Id.* The state could therefore not show the restrictions met a "substantial need of parents" who wanted to restrict their child's access to violent video games. *Id.*

NetChoice provided evidence that cell phone service providers, Internet providers, and Internet browsers already enable parents to fully block social media platforms, either fully or for specified hours. *See* filing 19-1 at 6-7. The social media platforms themselves also contain ways for parents to restrict or control a minor's use of the platform, and many platforms require users to be at least 13 years old before making an account. But the Attorney General's evidence indicates these tools aren't enough. Minors can easily lie about their age and create accounts not subject to their parents' preferred restrictions, and they can access accounts on websites banned at home at other locations. *See*

22

filing 24-20 at 20. A parent is unable to effectively grant their child *some* access to social media. The only way for parents to be aware of their children's online activity, argues the Attorney General, is to require age verification.

But this distinction between the law in *Brown* and LB 383 is not enough to overcome the Nebraska law's other deficiencies. On the whole, the law is not tailored to solve the identified problem: increased use of social media platforms, and some platforms' utilization of "addicting" features, driving a mental health crisis among adolescents. Rather, NetChoice has demonstrated it is likely to prevail in showing the unconstitutional applications of LB 383 outweigh the constitutional ones because LB 383 too broadly restricts minors' ability to access and engage in protected speech, even where speech does not pose the identified risk of harm.

### (4) Intermediate Scrutiny

Even if intermediate scrutiny applied, the age-verification and parental consent provisions fail. A law will be upheld under that scrutiny if it advances an important government interest unrelated to the suppression of free speech, and does not burden substantially more speech than necessary. *See TikTok,* 604 U.S. at 70.

For much the same reasons explained above, LB 383 burdens substantially more speech than necessary to fulfill the government's interests. Rather than targeting only platforms "designed to capture as much of a user's attention as possible," as the Attorney General argues, filing 25 at 24, the law covers *any* website that permits users to make an account and share content with other users. There's no connection between the asserted governmental interests and the actual text of LB 383; the breadth of the law covers substantially more speech than necessary.

23

If the Unicameral had wanted to focus on harmful contract terms or addictive features, it could have done so. *See Yost*, 2026 WL 1758907, at \*4; *Griffin*, 812 F. Supp. 3d at 914. But LB 383 is not that law. The speech burdened is substantially more than is necessary to curb excessive social media use by minors, to promote parental authority, or to protect minors from contracts. NetChoice is likely to prevail in showing LB 383 cannot survive intermediate scrutiny.

### (c) Severability

Having found at least some portions of LB 383 are unconstitutional, the next question is whether the entire law is unconstitutional, or if those provisions are severable. *See, e.g., Barr*, 591 U.S. at 623; *Phelps-Roper v. Koster*, 713 F.3d 942, 953 (8th Cir. 2013). Under Nebraska law, where unconstitutional portions of an act can be separated from the valid portions and enforced independently, the Court may uphold the valid portions of the statute and reject the invalid. *See State ex rel. Meyer v. Duxbury*, 160 N.W.2d 88, 94 (Neb. 1968).

LB 383 contains a severability clause, § 32. This is an "aid to interpretation, and is a declaration of the intent of the Legislature that it would have passed the act with the invalid parts omitted." *Id.* Courts generally presume a statute is severable, and "hew closely to the text of severability" clauses. *See Barr*, 591 U.S. at 624.

The parties do not appear to dispute that it is possible to sever the age verification and parental consent provisions from the rest of LB 383. NetChoice, in fact, explicitly chose to only challenge certain provisions of the Act. Filing 18 at 9. Given the unequivocal severability clause in the law, the Court finds that LB 383 §§ 28(1)(a) and 28(2) are severable from the remaining

24

provisions. NetChoice separately challenges two other provisions of the law, but no others. The Court will assess the constitutional validity of those provisions.

## (d) Section 28(4)(a) and (b)

Compared to the age verification and parental consent provisions, the parties spend relatively little time discussing the other challenged requirements: that social media companies allow a parent to "[v]iew all posts the minor account holder makes under the social media account" and to "[v]iew all responses and messages sent to or by the minor account holder in the social media platform account." § 28(4)(a) and (b). The Court is not persuaded that NetChoice has demonstrated it is likely to be successful on the merits on this issue.

Unlike the age-verification and parental consent requirements, these requirements allow, but do not mandate, parents to monitor what their children are seeing and saying on a platform. For that reason, this regulation doesn't have the problems addressed above—at bottom, it does not "impose governmental authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. At this early stage, these provisions appear to be narrowly tailored to alleviate the identified harms of unmonitored social media activity by minors, and do not offend the Constitution.

## 2. REMAINING *DATAPHASE* FACTORS

"In a First Amendment case, the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Iowa Safe Schs.*, 172 F.4th at 594. Based on its conclusion that NetChoice is likely to succeed on the merits of its First Amendment claim, the other

25

*Dataphase* factors weigh in its favor. Irreparable harm results for any time a First Amendment freedom is lost, and it is always in the public interest to protect constitutional rights. *Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025).

The Attorney General argues that NetChoice is effectively estopped from claiming irreparable harm because it waited a year after LB 383 was signed to bring this lawsuit. Filing 25 at 34. But the Court is satisfied that NetChoice filed its lawsuit in an appropriate time. The current legal landscape in this area is changing almost every day. Even now, the Court is continually reviewing pending cases—since NetChoice filed its motion, no fewer than two circuit courts have weighed in on the issue. There was no way for NetChoice to know, until enforcement was actually imminent, that the Attorney General would (or could) enforce LB 383.

NetChoice has satisfied all of the *Dataphase* factors warranting a preliminary injunction as to the age-verification and parental consent provisions of LB 383. Accordingly,

IT IS ORDERED:

1.    The plaintiff's motion for a preliminary injunction (filing 17) is granted in part, and denied in part.

2.    The Attorney General is preliminarily enjoined from enforcing LB 383 § 28(1)(a), requiring a social media platform to "use a reasonable age verification method to verify the age of an individual seeking to become an account holder" on a social media platform, and § 28(2), requiring

26

"express parental consent authorizing" a minor to become an "account holder."

3.    The remaining provisions of LB 383, including §§ 28(4)(a) and (b)—requiring a social media platform to provide parents with the option to view all posts, messages, and responses a minor makes, sends, or receives on the platform—are likely to survive constitutional scrutiny, and may be enforced by the Attorney General.

4.    This case is referred to the Magistrate Judge for case progression.

Dated this 27th day of June, 2026.

BY THE COURT:

John M. Gerrard
Senior United States District Judge

27